UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

INFOLINK PANAMA CORPORATION,
a Panama corporation, FORTATRUST
USA CORPORATION, a Delaware
corporation,

CASE NO.:

       Plaintiffs,

v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

       Defendants.

_____/

## **NOTICE OF REMOVAL**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW Defendant, CoreSpace, Inc., a Texas corporation, ("Defendant") by and through its undersigned counsel, and hereby files this Notice of Removal to the United States District Court for the Southern District of Florida, Miami Division, pursuant to 28 U.S.C. §1441(b) based upon complete diversity of citizenship, and would respectfully show the Court as follows:

1.     On or about March 3, 2014, an action was commenced against Defendants in the Eleventh Judicial Circuit in and for Miami Dade County, Florida, Circuit Civil Division, styled: *Infolink Panama Corporation and Fortatrust USA Corporation v. Corespace, Inc, Mark Wulff and Liana Dunlap,* Case No. 14-10104-CA-4. A copy of all process, pleadings, and orders served in the State Court action are attached hereto and incorporated herein by reference as follows:

| | |
|---|---|
| **Exhibit A.** | Civil Cover Sheet |
| **Exhibit B.** | Plaintiff's Complaint |
| **Exhibit C.** | Request for Admissions to Liana Dunlap |
| **Exhibit D.** | Request for Admissions to Mark Wulff |
| **Exhibit E.** | Notice of Filing Verified Return of Service regarding CoreSpace, Inc. |
| **Exhibit F.** | Motion for Default Against CoreSpace, Inc. and Default |
| **Exhibit G.** | Notice of Removal filed with Eleventh Judicial Circuit Court, Miami-Dade County, Florida |

2.      Pursuant to 28 U.S.C. §1446(b), this Notice of Removal is being filed within thirty (30) days after the alleged receipt by Defendant of service of Plaintiff's Complaint in State Court.[1]

3.      Removal venue is appropriate to this Court because the Miami Division of the Southern District of Florida embraces the place where the State Court action is pending.

4.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction), and this case is removable pursuant to 28 U.S.C. §§ 1441(b) and 1446.  According to the Complaint, Plaintiff Infolink Panama Corporation is a Panama corporation with its principal place of business in Panama, and Plaintiff Fortatrust USA Corporation is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.  Defendant CoreSpace, Inc. is a Texas corporation with its principal place of business in Dallas, Texas.  Defendants, Mark Wulff and Liana Dunlap are both citizens of the State of Texas.  Pursuant to the Complaint, the amount in controversy exceeds $75,000.00[2], exclusive of interest and costs.

5.      Although not served in the State Court action as of this date, Defendants Mark Wulff and Liana Dunlap consent to removal and join in this Notice of Removal. However, the

---

[1] Defendant, CoreSpace, Inc. contests that it was properly served with the Plaintiff's Summons and Complaint on May 7, 2014, and is preserving the right to file the appropriate motion to vacate the default entered in the State Court action on May 29, 2014.

[2] Ex. B (Complaint., p. 6-7, ¶ 35 ("Plaintiffs continued to be deprived of their servers, are hamstrung in the ability to continue doing business, furnished valuable proprietary information to Defendants, and passed on an opportunity to sell Plaintiffs' assets to Colo Crossing for $600,000.00, as well as a position for Leary within the Colo Crossing team.")).

consent given by Wulff and Dunlap shall not serve as a waiver of the Plaintiffs' obligation to serve these individual defendants with the lawsuit and process.

6.     Contemporaneous with the filing of this Notice of Removal, Defendant has given the Eleventh Judicial Circuit, Miami-Dade County, Florida, written notice of the same, a copy of which is attached hereto.

WHEREFORE, Defendant CoreSpace, Inc. requests that this Court take jurisdiction over this matter as an action properly removed to it.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on Jason H. Weber, Esquire, Xander Law Group, P.A., One N.E. 2nd Avenue, Suite 200, Miami, Florida 33132 jason@xanderlaw.com on June 6, 2014.

> **SHRAIBERG, FERRARA & LANDAU, P.A.**
> Attorneys for Defendants
> 2385 N.W. Executive Center Dr., Suite 300
> Boca Raton, Florida 33431
> Tel: (561) 443-0800
> Fax: (561) 998-0047
> Primary email: jferrara@sfl-pa.com
> Secondary email:  scusack@sfl-pa.com
>
>
> By: /s/ James T. Ferrara
>      James T. Ferrara
>      Florida Bar No. 764825

# EXHIBIT "A"

Filing # 12624655 Electronically Filed 04/17/2014 12:01:43 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

CIRCUIT/CIVIL DIVISION

CASE NO.:


INFOLINK PANAMA CORPORATION, a Panama
corporation, FORTATRUST USA CORPORATION,
a Delaware corporation,

       Plaintiffs,

v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

       Defendants.

_____/

## CIVIL COVERSHEET

**I.    TYPE OF CASE**    (If the case fits more than one type of case, select the most definitive category.)  If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

- [ ] Condominium
- [ ] Contracts and indebtedness
- [ ] Eminent domain
- [ ] Auto negligence
- [x] Negligence-other
  - [ ] Business governance
  - [x] Business torts
  - [ ] Environmental/Toxic tort
  - [ ] Third party indemnification
  - [ ] Construction defect
  - [ ] Mass tort
  - [ ] Negligent security
  - [ ] Nursing home negligence
  - [ ] Premises liability-commercial
  - [ ] Premises liability-residential
- [ ] Products liability
- [ ] Real property/Mortgage foreclosure
- [ ] Commercial foreclosure $0 - $50,000
- [ ] Commercial foreclosure $50,001 - $249,999
- [ ] Commercial foreclosure $250,000 or more

- [ ] Homestead residential foreclosure $0 - $50,000
- [ ] Homestead residential foreclosure $50,001 - $249,999
- [ ] Homestead residential foreclosure $250.000 or more
- [ ] Nonhomestead residential foreclosure $0 - $50,000
- [ ] Nonhomestead residential foreclosure $50,001 - $249,999
- [ ] Nonhomestead residential foreclosure $250,000 or more
- [ ] Other real property actions $0 - $50,000
- [ ] Other real property actions $50,001 - $249,999
- [ ] Other real property actions $250.000 or more
- [ ] Professional malpractice
  - [ ] Malpractice-business
  - [ ] Malpractice-medical
  - [ ] Malpractice-other professional
- [ ] Other
  - [ ] Antitrust/Trade regulation
  - [ ] Business transactions
  - [ ] Constitutional challenge-statute or ordinance

☐ Constitutional challenge-proposed amendment
☐ Corporate trusts
☐ Discrimination-employment or other
☐ Insurance claims
☐ Intellectual property

☐ Libel/Slander
☐ Shareholder derivative action
☐ Securities litigation
☐ Trade secrets
☐ Trust litigation

**II.**     **REMEDIES SOUGHT** (check all that apply):

☒ monetary
☒ nonmonetary declaratory or injunctive relief;
☐ punitive

**III.**     NUMBER OF CAUSES OF ACTION: ___4___

(specify) Count I – Fraud in the Inducement; Count II – Breach of UCC; Count III – Unjust Inrichment; Count IV – Florida Deceptive and Unfair Trade Practices Act

**IV.**     IS THIS CASE A CLASS ACTION LAWSUIT?

☐ yes
☒ no

**V.**     HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒ no
☐ yes   If "yes," list all related cases by name, case number, and court.

**VI.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**

☒ yes
☐ no

_____

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____ s/Jason H. Weber _____     Fla. Bar # 86832
Xander Law Group, P.A.                             (Bar # if attorney)
One N.E. 2nd Avenue, Suite 200
Miami, Florida 33132
(305) 767-2001

Jason H. Weber, Esquire                     April 17, 2014 _____
/s/ Jason H. Weber                             Date
(Type or print name)

2

# EXHIBIT "B"

Filing # 12624655 Electronically Filed 04/17/2014 12:01:43 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,
a Panama corporation, FORTATRUST
USA CORPORATION, a Delaware
corporation,

        Plaintiffs,

v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

        Defendants.

_____/

CIRCUIT/CIVIL DIVISION

CASE NO.:

## COMPLAINT

Plaintiffs, INFOLINK PANAMA CORPORATION ("Infolink Panama") and FORTATRUST USA CORPORATION ("Fortatrust") (collectively "Plaintiffs"), by and through undersigned counsel, hereby sue Defendants CORESPACE, INC. ("Corespace"), MARK WULFF ("Wulff"), and LIANA DUNLAP ("Dunlap") (collectively "Defendants"), and allege:

### PARTIES, JURISDICTION AND VENUE

1.    This is an action for damages in excess of fifteen thousand dollars ($15,000.00), and is otherwise within the jurisdiction of this court.

2.    Venue is proper in Miami-Dade County, Florida because the cause of action accrued in Miami-Dade County, Florida.

3.    Plaintiff Infolink Panama Corporation is a Panama corporation with its principal place of business being in Panama.

4.      Plaintiff Fortatrust USA Corporation is a Delaware corporation with its principal place of business being in Miami-Dade County, Florida.  Fortatrust is a wholly owned subsidiary of Infolink Panama.

5.      Defendant Corespace, Inc. is a Texas corporation with its principal place of business being in Dallas, Texas.

6.      Defendant Mark Wulff is a resident of Texas, and is *sui juris*.

7.      Defendant Liana Dunlap is a resident of Texas, and is *sui juris*.

8.      The Court may exercise jurisdiction over Defendants because Defendants engage in substantial, and not isolated activity within the state, and because the cause of action arises from: (i) Defendants' carrying on a business or business venture in this state or having an office or agency in this state; (ii) Defendants' committing a tortious act within the state; and (iii) Defendant's causing injury to persons or property within the state while Defendants engaged in the solicitation of services within the state.

## GENERAL ALLEGATIONS

9.      Infolink Panama is in the business of providing cloud computing services.  In late-2013/early-2014, Infolink Panama desired to sell its assets, and engaged the firm of Cheval Capital, Inc. in order to do so.  Cheval Capital introduced Infolink Panama to Defendant Wulff, one of the principals for Defendant Corespace.

10.     Infolink Panama then entered into extensive confidential negotiations with Defendants Wulff and Dunlap (also a principal of Corespace) regarding the potential purchase of Infolink Panama's assets by Corespace.  These negotiations included Fortatrust and Corespace entering into a Mutual Confidentiality Agreement (attached hereto as **Exhibit A**).  The product of these negotiations was the Letter of Intent (attached hereto as **Exhibit B**).

11.    Around the same time as Plaintiffs received the Letter of Intent from Corespace, they also received a Term Sheet (attached hereto as **Exhibit C**) from Velocity Servers, Inc. d/b/a Colo Crossing.  However, Plaintiffs chose to pursue the Letter of Intent with Corespace because Wulff and Dunlap represented to Plaintiffs that Corespace would be able to complete the deal quickly.

12.    The Letter of Intent was not in the name of Corespace, but rather, it was in the name of Voyage Technologies, Inc. with a Reno, Nevada address.  Notably, there is a Minnesota corporation with an identical name, and which advertises similar services to Corespace.

13.    When Plaintiffs' principal, Prieur Leary, asked Wulff and Dunlap about the name of Voyage Technologies being on the Letter of Intent, Wulff and Dunlap represented that Voyage Technologies was one of Corespace's companies, and that Leary should not worry about it.

14.    To consummate the deal, Plaintiffs entered into a co-location agreement whereby certain of Plaintiffs' assets would be moved from Doral, Florida and Panama to Dallas, Texas, where Corespace is located.  Documents comprising the Co-location Agreement (attached hereto as **Composite Exhibit D**).  Defendants induced Plaintiffs to transfer these assets by promising an immediate payment upon the completion of the transfer.

15.    Plaintiffs entered into the Co-location Agreement with a company called Ace Colocation, Inc.  When Leary asked Wulff and Dunlap why this agreement was in the name of Ace Colocation, rather than Corespace, Wulff and Dunlap they again told Leary not to worry about it, and that Ace Colocation was another of Corespace's companies.

16.     Plaintiffs' servers were transferred to Corespace's facility in or about January, 2014.  To date, Plaintiffs have received no payments in exchange for the server, despite Defendants Wulff and Dunlap's representations of immediate payment.

17.     At the request of Wulff and Dunlap, Fortatrust furnished quotations, analysis, and proposals for the migration of Fortatrust's live customer servers to Corespace's Dallas facilities. Despite the representations made by Defendants, no plan or funding for this task was approved by Defendants.

18.     Plaintiffs have retained the undersigned attorneys and are required to pay a reasonable fee for attorneys' services incurred in connection with the institution, maintenance, and prosecution of this Action.

19.     All conditions precedent to the institution and maintenance of this Action have been performed, waived, or have otherwise occurred.

## COUNT I
## FRAUD IN THE INDUCEMENT

20.     Plaintiffs reallege and incorporate Paragraphs 1 through 19 as if fully set forth herein.

21.     In the course of their negotiations with Plaintiffs, Defendants made a number of misrepresentations of material fact.   Specifically, Defendants represented that Defendant Corespace would be purchasing Plaintiffs' assets, and that the deal would be completed quickly. Both these representations turned out to be false.

22.     Defendants knew or should have known that the representations were false.

23.     Defendants knew that the misrepresentation would induce Plaintiffs to rely and act upon them.

24.     Plaintiffs suffered injury in justifiable reliance on the representations by transferring their servers to Defendants' facility in Dallas, and by foregoing another letter of intent to purchase Plaintiffs' assets.   Plaintiffs continue to be deprived of their servers, are hamstrung in their ability to continue doing business, furnished valuable proprietary information to Defendants, and passed on an opportunity to sell Plaintiffs' assets to Colo Crossing for $600,000.00, as well as a position for Leary within the Colo Crossing team.

WHEREFORE, Plaintiffs Infolink Panama and Fortatrust demand the entry of a judgment against Defendants Corespace, Wulff, and Dunlap for money damages, the return of Plaintiffs' assets, and any applicable prejudgment and postjudgment interest, and any other relief the Court deems just and proper.

## COUNT II
## BREACH OF UCC

25.     Plaintiffs reallege and incorporate Paragraphs 1 through 19 as if fully set forth herein.

26.     By transferring its servers to Defendants' Dallas location, Plaintiffs sold Defendants "goods," as defined by Florida Statute § 672.105(1).

27.     Defendants have failed to make payments for these goods.

WHEREFORE, Plaintiffs Infolink Panama and Fortatrust demand the entry of a judgment against Defendants Corespace, Wulff, and Dunlap for the remedies available to sellers under Florida Statute § 672.703, including those remedies described in Florida Statutes § 672.708 and § 672.709 and postjudgment interest, and any other relief the Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT

28.     Plaintiffs reallege and incorporate Paragraphs 1 through 19 as if fully set forth herein.

29.     Plaintiffs have conferred a benefit upon Defendants by transferring servers to their facilities in Dallas.

30.     Defendants have knowledge of the benefit conferred.

31.     Defendants have accepted or retained the benefit conferred.

32.     The circumstances are such that it would be inequitable for the Defendants to retain the benefit without paying full value for it.

WHEREFORE, Plaintiffs Infolink Panama and Fortatrust demand the entry of a judgment against Defendants Corespace, Wulff, and Dunlap for money damages, disgorgement of any profits, and any applicable prejudgment and postjudgment interest, and any other relief the Court deems just and proper.

## COUNT IV
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

33.     Plaintiffs reallege and incorporate Paragraphs 1 through 19 as if fully set forth herein.

34.     Defendants engaged in deceptive acts, unfair practices, unfair methods of competition, and unconscionable acts or practice in the conduct of trade or commerce. Specifically, they led Plaintiffs to believe that Corespace would be purchasing Plaintiffs' assets, and that the deal would be concluded quickly.

35.     Defendants' actions caused Plaintiffs to suffer actual damages.   Plaintiffs continued to be deprived of their servers, are hamstrung in their ability to continue doing

business, furnished valuable proprietary information to Defendants, and passed on an opportunity to sell Plaintiffs' assets to Colo Crossing for $600,000.00, as well as a position for Leary within the Colo Crossing team.

WHEREFORE, Plaintiffs Infolink Panama and Fortatrust demand the entry of a judgment against Defendants Corespace, Wulff, and Dunlap for money damages, declaratory and injunctive relief, attorneys' fees and costs, and any applicable prejudgment and postjudgment interest, and any other relief the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted on this 17 day of April, 2014.

XANDER LAW GROUP, P.A.

Attorneys for Plaintiffs
One NE 2nd Avenue
Suite 200
Miami, Florida 33132
Tel: (305) 767-2001
Fax: (855) 926-3370
Jason@xanderlaw.com

By: s/Jason H. Weber
    JASON H. WEBER
    FBN: 86832

# EXHIBIT A

4.     Ownership and Return of Confidential Information and Other Materials. All Confidential Information of each of the parties, as Discloser, and any Derivatives thereof whether created by such Discloser or the other party, as Recipient, shall remain the property of Discloser, and no license or other rights to such Discloser's Confidential Information or Derivatives is granted or implied hereby. For purposes of this Agreement, "Derivatives" shall mean: (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material which is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected under copyright, patent and/or trade secret laws. All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists and all other tangible media of expression) furnished by each of the parties, as Discloser, to the other party, as Recipient, and which are designated in writing to be the property of such Discloser, shall remain the property of such Discloser. At such Discloser's request and no later than five (5) days after such request, such Recipient shall promptly destroy or deliver to such Discloser, at such Discloser's option, (a) all materials furnished to such Recipient by such Discloser, (b) all tangible media of expression in such Recipient's possession or control to the extent that such tangible media incorporate any of such Discloser's Confidential Information, and (c) written certification of such Recipient's compliance with such Recipient's obligations under this sentence.

5.     Independent Development. Each of the parties, as Discloser, understands that the other party, as Recipient, may currently or in the future be developing information internally, or receiving information from other parties that may be similar to such Discloser's Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that such Recipient will not develop products or services, or have products or services developed for such Recipient, that, without violation of this Agreement, compete with the products or systems contemplated by such Discloser's Confidential Information.

6.     Disclosure of Third Party Information. Neither party shall communicate any information to the other in violation of the proprietary rights of any third party.

7.     No Warranty. All Confidential Information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's accuracy or performance.

8.     No Export. Neither party shall export, directly or indirectly, any technical data acquired from the other party pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other government approval without first obtaining such license or approval.

9.     Term. This Agreement shall govern all communications between the parties that are made during the period from the Effective Date to the date on which either party receives from the other written notice that subsequent communications shall not be so governed, provided, however, that each party's obligations under Paragraph 2 ("Nondisclosure and Nonuse Obligations") with respect to Confidential Information of the other party which such each party has previously received shall continue in for a period of two (2) years from the date of such information's disclosure unless terminated pursuant to Paragraph 3 ("Exclusions from Nondisclosure and Nonuse Obligations").

10.    No Assignment. Neither party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

11.    Notices. Any notices required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or

2 - 4

registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to the addresses set forth above or to such other address as either party may specify in writing.

12. Governing Law. This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the Delaware. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Delaware, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Delaware, such personal jurisdiction shall be nonexclusive.

13. Severability. If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

14. Waiver; Amendment; Modification. No term or provision hereof will be considered waived by either party, and no breach excused by either party, unless such waiver or consent is in writing signed by the party against whom such waiver or consent is asserted. The waiver by either party of, or consent of either party to, a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of, consent to, or excuse of any other or subsequent breach by the other party. This Agreement may be amended or modified only by mutual agreement of authorized representatives of the parties in writing.

15. Injunctive Relief. A breach by either party of any of the promises or agreements contained herein will result in irreparable and continuing damage to the other party for which there will be no adequate remedy at law, and such other party shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

16. Entire Agreement. This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"Company"                                    "Other Party"

FORTATRUST USA CORPORATION

By: _____

Signer's Name: Prieur J. Leary III

Title: President

By: _____

Signers name: MARK WULFF

Title: VP OPERATIONS

Company Name: CORESPACE, INC.

Date: 11/22/13

4 - 4

# EXHIBIT B

**VOYAGE TECHNOLOGIES, INC.**
**3983 S. MCCARRAN BLVD., #144**
**RENO, NV 89502**

December 31, 2013

*EMAIL: prieur3@infolinkco.com*

Mr. Prieur J. Leary, III
3701 NW 82nd St.
Doral, FL 33166

RE:     Letter of Intent – Purchase of Assets from FortaTrust USA Corporation

Dear Mr. Leary:

This letter of intent ("*LOI*") is intended to outline the general terms and conditions of a proposed transaction pursuant to which CS Acquisitions, LLC, a Delaware LLC and/or its assigns ("*Buyer*") would be willing to (A) purchase from (i) FortaTrust USA Corporation, a Delaware corporation, and (ii) InfoLink Panama Corp., a Panamanian corporation (collectively, "*Seller*"), certain of the business, assets and properties of Seller used in its co-location, dedicated server and cloud hosting business (the "*Business*"), including all the Assets (as defined below), and (B) enter into certain binding agreements by and among Seller, Buyer and the primary shareholders, members or owners of each Seller, being those persons owning 20% or more of either or both Seller (the "*Primary Owners*") relating to the proposed transaction (the "*Transaction*").

Based on a review of the preliminary information provided to Buyer by Seller (collectively, the "*Preliminary Information*") and other information that is currently available to Buyer, Buyer is interested in pursuing the Transaction on the following terms and conditions:

1. **Transaction Documents.** Seller and Buyer will cooperate and use reasonable commercial efforts to (i) complete in a timely manner the preparation, execution and delivery of a definitive agreement (the "*Definitive Agreement*") embodying the terms and conditions stated in this LOI, along with such other commercial terms, representations, warranties, covenants, agreements, indemnities and conditions customarily contained in agreements for similar transactions, and (ii) consummate the Transaction on or before fifteen (15) days after the date of the Definitive Agreement or on such other date set forth in the Definitive Agreement (the "*Closing Date*").

2. **Purchase of Business and Assets.** At the closing of the Transaction (the "*Closing*"), Seller will sell to Buyer and Buyer will acquire from Seller those tangible and intangible assets of the Business used in or relating to the Business and specifically set forth on attached <u>Schedule 1</u> (collectively, the "*Assets*"):

   a. *Business Contracts.* All contracts and agreements relating to the operation of the Business, including but not limited to leases for the Business, and all agreements with customers and suppliers (collectively, the "*Business Contracts*") will be identified by Seller and, unless otherwise specified in the Definitive Agreement, will be assigned to Buyer at the Closing.

   b. *Seller Debt, Liens and Other Liabilities.* At the Closing, Buyer will acquire good and marketable title to the Assets, free and clear of all liens, claims and encumbrances. Buyer will not assume any accounts payable, accrued expenses, compensation or employee benefits, collective bargaining agreements, capital lease or other contractual obligations, or other liabilities or obligations of any

kind, except for any Assumed Liabilities expressly identified in the Definitive Agreement (the "*Assumed Liabilities*"), and then only to the extent expressly set forth and after satisfaction of all conditions to the Closing. Seller will retain sole responsibility for all of its liabilities and obligations that are not Assumed Liabilities, including but not limited to all customer warranty and product liability claims, all pending litigation, claims and disputes.

 c. <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, in no event will Buyer purchase any of the assets identified as excluded assets on the attached <u>Schedule 1</u> (the "*Excluded Assets*").

**3. <u>Transaction Consideration</u>.**

 a. <u>Purchase Price</u>.  The Purchase Price for the Assets shall be calculated using a formula equal to One-Half (.5) X Revenue (as defined below), or approximately Six Hundred and Fifty Thousand Dollars ($650,000.00), based on the financial information and historical performance numbers provided by Seller.  For purposes of this LOI, the term "*Revenue*" means the actual revenue received by Seller from time to time during the ensuing twelve (12) months following Closing, from its usual and customary Business operations now being conducted in Miami, Florida and Panama City, Panama.

 b. <u>Payments</u>.  The Purchase Price would be composed of $50,000.00 in cash at Closing, and payments over time for the balance of the Purchase Price, as follows: beginning on the 10th day of the first month following the Closing, and continuing regularly and monthly thereafter, Buyer will pay to Seller an amount equal to one-half (1/2) of all of the post-closing revenue collected by Buyer in the prior month, including but not limited to recurring revenue from renewing clients, and revenue from new services and subscriptions (the "*Collected Revenue*"), subject to Seller and Primary Owners not being in default under the terms of the Definitive Agreement.  The sum of any refunds made during said month will be deducted from the Collected Revenue for that month. Non-pays or cancelled subscriptions shall not be included in the Collected Revenue amount.

**4. <u>Due Diligence Review/Access</u>.**  Seller will provide to Buyer and its advisers access all Seller's personnel and records (including all financial and operational records, customer lists, litigation files, etc.), and all other information reasonably requested by Buyer, to permit Buyer to conduct its due diligence on the Business, the Assets (including the Business Contracts) and any Assumed Liabilities.  Within five (5) days of the date of this LOI, Seller will deliver to Buyer the following due diligence items (the "*Deliverables*"), with each being segregated between the Miami, Florida location and the Panama City, Panama location:

 (i) Listing of all deposits or letters of credit held on behalf of customers;

 (ii) Schedule of any past due accounts and most recent aged accounts receivable;

 (iii) Schedule of any current or potential claims or litigation from third parties, including customers or former customers of the Business or its Owners;

 (iv) Schedule of any violations of any laws or governmental regulations, and all inquiries from any governmental entities;

 (v) Copies of all employment, non-competition, non-solicitation or confidentiality agreements with current or former employees or third parties;

 (vi) List of all specifications for the servers maintained by Seller, including such specifications as may be needed by Buyer to determine replacement needs for those servers that will be relocated to Dallas;

 (vii) Bank statements for Seller for the prior 24 months;

(viii)   Access to Seller's WHMCS system to review the accounting and related bookkeeping entries pertaining to Seller's operations, including Florida and Panama;

(ix)   Tax returns, tax reports and similar filings made by Seller to any local, state, county, or federal agency or bureau;

(x)   A detailed description and explanation of the ownership and organizational structure of Seller, including owners, officers, parent companies, subsidiaries, affiliated and related entities and persons;

(xi)   Documentation establishing proof of ownership of the Assets and the absence of any liens or other encumbrances thereon; and

(xii)   Such other information (including documents or records responsive) as may be reasonably requested by Buyer.

5. **Conditions**.

   a. <u>Panama Facility/Inspection</u>.   Seller will arrange for an on-site inspection of the operations, including the facility, in Panama City by Buyer and/or its representatives at a mutually convenient time.   Seller will also arrange for a meeting between Buyer and/or its representatives and (i) the landlord of the Panama facility, and (ii) the key employees of the Panamanian operation.   As a condition of Closing, Buyer may require that the lease of the Panama facility be assigned to Buyer on such terms and conditions as it deems acceptable.

   b. <u>Miami Facility/Inspection</u>.   Seller will arrange for an on-site inspection of the operations, including the facility, in Miami by Buyer and/or its representatives at a mutually convenient time.   Seller will also arrange for a meeting between Buyer and/or its representatives and the key employees and other staff of the Florida operation.

   c. <u>Delivery of Servers</u>.   Seller will be obligated to deliver the servers from the Miami facility, together with all "Customer Data" (as defined below) (the *"Servers"*), to Buyer's designated facility in Dallas as a condition of Closing, free and clear of all claims and in good working condition.   At Closing Seller will be reimbursed for its reasonable expenses incurred in connection with the relocation of the Servers to Dallas, provided that an estimate of such expenses is provided by Seller no later than the Pre-Closing.   *"Customer Data"* shall have the meaning described in more detail in the Definitive Agreement.

   d. <u>Pre-Closing</u>.   The Transaction will include a pre-closing stage whereby the parties will execute and deliver to each other the documents and instruments required for Closing, and take all other actions needed for Closing, save and except (i) Buyer's payment of the consideration due Seller at Closing, and (ii) Seller's delivery of the Servers.   The documents and instruments executed for the Pre-Closing will be held in trust by Buyer's counsel pending final Closing.   Upon Seller's delivery and Buyer's acceptance of the Servers, the Closing will occur and Buyer will release the portion of the Purchase Price payable at Closing to Seller.

   e. <u>Closing</u>. The Definitive Agreement will include customary Buyer and Seller closing conditions (*"Closing Conditions"*) including the absence of any material adverse change in the Business prior to Closing, receipt of necessary approvals, consents and/or waivers, accuracy of representations and warranties, performance of covenants and agreements, and execution and delivery of Closing documents.

Mr. Prieur J. Leary, III
FortaTrust USA Corporation
Letter of Intent
December 31, 2013
Page 4

6. **Confidentiality**. Buyer and Seller agree not to discuss the existence or otherwise disclose the contents of this LOI or details about the Transaction with any other person or entity; provided, however, the parties may disclose the existence of negotiations in respect of the Transaction to professionals and lenders that may be engaged by the parties for the purpose of assisting with the evaluation and completion of the Transaction, so long as such professionals are made aware of the confidential nature of such negotiations and of this confidentiality provision.

7. **Conduct of Business in Ordinary Course**. As consideration for the significant time and expense of Buyer to evaluate the Business, Seller and Primary Owners agree that until the execution of the Definitive Agreement or termination of this LOI that, except as otherwise described herein: (a) Seller shall operate the Business and maintain its respective assets in the ordinary course, consistent with past practices; (b) Seller shall use its best efforts to maintain its existing business relationships with customers and suppliers; (c) neither Seller nor any of the Primary Owners shall sell or transfer any of their respective ownership interests, or grant any rights or options to purchase therein, or allow any lien or encumbrance on any of such ownership interests; and (d) Seller and the Primary Owners shall ensure that the Business will not sell or transfer any of its assets, or grant any rights to purchase therein, or allow any lien or encumbrance on any of the assets of the Business.

8. **Exclusivity**. In consideration of the time, effort and expense to be incurred by Buyer in connection with the Transaction, Seller and Primary Owners agree that from the date of this LOI until the earlier of (i) the execution of the Definitive Agreement by the Parties, or (ii) termination of this LOI (the "*Exclusivity Period*"), none of Seller, Primary Owners, or any of their officers, directors, shareholders, employees, agents, advisers or representatives of Seller, will enter into, or continue, any agreement, discussion, or negotiation with, or provide information to, or solicit, encourage, entertain or consider any inquiries or proposals from, any other corporation, firm or other person with respect to (a) the possible disposition of any of the Business or the Assets, or (b) any business combination involving Seller, the Business or the Assets, whether by way of merger, consolidation, share exchange or other transaction.

9. **Assumptions**. In preparation of this LOI, Buyer has made several material assumptions, including the following: all information provided in the Preliminary Information is accurate in all material respects and that there has been no material adverse change in Seller's business or in the relationship with any customer in the time period following the date or delivery of such information.

10. **Costs and Commissions**. Except as provided herein or in the Definitive Agreement, each party will be solely responsible for and bear all costs and expenses (including any broker's fees, finder's fees, attorney's fees and fees of other representatives) incurred by it at any time in connection with evaluating, negotiating, pursuing or consummating the Transaction.

11. **Employees**. Buyer will consider extending offers of employment to those employees of Seller designated by Buyer in writing not less than seven (7) days prior to the Closing Date, but in all events after the site inspection in Panama City, Panama, on such terms and conditions as Buyer may deem appropriate at its discretion, provided, however, Buyer will be under no obligation to issue any offers of employment to any employees of Seller.

12. **Noncompetition and Nonsolicitation**. Seller and the Primary Owners will agree not to compete with Buyer or to solicit any of the employees, contractors or current or prospective customers of the Business (the "*Covenants*") for a period of two (2) years after the date the Primary Owners cease to provide services for, or be retained by, Buyer, and on other terms and conditions reasonably acceptable to Buyer. 'Customer' means any person, firm, entity or association to which any sale was made, or with which Seller has had any contact as evidenced by a written document sent or received, during the two (2) year

*Mr. Prieur J. Leary, III*
*FortaTrust USA Corporation*
*Letter of Intent*
*December 31, 2013*
*Page 5*

period prior to the date the Primary Owners ceased to provide services for, or be retained by, Buyer. As additional consideration for the Transaction, Buyer will agree to retain the services of Prieur J. Leary, III, in a capacity to be determined by the Parties and set forth in the Definitive Agreement, at the gross rate of US$12,000.00 per month for a minimum of twelve (12) months.

13. <u>Governing Law</u>. This LOI shall be governed by and construed according to the laws of the State of Texas, without regard to conflict of laws or rules thereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this LOI may be brought against any of the parties in the courts of the State of Texas, Dallas County. Seller and Buyer consent to the jurisdiction of such courts in any such action or proceeding and waive any objection to venue laid therein.

14. <u>Seller Approval</u>. Seller and Primary Owners of Seller warrant and represent that the Primary Owners of Seller have the full right, power and authority to approve the Transaction, and that the approval or consent of any other party is not required to consummate the Transaction.

15. <u>Counterparts</u>. This LOI may be executed in one or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one in the same instrument. The LOI may be executed and delivered electronically.

16. <u>No Public Announcement</u>. Except as required by law or other securities regulations, except as may be contemplated by a Definitive Agreement, Seller and Buyer agree that there shall be no public announcement of the Transaction.

17. <u>Non-Binding</u>. Seller and Buyer expressly agree that except as provided in Paragraphs 4, 6, 7, 8, 10, 13-16 herein, this LOI is not intended to create any obligations or a binding agreement of any kind between the parties hereto and that consummation of the Transaction is subject in all respects to Buyer's favorable due diligence analysis, and the execution and delivery of the Definitive Agreement and satisfaction of certain conditions.

If the foregoing meets with Seller's approval, please have the authorized representative of each Seller, together with each of the Primary Owners of Seller execute and return one duplicate copy of this letter to me, whereupon this letter will constitute a letter of intent between the parties in accordance with the terms and provisions set forth herein.

We look forward to receiving your prompt response.

Very truly yours,

Voyage Technologies, Inc. a Nevada
corporation and/or its assigns

1/6/14

Authorized Representative

*Mr. Prieur J. Leary, III*
*FortaTrust USA Corporation*
*Letter of Intent*
*December 31, 2013*
*Page 6*

Reviewed and Agreed by the Business and the Primary Owners:

**SELLERS:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____          3-Jan-14
       Prieur J. Leary, III, President            Date

**InfoLink Panama Corp.**
a Panamanian corporation

By: _____          3-Jan-14
       Prieur J. Leary, III, Authorized Representative     Date

*Mr. Prieur J. Leary, III*
*FortaTrust USA Corporation*
*Letter of Intent*
*December 31, 2013*
*Page 7*

## Schedule 1

List of Included Assets

[To be provided]

List of Excluded Assets

[To be provided]

# EXHIBIT C

<u>**Term Sheet**</u>

<u>**Recitals and Assumptions**</u>

1. Infolink Panama Corp. owns and operates a data center in the PCRC Switching Station, Corozal, Panama, Republic of Panama.

2. FortaTrust USA Corporation is a wholly owned subsidiary of Infolink Panama Corp. and operates a data center at 3701 NW 82nd Ave., Doral, Florida, USA.

3. Infolink Panama Corp. and FortaTrust USA Corp. ("FortaTrust") collectively own and operate the cloud hosting brand, FortaTrust, which operates an e-commerce site located at www.FortaTrust.com.

4. Velocity Servers Inc. ("Colo Crossing") and FortaTrust have expressed interest in consummating a transaction with FortaTrust. The purpose of this term sheet is to outline the details of a transaction to be incorporated into a binding formal agreement.

5. FortaTrust has made certain representations regarding its operations, revenue and expenses, via e-mail. These representations are incorporated into this agreement by reference and attached accordingly.

<u>**Terms of Transaction**</u>

1. Colo Crossing, or a yet to be formed Colo Crossing entities, will purchase the assets of FortaTrust for $600,000. These assets include, but are not limited to, the FortaTrust brand, its website, its entire customer base, the network and servers used to provide these customers with service, and the Panama Data Center with all infrastructure.

2. Colo Crossing will assume only the liabilities of FortaTrust below:
   a. The lease for the Panama Data Center.
   b. The lease for the Doral, Florida USA Data Center.
   c. Telecommunications contracts (Level 3 and Columbus Comm.) necessary to operate the Data Centers.
   d. The Data centers utilities (electric).
   e. No obligation will exist to retain any of the FortaTrust employees.

3. FortaTrust's current President, Prieur Leary, will join the Colo Crossing team, and will be offered a position with Colo Crossing to be defined in a separate agreement.

<u>**Transaction Process**</u>

1. Upon execution of this term sheet, a 14 day due diligence phase will commence, as well as a 20 day exclusivity period whereby FortaTrust agrees to suspend its discussions with other interested parties.

2. Colo Crossing is free to conduct due-diligence in any manner it sees fit, and FortaTrust will provide any and efforts to complete in a timely manner.

3. Should Colo Crossing determine during the due-diligence phase that it does not wish to proceed with a transaction, it shall promptly notify FortaTrust. The parties would then have no further

obligation as it relates to the proposed transaction, and FortaTrust would be free to re-engage the other interested parties.

4. Concurrently, during the pendency of due-diligence, the parties will work together to come to terms of a final and formal agreement to consummate the transaction.

5. The parties agree to close the transaction no later than 7 days following the due diligence phase.


Agreed and accepted,


_____

Prieur J. Leary III/President

FortaTrust USA Corp.

Date:_____

Joseph E. Robinson IV, Vice President

Colo Crossing Inc.

Date: 12/26/2013

# COMPOSITE EXHIBIT D

## AGREEMENT FOR COLOCATION AND PURCHASE

This AGREEMENT FOR COLOCATION AND PURCHASE (the "*Agreement*") is executed as of the date last shown below to be effective on the Effective Date (as defined in Section 19 below), by and between ACE COLOCATION, INC., a Nevada corporation having its registered place of business located at 7575 W. Washington Avenue, Suite 127-270, Las Vegas, NV 89128 ("*Ace*"), on the one hand, and INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama ("*Infolink*"), and its wholly owned subsidiary, FORTATRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 ("*FortaTrust USA*") (Infolink and FortaTrust USA being sometimes referred to collectively as "*FortaTrust*"), and GROUPO PRONTO, a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the "*Shareholders*"), on the other hand. As used herein, the term "FortaTrust" also includes the Shareholders and all subsidiaries, affiliated or related companies or companies under common control, and any other entities operating under assumed names. Ace and FortaTrust are sometimes collectively referred to as the "*Parties*". The officer of FortaTrust, consisting of Prieur J. Leary, III (the "*Guarantor*") joins in the execution and delivery of this Agreement to evidence Guarantor's obligations to perform and cause FortaTrust to perform under this Agreement.

RECITALS:

A.     FortaTrust is currently engaged in the business of providing dedicated servers, VPS, managed hosting and server colocation to its customers through the use of assets, equipment and other personal property maintained in a leased facility located at (i) 3701 NW 82nd St., Doral, Florida 33166, Suite A, as further described in that certain Industrial Lease by and between Richter Developments, Ltd., and FortaTrust USA, Inc., dated February 21, 2012 (the '*Miami Facility*"), and (ii) Corozal Oeste, Panama, Republic of Panama, as further described in that certain Rental Contract Between Panama Canal Railway Company and Infolink Panama Corp., S.A., dated August 8, 2006 (the '*Panama Facility*")), with the Miami Facility and Panama Facility being sometimes referred to herein collectively as the "*Facilities*".

B.     FortaTrust desires to relocate its business activities to Dallas, Texas to take advantage of lower power costs and other available cost savings, and desires to enter into a transaction with Ace to obtain colocation and related services and to enter into an agreement that, upon satisfaction of certain conditions, obligates FortaTrust to sell certain assets to Ace.

C.     Ace is also engaged in the business of providing or furnishing, among other things, dedicated servers, VPS, managed hosting and server colocation services through a contractual arrangement with a facility located at 7505 John W. Carpenter Freeway, Dallas, Texas (the "*DFW Facility*"), and Ace desires to enter into a transaction with FortaTrust to provide it with colocation and related services and to enter into an agreement that, upon satisfaction of certain conditions, obligates Ace to purchase certain assets of FortaTrust.

D.     In connection with this Agreement, Ace and FortaTrust have agreed to enter into (i) a colocation agreement pursuant to which Ace will provide FortaTrust with certain access to the DFW Facility that will enable FortaTrust to continue to operate its business (the "*Colocation Agreement*"), and (ii) a purchase agreement pursuant to which Ace will purchase from FortaTrust, and FortaTrust will sell to Ace, the equipment, customers and certain other assets of FortaTrust upon the satisfaction of certain conditions (the "*Purchase Agreement*").

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are confessed, the Parties agree as follows:

AGREEMENT:

1.      **Acknowledgments and Other Agreements of the Parties.**

A.      Relocation of FortaTrust's Business.  FortaTrust acknowledges its desire to relocate its business from the Miami Facility and the Panama Facility to the DFW Facility, and to thereafter sell certain assets of FortaTrust after such assets have been relocated to the DFW Facility and are online and operational.  Ace acknowledges its desire to purchase certain assets of FortaTrust after such assets have been relocated to the DFW Facility and are online and operational, subject to the other terms and conditions of this Agreement and the Purchase Agreement.

B.      Execution of Collateral Agreements.  FortaTrust and Ace further acknowledge that neither would be willing to enter into the Colocation Agreement or the Purchase Agreement (such agreements being sometimes collectively referred to herein as the "*Collateral Agreements*"), without the agreement of certain principal officers of FortaTrust being obligated on the obligations set forth in the Collateral Agreements and in this Agreement.  Ace and FortaTrust acknowledge and agree that the Collateral Agreements are an integral part of the consideration for this Agreement, and that neither would be willing to enter into this Agreement without the Collateral Agreements.

2.      **Acknowledgments and Agreements Regarding Assets.**  FortaTrust warrants and represents that the FortaTrust Assets, as further described on Schedule 1 attached hereto and made a part hereof, consist of the assets that are to be relocated to the DFW Facility from either the Miami Facility or the Panama Facility, and that such Assets (i) are of sufficient quality and sufficient capacity to support the customers presently being served by FortaTrust, (ii) are owned free and clear of all liens, leases, encumbrances, security interests or other rights of third parties, (iii) may be transported to the DFW Facility without violation of any laws, orders, decrees, agreements or other understandings by or with any third parties, including but not limited to all governmental agencies and authorities, (iv) are not subject to the use or operation of any third party who may request or demand access to the DFW Facility for the purpose of accessing, utilizing or removing all or any part of the Assets.

3.      **Acknowledgments and Agreements Regarding Colocation.**  The parties acknowledge and agree that the FortaTrust Assets will be relocated to the DFW Facility designated by Ace in the Colocation Agreement for the colocation services to be provided thereunder, and that any subsequent sale of the Assets from FortaTrust to Ace will occur pursuant to the terms and conditions of the Purchase Agreement, the form of which is attached hereto as Exhibit A and made a part hereof.  The parties agree that the amount of the fees for the Colocation services shall be set forth in the Colocation Agreement, provided however, if FortaTrust becomes delinquent in the payment of any fees, charges or other amounts payable to any vendor, licensor or other provider of any good or service effecting the FortaTrust Assets, including but not limited to any provider of equipment, fiber optics, cables, wiring or other connective items, licenses, software, programs, data recovery or the like (collectively, the "*Additional Service Fees*"), then Ace shall have the option, but not the obligation, to cure any such delinquency of Additional Service Fees and add the amounts paid therefor and in connection therewith, including but not limited attorneys fees and costs to contest or resolve such issues, to the amount due under the Colocation Agreement.

4.      **Acknowledgments and Agreements Regarding Employees.**

A.      No Intent to Offer Positions.  The parties acknowledge and agree that since the Assets, other than the Previously Conveyed Assets (as defined below) of FortaTrust will continue to be owned by FortaTrust after the relocation (and prior to closing under the Purchase Agreement), and the FortaTrust business will continue to be operated by FortaTrust after the relocation (and prior to closing under the Purchase Agreement), that Ace will have no obligation or liability whatsoever to any of the FortaTrust

employees, agents, contractors or consultants.  Specifically, Ace shall have no obligation to hire or retain any employee, agent, contractor or consultant of FortaTrust, or to extend any offer to any such person to serve as a full or part-time employee, consultant or independent contractor of Ace.  Notwithstanding anything contained herein, in the event Ace does, at its sole and absolute discretion, decide to extend an offer of employment or retention to any employee, agent, contractor or consultant of FortaTrust, Ace may do so on the terms and provisions it chooses, and without regard to any terms and provisions that may have previously been in effect with such person and FortaTrust.

B.     No Solicitation of Employees.  FortaTrust acknowledges and agrees that it will not, without the prior written consent of Ace, hire, offer to hire, or solicit for the purpose of hiring or retaining, directly or indirectly, any employee, agent, contractor or consultant of Ace or any affiliated or related entities controlled by or under common control with Ace.  Ace acknowledges and agrees that FortaTrust has no obligation or commitment to hire or retain any Ace personnel.

5.     Acknowledgments and Agreements Regarding Asset Purchase.  In conjunction with this Agreement, the parties shall enter into the Purchase Agreement for the sale by FortaTrust, and the purchase by Ace, of the Assets described therein.  The purchase described in the Purchase Agreement shall be consummated by Ace provided there has been no failure of any of the Purchase Conditions (as defined below) or any of the Closing Conditions described in the Purchase Agreement.  As used herein, the term "*Purchase Conditions*" means and includes the following: (i) none of the Assets shall be subject to any claim, demand, lien, interest, right or dispute involving any party; (ii) neither FortaTrust nor Guarantor shall be in breach or default under this Agreement or the Colocation Agreement; (iii) the representations by FortaTrust and its officers and agents with respect to the customer revenue level at the time of this Agreement shall be accurate in all material respects to the actual receipts following the relocation; (iv) FortaTrust shall be current with all its vendors and other creditors; and (v) none of FortaTrust, Guarantor and Ace shall be the subject of any demand, litigation, investigation, inquiry or dispute that involves or could involve the Assets.  Notwithstanding the foregoing, Ace may, at its sole discretion, elect to waive one or more of the Purchase Conditions and Closing Conditions required for the consummation of the purchase of the Assets.

6.     Acknowledgments and Agreements Regarding Delinquent Payments.  FortaTrust acknowledges and agrees that at the time of this Agreement, it is delinquent in the payment of certain monies owed to the landlord for InfoLink, and that such delinquency will be cured or otherwise settled or remedied to the mutual satisfaction of the parties to that issue within thirty (30) days following the Effective Date.

7.     Acknowledgments and Agreements Regarding Advances by Ace.

A.     Confirmation of Obligation; Conveyance of Certain Assets.  Notwithstanding anything herein or in any of the Collateral Agreements to the contrary, upon the full execution and delivery of this Agreement and the Collateral Agreements, Ace will pay to or for the benefit of FortaTrust, the sum of $10,000.00 (the "*Advance*"), and FortaTrust will sell and convey to Ace the equipment and other assets described on Schedule 2 attached hereto and made a part hereof (collectively, the "*Previously Conveyed Assets*"), pursuant to the terms of the Bill of Sale attached hereto and made a part hereof.  FortaTrust and Guarantor warrant and represent that: (i) none of the Previously Conveyed Assets are subject to any claim, demand, lien, interest, right or dispute involving any party; and (ii) that FortaTrust has the legal right, power and authority to convey good and marketable title in and to the Previously Conveyed Assets to Ace.

B.     FortaTrust and Guarantor acknowledge and agree that all of such parties will be jointly and severally responsible for the delivery of Previously Conveyed Assets to the DFW Facility as and when demanded by Ace; provided, however, the parties contemplate that such Previously Conveyed Assets will remain in the Miami Facility and Panama Facility until the earlier of the relocation of the Assets or demand by Ace following any breach of default under this Agreement or the Collateral Agreements.  In addition, FortaTrust and Guarantor acknowledge and agree that in the event the Previously Conveyed Assets are not

relocated to the DFW Facility, and Ace is otherwise unsuccessful in any efforts it makes to secure possession of the Previously Conveyed Assets within the DFW Facility, that FortaTrust and Guarantor shall be and remain jointly and severally liable for repayment of the amount of the Advance.

        **8.**    **Agreement Regarding Certain Assets**.  Upon the Effective Date of this Agreement, and notwithstanding the ownership thereof by FortaTrust, Ace:

        (i)  shall have the exclusive responsibility for communication with American Registry Internet Numbers ("*ARIN*") and Latin American and Caribbean Network Information Centre ("*LACNIC*"), and FortaTrust agrees to execute and deliver to Ace such letters of authority or other similar documents as may be requested by Ace to communicate with ARIN and LACNIC with respect to same. In addition to the foregoing, FortaTrust agrees to deliver to Ace on a monthly basis (or other periodic basis as determined by Ace) a copy of the ARIN and LACNIC invoices along with evidence of payment of all amounts reflected on the invoices. In the event of a default by FortaTrust in the timely payment of any fees or other charges due ARIN or LACNIC, Ace shall have the right, but not the obligation, to pay such fees on behalf of FortaTrust (or to work out such arrangements with ARIN and LACNIC as Ace may deem appropriate), and in exchange therefor, to take an assignment of all rights and privileges FortaTrust has with respect to such ARIN and LACNIC assets; and

        (ii)  shall have the exclusive responsibility for communication of all SWIP information to ARIN and LACNIC, and may transmit such information via facsimile, email or such other mode allowed by ARIN and LACNIC. FortaTrust will not provide any SWIP information to ARIN, LACNIC or any other party without the prior written approval of Ace.

        **9.**    **Events of Default**.  As used in this Agreement, the term "*Event of Default*" shall mean the occurrence of any one or more of the following with respect to FortaTrust:

        **A.**    **Breach**. FortaTrust fails to (i) timely pay to Ace any amount when such payment is due, and such breach is not cured within ten (10) days following Ace's written notice to FortaTrust, or (ii) perform any other covenant, agreement or obligation contained in this Agreement or in the Collateral Agreements, other than the payment of money, and such breach is not cured within thirty (30) days following Ace's written notice to FortaTrust;

        **B.**    **Bankruptcy or other Creditor Protection**. FortaTrust or any other person obligated to make any payments under this Agreement or the Collateral Agreements, including but not limited to the Guarantor: (i) does not pay its debts as they become due or admits in writing its inability to pay its debts or makes a general assignment for the benefit of creditors; or (ii) commences any case, proceeding, or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution, or composition of it or its debts under any debtor relief laws; or (iii) in any involuntary case, proceeding, or other action commenced against it which seeks to have an order for relief entered against it, as debtor, or seeks reorganization, arrangement, adjustment, liquidation, dissolution, or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, and (a) fails to obtain a dismissal of such case or proceeding or (b) converts the case from one chapter of the Federal Bankruptcy Code to another chapter, or (c) is the subject of an order for relief; or (iv) applies or consents to have a trustee, receiver, custodian, intervenor, liquidator, or other similar official appointed for or take possession of all or any part of its property or has any court take jurisdiction of its property which continues for a period of sixty (60) days; or (v) fails to have discharged within a period of thirty (30) days any attachment, sequestration, or similar writ levied upon any property of such person; or

        **C.**    **Other Agreements**. There occurs a breach or default by FortaTrust under the terms of any of the Collateral Agreements, or any other agreement between Ace and FortaTrust, and such default or breach

remains uncured for any period of time specifically allowed under such other agreement.

10.   **Agreement of Guarantor**.  The Guarantor joins in the execution of this Agreement and the Collateral Agreements to confirm its guarantee of the amounts and obligations due and owing to Ace under the terms of this Agreement and the Collateral Agreements, including but not limited to the amount of the Advance.

11.   **Releases of FortaTrust**.  Each of FortaTrust (as defined in the preamble) and the Guarantor (collectively, the "*FortaTrust Parties*"), on behalf of itself, its respective affiliates, subsidiaries, heirs, executors, successors and assigns, hereby irrevocably and unconditionally releases, waives, and forever discharge Ace, and its organizers, directors, officers, employees, agents, representatives, parent companies, subsidiaries, affiliates, stockholders, attorneys, successors and assigns (collectively, the "*Ace Parties*"), from any and all claims, demands, actions, causes of action, costs, fees, expenses, and all liability whatsoever, whether known or unknown, fixed or contingent, accrued or unaccrued, whether arising or accruing before or after the delivery of this Agreement, which it has, had, or may have against the Ace Parties in connection with any actions or omissions of any of the Ace Parties prior to the day following the effective date of this Agreement.  FortaTrust and Guarantor acknowledge and agree that no affiliate or related entity of Ace, including but not limited to CoreSpace, Inc. and Cloud Holdings, LLC, has been or will be involved in the transactions described or referenced in this Agreement or the Collateral Agreements, and thus, any claim, demand or dispute advanced by FortaTrust or Guarantor under this Agreement or the Collateral Agreements shall be limited solely to Ace.

12.   **Term of Agreement**.  This Agreement shall continue in effect for a period of one (1) year following the expiration or earlier termination of the Colocation Agreement, including any renewals and extensions thereof, such ending date being the "*Termination Date*"; provided, however, such Termination Date shall be extended (without further notice to either party) upon the occurrence of any event described in Section 9.B. hereof to the date that is six (6) months after the final disposition of all such proceedings described in Section 9.B.

13.   **Governing Law; Attorney's Fees**.  This Agreement has been made in Texas and it shall be governed by and construed pursuant to the laws of the State of Texas.  This Agreement shall be performable in Dallas County, Texas, and all parties hereto unequivocally submit to jurisdiction and venue in Dallas County, Texas.  The parties agree that all disputes in any way relating to, arising under, connected with, or incident to this Agreement, and over which the federal courts have subject matter jurisdiction, shall be litigated, if at all, exclusively in the United States District Court for the Northern District of Texas, Dallas Division, and if necessary, the corresponding appellate courts, and if the federal courts do not have subject matter jurisdiction, shall be litigated, if at all, exclusively in the courts of the State of Texas, in Dallas County, and, if necessary, the corresponding appellate courts. If any legal action is necessary to enforce the terms of this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees in addition to any other relief to which that Party may be entitled.

14.   **Entire Agreement; Amendments; Assignment**.  This Agreement, together with the Collateral Agreements, is the complete and exclusive statement of the mutual understanding of the Parties with respect to the subject matter set forth herein, which supersedes and cancels all previous written and oral agreements and communications between the Parties relating to the subject matter of this Agreement.  This Agreement may only be amended by a written agreement duly executed by persons authorized to execute agreements on behalf of the Parties.  FortaTrust may not assign this Agreement or any rights under this Agreement without the prior written consent of Ace, at its sole and absolute discretion.

15.   **Notice**.  Any notice required or permitted by this Agreement shall be deemed to have been given (i) when such written notice is personally delivered, or (ii) on the next business day when sent for overnight delivery by FedEx or other nationally recognized overnight courier, or (iii) on the third (3rd) day after

postmark when mailed by first-class, registered, or certified mail, postage prepaid to the other Party. Notices to the Parties shall be sent to the addresses set forth below or to such other address as either Party may designate in writing to the other in accordance with this Section.

If to FortaTrust:

FortaTrust USA Corporation
InfoLink Panama Corp.
3701 NW 82nd St.
Doral, Florida 33166

With a copy to:

_____
_____
_____  _____

If to Buyer:

Ace Colocation, Inc.
7505 John W. Carpenter Fwy
Dallas, Texas 75247
ldunlap@acecolocation.com
mwulffi@acecolocation.com

With a copy to:

Jay Gibson
Elliott, Thomason & Gibson, LLP
511 Akard St., Suite 411
Dallas, Texas 75201
jay@etglawfirm.com

**16.   No Partnership or Venture.**  The only relationship between the parties under this Agreement shall be the contractual relationship set forth in this Agreement. Without limitation to the generality of the foregoing, FortaTrust is not, and shall not be deemed to be, an affiliate, division, subsidiary, employee, partner, joint venturer, agent, servant or franchisee of Ace. FortaTrust shall not hold itself out as having any right, power or authority to obligate Ace or any other Ace Party in any manner, whether by express or implied contract or otherwise.

**17.   Severability.**  If any court of competent jurisdiction determines that any part of this Agreement is invalid or unenforceable, that determination shall not impair or nullify the remainder of this Agreement, and such invalid provision shall be reformed or modified to the extent necessary to make such provision valid and enforceable.

**18.   No Recordation.**  FortaTrust shall not record a copy of this Agreement or a memorandum thereof without the prior written consent of Ace, which may be given or withheld in its sole and absolute discretion.

**19.   Effective Date.**  This Agreement will become effective upon last of the parties to sign below, which time and date shall for purposes of this Agreement be the "*Effective Date*".

**20.   Counterparts.**  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other party.

**21.   Rules of Construction.**  The parties acknowledge that each has reviewed, or has had the opportunity to review this Agreement with counsel engaged to advise them on same; therefore, the parties agree that the normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement. All headings used herein are for convenience only and shall not be considered when interpreting the provisions of this Agreement.

*[Signatures appear on following page]*

EXECUTED to be effective as of the Effective Date described herein.

ACE:                          ACE COLOCATION, INC.,
                              a Nevada corporation

                              By: _Liana Dunlap_
                                  Liana Dunlap, CEO - President
                              Date: __1 - 27 - 14__


FORTATRUST:                   FORTATRUST USA CORPORATION,
                              a Delaware corporation

                              By: _____
                                  Prieur J. Leary, III, President
                              Date: _____


INFOLINK:                     INFOLINK PANAMA CORP.,
                              a Panama corporation

                              By: _____
                                  Prieur J. Leary, III, President
                              Date: _____


GRUPO PRONTO                  GRUPO PRONTO, S.A.
                              a Panamanian corporation

                              By:_____
                                  Prieur J. Leary, III, President
                              Date: _____


IT EXPERTS                    IT EXPERTS S.A.
                              a Panamanian corporation

                              By:_____
                                  Luciano E Maiello, President
                              Date: _____


GUARANTOR:                    _____
                              PRIEUR J. LEARY, III


---

**AGREEMENT FOR COLOCATION AND PURCHASE**                    **Page - 7 -**

EXECUTED to be effective as of the Effective Date described herein.

ACE:                          **ACE COLOCATION, INC.,**
                              a Nevada corporation

                              By: _____
                                  Liana Dunlap, CEO - President
                              Date: _____


FORTATRUST:                   **FORTATRUST USA CORPORATION,**
                              a Delaware corporation

                              By: _____
                                  Prieur J. Leary, III, President
                              Date: _____24-JAN-14_____


INFOLINK:                     **INFOLINK PANAMA CORP.,**
                              a Panama corporation

                              By: _____
                                  Prieur J. Leary, III, President
                              Date: _____24-JAN-14_____


GRUPO PRONTO                  **GRUPO PRONTO, S.A.,**
                              a Panamanian corporation

                              By: _____
                                  Prieur J. Leary, III, President
                              Date: _____24-JAN 14_____


IT EXPERTS                    **IT EXPERTS S.A.**
                              a Panamanian corporation

                              By: _____
                                  Luciano E Maiello, President
                              Date: _____


GUARANTOR:                    _____
                              **PRIEUR J. LEARY, III**

---

EXECUTED to be effective as of the Effective Date described herein.

ACE:        **ACE COLOCATION, INC.,**
           a Nevada corporation

           By: _____
             Liana Dunlap, CEO - President
           Date: _____


FORTATRUST:      **FORTATRUST USA CORPORATION,**
           a Delaware corporation

           By: _____
             Prieur J. Leary, III. President
           Date: _____


INFOLINK:       **INFOLINK PANAMA CORP.,**
           a Panama corporation

           By: _____
             Prieur J. Leary, III. President
           Date: _____


GRUPO PRONTO     **GRUPO PRONTO, S.A.**
           a Panamanian corporation

           By: _____
             Prieur J. Leary, III. President
           Date: _____


IT EXPERTS       **IT EXPERTS S.A.**
           a Panamanian corporation
           By: _____
             Luciano E. Maiello, President
           Date: 29/0 . 2014


GUARANTOR:      _____
           **PRIEUR J. LEARY, III**

---

AGREEMENT FOR COLOCATION AND PURCHASE     Page - 7 -



7º TABELIÃO DE NOTAS DA CAPITAL - SP
RUA BENJAMIN CONSTANT, 177 - PABX: 3293-1400
RECONHEÇO por SEMELHANÇA a firma(s) COM VALOR ECONOMICO de:
LUCIANO ELIAS MATELLI☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺
São Paulo, 27 de Janeiro de 2014.
        Em Testemunho              da verdade.

AMERICO ROBERTO GARCIA - MAURICIO R.S. CRUZ - ALFREDO R. S. CRUZ
Total R$ 6,80 VALIDO SOMENTE COM SELO DE AUTENTICIDADE
Carimbo:702204 Selo(s): 173590-AWW☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺☺

List of Schedules and Exhibits

| | | |
|---|---|---|
| Schedule 1 | - | List of FortaTrust Assets |
| Schedule 2 | - | List of Collateral |
| Exhibit "A" | - | Form of Purchase Agreement |
| Exhibit "B" | - | Form of Bill of Sale |

## ACKNOWLEDGMENTS:

STATE OF _FLORIDA_  §
§
COUNTY OF _Miami-Dade_  §

BEFORE ME, the undersigned authority, on this day personally appeared **Prieur J. Leary, III**, as President and authorized representative for **INFOLINK PANAMA CORP.**, a Panamanian corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

Checked FLDL # 600-670-68-463-0

SUBSCRIBED AND SWORN TO before me on this the _24_ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

Notary Public in and for the State of _FLORIDA_

STATE OF _FLORIDA_  §
§
COUNTY OF _Miami-Dade_  §

BEFORE ME, the undersigned authority, on this day personally appeared **Prieur J. Leary, III**, as President and authorized representative for **FORTATRUST USA CORPORATION**, a Delaware corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _24th_ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

Notary Public in and for the State of _FLORIDA_

STATE OF _FLORIDA_  §
§
COUNTY OF _Miami-Dade_  §

BEFORE ME, the undersigned authority, on this day personally appeared **Prieur J. Leary, III**, known to me to be the person who executed the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _24th_ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:
Notary Public in and for the State of _FLORIDA_

---

**AGREEMENT FOR COLOCATION AND PURCHASE**  **Page - 9 -**

STATE OF _FLORIDA_ §

COUNTY OF _Miami-Dade_ §
§

BEFORE ME, the undersigned authority, on this day personally appeared **Priear J. Leary, III**, as President and authorized representative for GROUPO PRONTO, S.A., a Panamanian corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

_Checked   FLDL#600-670.68.463-0_

SUBSCRIBED AND SWORN TO before me on this the _24th_ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

CAPTAIN MAKHIJA
Notary Public - State of Florida
My Comm. Expires Jun 27, 2016
Commission # EE 184015
Bonded Through National Notary Assn.

_Captain Makhij_

Notary Public in and for the State of _FLORIDA_

STATE OF _____ §
§
COUNTY OF _____ §

BEFORE ME, the undersigned authority, on this day personally appeared **Luciano E Maiello**, as President and authorized representative for IT EXPERTS S.A., a Panamanian corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _____ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

_____

Notary Public in and for the State of _____

STATE OF _____ §
§
COUNTY OF _____ §

BEFORE ME, the undersigned authority, on this day personally appeared **Liana Dunlap**, as President and authorized representative for ACE COLOCATION, INC., a Nevada corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _____ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

_____

Notary Public in and for the State of _____

STATE OF _____        §
                             §
COUNTY OF _____         §

BEFORE ME, the undersigned authority, on this day personally appeared **Prieur J. Leary, III**, as President and authorized representative for GROUPO PRONTO, S.A., a Panamanian corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _____ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

                             _____
                             Notary Public in and for the State of _____


STATE OF _____        §
                             §
COUNTY OF _____         §

BEFORE ME, the undersigned authority, on this day personally appeared **Luciano E Maiello**, as President and authorized representative for IT EXPERTS S.A., a Panamanian corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the _____ day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

                             _____
                             Notary Public in and for the State of _____


STATE OF Texas               §
                             §
COUNTY OF Dallas             §

BEFORE ME, the undersigned authority, on this day personally appeared **Liana Dunlap**, as President and authorized representative for ACE COLOCATION, INC., a Nevada corporation, known to me to be the person who executed the foregoing instrument and acknowledged to me that s/he executed the same in the capacities shown and for the purposes and consideration therein expressed.

SUBSCRIBED AND SWORN TO before me on this the 27th day of January, 2014, to certify which, witness my hand and seal of office.

Seal:

DANIEL C. HOPKINS            Daniel C Hopkins
Notary Public                _____
STATE OF TEXAS               Notary Public in and for the State of Texas
My Comm. Exp. 08-18-2014

---

**AGREEMENT FOR COLOCATION AND PURCHASE**                    Page - 10 -

## SCHEDULE 1

### LIST OF ASSETS PURCHASED

- Hardware
  - Miami
    - Liebert 600T 225KVA UPS
    - Cisco 12416 w/10GE Ports
    - 2 Cisco 3750
    - 12 Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 250 Rackable 1U Dual Quad Core Opteron Servers
    - 350 Dell 1U Dual Quad Core Xeon Servers
  - Panama
    - Russel Electric ATS
    - Powerware 400/500KVA 9315 UPS
    - 2 Airflow 22 Ton HVAC
    - Cisco 12008 with GE Ports
    - 2 Cisco 3650
    - 40+ Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 1200 White Box Tower Servers
    - 50 1U Various Servers
- Complete customer list, both active and inactive
- Software:
  - WHMCS
  - FortaTrust email server and all email accounts
  - All other software applications and licenses
- Other:
  - IP Addresses
    - LACNIC IPs
      - 190.120.224/20 and 200.35.144/21
    - ARIN
      - 199.195.212.0/22 and some IPV6 - 2607:9300::/32(from June 2012)
      - 198.154.60.0/22 (from Sept 2012)
      - 162.213.152.0/22 (from June 2013)
      - 2607:FEB8::/32 (ipv6) ORG ID IIS-129
      - AS15083, AS262272
      - ORG ID FUC-9
  - All websites and content
  - Domain names:
    - FortaTrust.com
    - _____ (Other domains here)
  - Phone Numbers
    - _____ (NUMBERS HERE)

---

**Asset Purchase and Sale Agreement –**                                    **Exhibits and Schedules**

## SCHEDULE 2

### List of Conveyed FortaTrust Assets
### "Previously Conveyed Assets"

1.   UPS (Miami):  Liebert 600T 225KVA UPS

2.   UPS (Panama):  Powerware 400/500KVA 9315 UPS

3.   Fortatrust.com domain  name and existing SEO

<u>**EXHIBIT "A"**</u>

<u>Form of Purchase Agreement</u>

<u>[see attached document]</u>

---

## ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT (the *"Purchase Agreement"*) is made and entered into this ___ day of January, 2014, (the *"Effective Date"*) by and between INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama (*"Infolink"*), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 (*"FortaTrust USA"*) (Infolink and FortaTrust USA being sometimes referred to collectively as *"Seller"*), and GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the *"Shareholders"*), and Prieur J. Leary, III, the guarantor of the obligations of Seller (*"Guarantor"*), on the one hand, and ACE COLOCATION, INC., a Nevada corporation having its registered place of business located at 7575 W. Washington Avenue, Suite 127-270, Las Vegas, NV 89128 (the *"Buyer"*), on the other hand.

RECITALS:

A.    Seller is principally engaged in the business of providing dedicated servers, VPS, managed hosting and server colocation to its customers, such business operations being hereinafter referred to as *"Seller's Business"*.

B.    Seller, contemporaneously with this Agreement, has entered into an Agreement for Colocation and Purchase (the *"Agreement"*), and a Colocation Agreement (the *"Colocation Agreement"*) with Buyer.

C.    In addition to this Purchase Agreement, the parties also set forth in the Agreement certain terms and conditions to be satisfied prior to the consummation of the transaction covered in this Purchase Agreement.

D.    Seller and Buyer desire to enter into this Purchase Agreement to provide for the sale and purchase of certain assets of Seller upon the satisfaction of the conditions set forth herein and in the Agreement.

NOW, THEREFORE, in consideration of the mutual conditions, agreements, covenants and premises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the parties agree as follows:

ARTICLE ONE<br>SALE OF ASSETS

1.01    Purchase and Sale of Assets.  Seller does hereby agree to sell, assign, transfer and deliver to Buyer and Buyer agrees to purchase, accept and receive from Seller, the equipment of Seller described on Schedule 1 attached hereto and made a part hereof (the *"Equipment"*), together with:

(i)    all of Seller's current customers and customer relationships as itemized or otherwise identified on Seller's books and records as of the Effective Date of this Agreement (collectively, the *"Customers"*), together with all assignable rights and privileges of Seller with respect to such Customers, including but not limited to service agreements, service contracts, and service orders (collectively, the *"Customer Contract Rights")*;

(ii)    all information and data concerning the Customers arising from or in obtained connection

with the Seller's Business, including but not limited to Customer accounts, accounts receivable, contacts and other information, billing rates, and payment histories (collectively, the "***Customer Data***");

(iii)    all assignable licenses, permits, authorizations and consents issued by third parties, including any federal, state or local administrative agency, in the name of or in favor of Seller or which Seller has used or is currently using in connection with the Customers;

(iv)    all files, documents, records, warranties and any other material relating to the Customers (collectively, the "***Customer Records***");

(iv)    all Seller's rights, title and interest in and to all online and direct channel presences utilized or maintained in connection with Seller's Business as relating to the Customers, including but not limited to advertising listings, SEO plans and strategies, and Google rankings; and

(v)    any and all goodwill and other intangible property owned by Seller to the extent utilized in connection with Seller's Business as relating to the Customers.

For purposes hereof, the assets described in this Section 1.01 are referred to collectively as the "***Assets***", all which are to be conveyed to Buyer free and clear of all liens, encumbrances or other security interests.

1.02    <u>Excluded Assets</u>. The parties acknowledge and agree that this Purchase Agreement does not involve the sale and purchase of all the assets of Seller. Only the equipment, rights and other assets described in Section 1.01 or listed on Schedule 1 , shall comprise the Assets, and all other personal and real property of Seller shall comprise the "***Excluded Assets***" (herein so called). The parties acknowledge that the Previously Conveyed Assets have already been sold and conveyed to Buyer pursuant to the terms of the Agreement.

## ARTICLE TWO
## PURCHASE PRICE AND PAYMENT

2.01    <u>Purchase Price of Assets</u>. Subject to the terms and conditions of this Purchase Agreement, Buyer shall purchase the Assets from Seller on the Closing Date, and in consideration therefor Buyer shall pay to Seller the Purchase Price (as defined below). The purchase price of the Assets (the "***Purchase Price***") shall consist of and be computed as follows:

(i)    A sum equal to one-half (1/2), or fifty percent (50%) of the Collected Revenue (as defined below) received by Buyer during the twelve (12) month period following Closing (the "***Payout Period***") shall be paid to Seller, up to a maximum amount not to exceed $650,000; provided, however, during the final three (3) months of the Payout Period, there shall be deducted from the amount due Seller each month, an amount equal to 1/3 of the amount previously advanced under Section 2.01(ii) and Section 2.01(iii) below; and further provided, however, in any month that the Collected Revenue falls below the amount of $42,000 (a "***Threshold I Failure***"), the payout amount to Seller for such month shall be paid at the rate of twenty-five percent (25%) of the Collected Revenue, and any in month that the Collected Revenue falls below the amount of $25,000 (a "***Threshold II Failure***"), the payout amount to Seller for such month shall be paid at the rate of zero percent (0%) of the Collected Revenue.

(ii)    The sum of $40,000.00 payable for the Equipment, other than the items described on Schedule 2 (the "***Previously Conveyed Assets***"), sold and conveyed by Seller to Buyer in

conjunction with the execution and delivery of the Agreement.

     2.02   <u>Payments</u>. The Purchase Price shall be payable to Seller at Closing or from time to time after Closing as follows:

    (i)   The portion of the Purchase Price described in <u>Section 2.01(i)</u> shall be payable to Seller on a monthly basis, in arrears, beginning on the 10th day of the first month following the month of Closing, and continuing regularly and monthly thereafter during the Payout Period. On each payment date, Buyer shall pay to Seller an amount equal to one-half (1/2) (or 25% in the event of a Threshold I Failure, or 0% in the event of a Threshold II Failure) of all of the post-Closing revenue collected by Buyer in the prior month from the FortaTrust Customers, less all net chargebacks (reversals shall be credited) and refunds paid by Buyer (the "***Collected Revenue***"), subject to Seller and Guarantor not being in default under the terms of this Purchase Agreement. Non-pays or cancelled subscriptions shall not be included in the Collected Revenue amount, nor shall amounts paid to Seller prior to Closing. In addition to the foregoing, in the event Seller shall have unpaid amounts due, or otherwise be in default, under the Colocation Agreement, all amounts needed to cure such defaults shall be deducted from the payments that would otherwise be paid to Seller until all defaults have been cured. As used herein, the term "***FortaTrust Customers***" shall mean and consist of the Customers as well as new customers added by FortaTrust from time to time during the Payout Period and consistent with Buyer's client service policies, provided, however, FortaTrust shall not be eligible for any revenue growth from new customer adds, from enhancement and additional investment into the brand.

    (ii)   The portion of the Purchase Price described in <u>Section 2.01(ii)</u> shall be payable at Closing; provided, however, that Buyer shall be given a dollar-for-dollar credit against any funds advanced by or on behalf of Buyer to Seller for the conduct of Seller's Business prior to Closing; and further provided that if Buyer elects to close prior to the time that all the Equipment is located in Buyer's facility, then Buyer shall pay only a pro rata amount based on the Equipment then located within its facility, and will pay the remainder as and when the rest of the Equipment is delivered to Buyer's facility.

     2.03   <u>No Liabilities</u>. The parties expressly agree that Buyer shall not assume nor have any express or implied responsibility for any liabilities or obligations of Seller, Shareholders or Guarantor, and all of such parties shall hold Buyer harmless from all such liabilities or obligations pursuant to the indemnity provisions of this Purchase Agreement.

     2.04   <u>No Obligation to Employ</u>. The parties expressly agree that Buyer shall not have any obligation to offer, or consider for employment, any persons associated with Seller. In addition, Buyer shall have no obligation or liability for any employee or other personnel wages, expenses or other costs associated with any Seller employees, whether accruing before or after the Closing Date, except to the extent otherwise expressly assumed by Buyer pursuant to a separate written agreement.

ARTICLE THREE
<u>CLOSING AND CONVEYANCE MATTERS</u>

     3.01   <u>Pre-Closing Inspection</u>. On the morning of the Closing, or at any prior time selected by Buyer, Buyer shall have the right to inspect the Assets to verify the existence, quantities and value thereof.

3.02    Closing Date.  The sale of Assets and delivery of related documents contemplated by this Purchase Agreement (the "*Closing*") shall occur and be effective as of the close of business on May 31, 2014 (the "*Closing Date*"), provided, however, upon at least ten (10) days prior written notice to Seller, Buyer may accelerate the Closing and Closing Date at its option.

3.03    Extension of Closing.  Notwithstanding Section 3.02 above, Buyer shall have the right to extend the Closing and the Closing Date if any of the Closing Conditions set forth in Section 7.01 have not been satisfied or performed.

3.04    Instruments of Conveyance, Transfer, etc.  Effective as of the Closing Date, Seller shall deliver to Buyer:

A.    The Bill of Sale for all the Assets transferred pursuant to this Purchase Agreement, the form of which is attached hereto as Exhibit A, which Bill of Sale shall be executed in conjunction with this Purchase Agreement and deposited with Buyer's counsel for holding until the Closing;

B.    Such certificates of Seller, certifying to the matters set forth therein, and such other instruments as may be necessary (and in a form reasonably satisfactory to Buyer and its counsel) to convey the Assets and otherwise consummate the transaction contemplated in this Purchase Agreement, or as may be reasonably requested by Buyer to assure Buyer's continued use and operation of the Assets;

C.    Possession of, and all Seller's records which establish rights relating to, the Assets.

3.05    Instruments of Closing.  At and after the Closing, Buyer shall deliver to Seller:

A.    The cash portion of the Purchase Price, less such deductions and offsets as provided in Article Two;

B.    Such certificates of Buyer, certifying to the matters set forth therein, as may be reasonably necessary consummate the transaction contemplated in this Purchase Agreement and to assure Seller's receipt of the Purchase Price.

3.06    Closing and Post-Closing Obligations.

A.    At and before Closing, Seller shall coordinate with Buyer and shall act on the instructions given by Buyer from time to time to establish and/or modify the Point of Contact ("*POC*") information with ARIN.  Seller agrees to respond promptly to all requests for POC changes submitted by Buyer.  Seller, Shareholders and Guarantor further agree that for a period of sixty (60) days after Closing they will make themselves available to consult with Buyer with respect to the Assets in order to fully consummate the conveyance of same to Buyer.

B.    From and after Closing, Seller agrees to assist Buyer with the transfer of any warranties, contracts, licenses, and other components of the Assets that may require coordination with Seller to accomplish such transfers.  Notwithstanding anything herein to the contrary, Seller, Shareholders, Guarantor and Buyer agree to cooperate to timely perform the various functions and actions required to facilitate the transition and conveyance of the Assets.

C.    Seller, Shareholders and Guarantor agree that for a period of two (2) years after the end of the Payout Period, neither will solicit Clients to compete with Buyer selling products and services, nor will either contact any Clients for any reason without the prior written consent of Buyer.  As used in this Section 3.06.C,

---

**ASSET PURCHASE AND SALE AGREEMENT**                                                **PAGE 4**

the term "Client" means and includes any person, firm, entity or association to which any sale was made, or with which Seller, Shareholders or Guarantor has had any contact as evidenced by a written documents sent or received, during the two (2) year period prior to the date of Closing.

3.07    Other Action. Seller shall take all other actions prior, on or after the Closing Date as shall be reasonably required to comply with all other terms of this Purchase Agreement, or which shall be required to put Buyer in actual possession and operating control of the Assets, or to effect the consummation of the transaction contemplated by the parties and described in this Purchase Agreement (the "*Transaction*").

ARTICLE FOUR
SELLER'S REPRESENTATIONS AND WARRANTIES

4.01    Covenants, Representations and Warranties of Seller, Shareholders and Guarantor. Seller, Shareholders and Guarantor covenant, represent and warrant to Buyer as follows, all of which Buyer will rely solely upon in consummating this Transaction, notwithstanding any investigation by Buyer into any of the following matters.

A.    Legal Authority. Seller is a corporation duly organized and validly existing under the laws of the State of Delaware and Panama, as applicable. Seller has full legal power and authority to own, operate and sell the Assets and to carry on the business associated with the Assets wherever such business is being transacted. Shareholders are the controlling shareholders of Seller.

B.    Authorization. Seller, Shareholders and Guarantor have duly taken all action necessary to authorize the execution, delivery and performance of this Purchase Agreement and have executed and delivered all other documents as required herein, and have and shall have at Closing the full right, power and authority to sell, transfer and convey the Assets to Buyer and consummate the Transaction. This Purchase Agreement and all other agreements referred to herein and executed by Seller, Shareholders and Guarantor are legal, valid and binding obligations of Seller, enforceable in accordance with their terms. The performance of this Purchase Agreement does not require the consent of or approval of any person, agency or court, and will not conflict with, result in a breach of any term of, or constitute a default under any material agreement or instrument to which Seller is a party or any judgment, decree, order, statute, rule or regulation to which Seller is subject

C.    Litigation and Other Proceedings. There is no litigation, action, suit, investigation or proceeding pending or, to the knowledge of Seller, threatened against or affecting Seller, Shareholders or Guarantor, or the Assets before any court, agency or other governmental body which may result in any material adverse effect upon the Assets or the business associated therewith, or which seeks to enjoin or prohibit or otherwise challenge the Transaction, or would affect Buyer's ability to engage in business using the Assets or otherwise.

D.    Title to Assets; Condition. Seller shall convey to Buyer, on the Closing Date, good and marketable title to the Assets free and clear of all pledges, claims, liens, charges, or other encumbrances. None of Seller, Shareholders or Guarantor has sold, licensed or otherwise assigned any of its rights in, to or under the Assets (or entered into an agreement to do any of the foregoing), and Seller has not received any notice, and otherwise has no knowledge, of any termination, suspension, recision or requested amendment or modification of the Assets. Seller shall assign to Buyer, to the extent possible if any exist, all warranty rights, owned by Seller with respect to the Assets. All Assets, including but not limited to all vendor agreements, software licenses, and other contracts may be assigned and transferred by Seller, and Seller has the right and power to make such assignments in accordance with the terms of this Purchase Agreement.

E.     Taxes.  All taxes of every kind and description (whether incurred in respect of, or measured by, income or otherwise) relating to any date or period of time prior to the Closing Date and payable by the Seller to any federal, state, county or municipal taxing authorities, have either been paid in full or, with respect to any such taxes which have not been paid on or before the Closing Date, will be paid by the Seller when due, and Seller is not delinquent with respect to any tax payment or assessment.  There are no audits or material claims pending, or to the knowledge of Seller threatened, concerning taxes or assessments asserted against Seller, Guarantor or the Assets.  Any taxes attributable to this sale shall be paid by Seller on or before the date due.

F.     Tax Returns, Reports and Statements.  Seller and Guarantor have timely filed all income, franchise and other tax returns, reports and statements required by all taxing authorities to be filed by Seller and Guarantor for all dates and periods of time prior to the Closing Date.  Each party agrees to cooperate with the other and furnish to the other any information in the possession of either party in order to assist the other in the preparation of its federal, state and other tax returns, reports and assessments and statements of the business associated with the Assets.

G.     Licenses and Permits, etc.  Seller has all necessary licenses, permits, rights, certificates, approvals and other authorizations required to own, lease, use and operate the Assets at the places and in the manner previously conducted and operated.  Seller will preserve, make available for inspection, and assign at the Closing, all such licenses, permits, rights, certificates, approvals and other authorizations.  Seller has not received any notice of any event or condition which indicates that the Assets or the operation thereof are not in substantial conformity with all applicable laws, ordinances, regulations, rules, judgments and orders.

H.     Records and Inspections.  Buyer and its counsel shall have full and complete access at all reasonable times to all the books of account, records, files, leases and other information relating to the Assets for the purpose of examination and copying.

I.     Value.  Seller warrants and represents that the transfer of the Assets is (i) for reasonably equivalent value as negotiated and agreed to by Buyer and Seller, (ii) not a fraud on the rights of any creditor, and (iii) does not and will not render Seller insolvent as of the time of the transfer.

4.02   Seller's Covenants.

A.     Seller Conduct.  Seller has and through the time of Closing will: (i) conduct the business associated with the Assets in the usual, regular and ordinary course in accordance with Seller's past practice, save and except for the relocation of Seller's business to the DFW Facility and operation of such Assets under the Colocation Agreement; (ii) other than in the ordinary course of business of Seller as noted above, not: (a) sell, dispose of, mortgage or encumber any of the Assets; (b) acquire any Assets for which the purchase price has not been paid in full, without first obtaining Buyer's prior written approval; or (c) incur any indebtedness for which any of the Assets are, or may be, subject  to any lien or claim, either expressed or implied; and (iii) not solicit or negotiate with any other party, any offers for the sale of the Assets.  During the same period of time, and for a period of ninety (90) days following this Closing, neither Shareholders nor Guarantor will sell, grant, gift or otherwise transfer any equity interest in Seller to any third party without Buyer's written consent.

B.     No Existing Liens.  There are no currently effective financing statements under the Uniform Commercial Code which names Seller as debtor has been filed in any jurisdiction and Seller has not signed any such financing statement or any security agreement authorizing any secured party to file any such financing statement, that covers the Assets, either directly or indirectly.  Should any such lien arise with respect to the Assets, Seller and Guarantor agree to promptly discharge all such liens and encumbrances at their expense.

C.     Misrepresentations.  If any of the representations and warranties of Seller, Shareholders or Guarantor made in Section 4.01, or any of the undertakings Seller, Shareholders or Guarantor in Article Six, are, or at any time prior to Closing become, untrue, incorrect, inaccurate or unfulfilled in any respect whatsoever, Seller covenants and agrees to take immediate and corrective action to remedy same and shall provide Buyer written notice thereof of the discovery, the remedial actions being undertaken, and the results of such remedial action.

4.03     Definition of Knowledge.  As used in this Purchase Agreement, the term "knowledge", "actual knowledge" or "best knowledge" of Seller shall mean the knowledge which any officer of Seller has or should have acquired upon reasonable inquiry into facts known by or disclosed to such person.

ARTICLE FIVE
BUYER'S REPRESENTATIONS AND WARRANTIES

5.01     Buyer's Acknowledgments, Covenants, Representations and Warranties.

A.     Buyer is a corporation duly organized under the laws of the State of Nevada.  Buyer covenants, represents and warrants to Seller that Buyer has duly taken, or will have taken by the Closing Date, all action necessary to authorize the execution, delivery and performance of this Purchase Agreement and the Transaction, and has executed and delivered, or will execute and deliver, all other documents required herein. Buyer further covenants that it shall have as of the date of Closing, full right, power and authority to purchase the Assets from Seller.  The Agreement and all other agreements referred to herein and executed by Buyer are legal, valid and binding obligations of Buyer, enforceable in accordance with their terms.

B.     Unless otherwise disclosed in this Purchase Agreement, the performance hereof does not require the consent or approval of any person, agency or court, and will not conflict with, result in a breach of any term of, or constitute a default under any material agreement or instrument to which Buyer is a party or any judgment, decree, order, statute, rule or regulation to which Buyer is subject.

ARTICLE SIX
INTERIM OPERATIONS

6.01     Further Agreements for Interim Operations.

A.     Pending the Closing Date, Buyer is not and shall not in any event be responsible or liable for any loss or damage to the Assets from any cause whatsoever.  Seller shall give prompt notice to Buyer of any such loss or damage and Buyer shall, at its election, have the right to terminate this Purchase Agreement.

B.     Pending the Closing Date, Seller and Guarantor shall perform under all contracts pertaining to the Assets.  If Seller enters into any new contracts affecting the Assets, without the prior written consent of Buyer, Buyer shall have the right to terminate this Purchase Agreement and all obligations hereunder, and receive a return of the Purchase Price (or any portion thereof) previously deposited with or advanced to Seller; and following termination of this Purchase Agreement, Seller shall return the full amount of all funds previously deposited with or advanced to Seller.

C.     Seller, Shareholders and Guarantor shall, on or prior to the Closing Date, assist Buyer in obtaining from each person, firm, association, corporation, partnership and governmental authority, all consents and approvals to the sale, conveyance, transfer and assignment of the Assets, which is required by the terms of any statute, ordinance, regulation, lease or contract to which Seller is a party, or is otherwise subject.

D.    Seller, Shareholders and Guarantor agree that from and after the date of this Purchase Agreement it will not make any changes to any vendor contracts of Seller, nor communicate with any of such vendors regarding any changes to their contracts, without the prior written consent of Buyer.  The parties acknowledge that Buyer will not acquire or otherwise obtain any rights with respect to Seller's existing vendor relationships, and the foregoing covenant not to alter such agreements is intended to prevent any such changes from negatively impacting the Equipment or other Assets being purchased.  Notwithstanding the foregoing, if Buyer determines, at its sole and absolute discretion, that it desires to acquire a particular vendor relationship(s), then Seller and Guarantor agree to cooperate with Buyer in connection the assignment of such relationship(s).

E.    Seller and Shareholder agree that from and after the date of this Purchase Agreement it will not initiate any contact with ARIN or LACNIC or respond to any email, inquiries or other communication from ARIN or LACNIC, and will forward to Buyer all emails (and any other communications) received from ARIN and LACNIC.  Until the date of Closing, Seller and Buyer will prepare a mutually agreed response, and after Closing, Buyer shall have the sole right to prepare and respond to all ARIN and LACNIC inquiries.

## ARTICLE SEVEN
## CONDITIONS

7.01    Conditions Precedent to Buyer's Obligations.  The performance of the obligations of Buyer hereunder is subject, at the election of Buyer, to the following conditions (the "*Closing Conditions*"):

A.    Seller's Representations, Warranties and Covenant.  The representations, warranties and covenants of Seller Shareholders and Guarantor shall be true and correct in all respects as of and at the Closing Date with the same force and effect as though made on such date, and all obligations and covenants required by this Purchase Agreement to be performed or complied with by Seller on or prior to the Closing Date shall have been duly performed or complied with by Seller.

B.    Violation of Laws, Ordinances, etc.  On or before the Closing Date, none of Seller, Shareholders or Guarantor shall have received any notice or have knowledge of any pending or threatened lawsuit, or any violation or alleged violation of any city ordinance, state law, rule or regulation of any governmental authority with respect to Seller's use of the Assets or operation of any of Seller's Business.

C.    Documentation.  All documentation described herein or otherwise required to consummate this Purchase Agreement and the Transaction has been prepared to the reasonable satisfaction of Buyer and its counsel and delivered prior to or at Closing.

D.    Final Adjustment to Price.  Any adjustment to the Purchase Price, and any adjustment of related expenses and/or customer revenues, that is provided in this Purchase Agreement, shall have been made and communicated to Seller prior to the Closing.

E.    Conveyances.  Seller and Shareholder shall be able to deliver to Buyer good and marketable title to all the Assets.

F.    Other Conditions.  Seller shall have complied with and otherwise satisfied all conditions of closing set forth in the Agreement, and Seller, Shareholders and Guarantor shall not be in default under any of the terms and conditions of the Agreement or Colocation Agreement, and all representations, warranties, covenants and agreements of Seller, Shareholders and Guarantor, as set forth in the Agreement and Colocation Agreement shall be true and correct in all material respects and in no way misleading.

**ARTICLE EIGHT**
**SURVIVAL**

8.01    Survival of Representations, Warranties and Covenants. All covenants, representations and warranties made in this Purchase Agreement shall be deemed to be material and to have been relied upon by Seller or Buyer, as the case may be, notwithstanding any investigation made by or on behalf of any party prior to or after the Effective Date, and the indemnification and other provisions of this Purchase Agreement which by their terms are to be performed or observed after the Closing Date shall survive the Closing Date for a period of four (4) years.

8.02    Special Survival Provisions. Seller, Shareholders, Guarantor and Buyer agree that the obligations regarding communications with ARIN and LACNIC set forth in Section 6.01.E. will continue after closing for a period of seven (7) years.

**ARTICLE NINE**
**INDEMNIFICATION**

9.01    Indemnification by Seller. Seller, Shareholders and Guarantor hereby indemnify and agree to hold Buyer harmless from and to pay and reimburse Buyer for any and all liability, claim, cause of action, damage, demand, loss, cost or expense, including legal and accounting fees, incurred by reason of or arising out of: (i) misrepresentations by Seller, Shareholders or Guarantor in connection with Transaction; (ii) breaches by Seller, Shareholders or Guarantor of any representations, warranties, covenants or provisions of this Purchase Agreement not waived in writing by Buyer; or (iii) defending or otherwise contesting any claims which, if proven, would be covered in whole or in part by the indemnity provisions of this Purchase Agreement.

9.02    Indemnification by Buyer. Buyer hereby indemnifies and agrees to hold Seller harmless from and to pay and reimburse Seller for any and all liability, claim, cause of action, damage, demand, loss, cost or expense, including legal and accounting fees, incurred by reason of or arising out of: (i) misrepresentations by Buyer in connection with Transaction; (ii) breaches by Buyer of any representations, warranties, covenants or provisions of this Purchase Agreement not waived in writing by Seller; or (iii) defending or otherwise contesting any claims which, if proven, would be covered in whole or in part by the indemnity provisions of this Purchase Agreement.

9.03    Indemnification Claims. If any action, suit or proceedings shall be commenced against, or any claim or demand be asserted against either party, for which indemnification is to be provided hereunder, such party shall provide written notice to the other. Within thirty (30) days after receipt of demand for indemnification, such party shall have the right to assume the entire control of the defense, including the right of the selection of counsel, subject to the right to participate in such action, suit or proceedings with counsel of its choice and at its expense. In connection therewith, the parties shall reasonably and fully cooperate with each other in all respects in any such defense, compromise or settlement, including, without limitation, using its best reasonable efforts to make available all pertinent information under the direct control of each party. Neither party will compromise or settle any such action, suit, proceeding, claim or demand without the prior written consent of the other party.

**ARTICLE TEN**
**REMEDIES**

10.01    Remedies Upon Default.

A.    Seller's Remedies.  If Buyer shall materially default in the performance of its representations, warranties and covenants under this Purchase Agreement or shall for any reason fail to consummate this Purchase Agreement at the Closing Date other than for the failure of any of the specified conditions of Closing, and Seller is not then in default of any of its representations, warranties and covenants hereunder, Seller shall then be entitled, as its sole and exclusive remedy, to terminate this Purchase Agreement without any liability on Seller's part and shall be entitled to retain any earnest money, advance payments, or other amounts tendered by Buyer.

B.    Buyer's Remedies.  If Seller, Shareholders or Guarantor shall materially default in the performance of their respective representations, warranties and covenants under this Purchase Agreement, the Agreement or the Colocation Agreement, or shall for any reason fail to consummate this Purchase Agreement at the Closing Date, other than due to a material default by Buyer, Buyer shall be entitled at its option to either enforce specific performance of the obligations of Seller, Shareholders and Guarantor, or to terminate this Purchase Agreement without any liability on Buyer's part and shall be entitled to retain or recover, as applicable, any earnest money, advance payments, or other amounts tendered by Buyer.  In furtherance of the rights afforded Buyer under this Purchase Agreement in the event of a failure of Buyer to close, Seller hereby appoints Buyer, or its designee, to act as Seller's attorney-in-fact, and grants to Buyer or its designee an interest in the Assets for the limited purpose of transferring same under the terms of this Purchase Agreement, including but not limited to the power to execute and deliver any documents deemed necessary by Buyer to consummate the Transaction.  The power of attorney granted above shall be irrevocable and coupled with an interest.

## ARTICLE ELEVEN
## GENERAL PROVISIONS

11.01   Expenses.  Each of the parties hereto shall bear all expenses incurred by them in connection with this Purchase Agreement, and in the preparation for and consummation of the Transaction.

11.02   Broker.  No Broker or Finder has been involved in this transaction, other than the broker representing Buyer, who will be compensated solely by Buyer pursuant to the terms of a separate agreement outside of this Purchase Agreement.  Seller and Buyer agree to indemnify each other for any other broker's, finder's, or other fee due by reason of actions of the other party as a result of this Purchase Agreement and the Transaction.

11.03   Benefit.  This Purchase Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, personal representatives, successors and permitted assigns, if applicable.

11.04   Construction.  This Purchase Agreement shall be construed and enforced in accordance with laws of the State of Texas, and venue for any action arising hereunder shall be proper only in Dallas County, Texas.

11.05   Notices.  All necessary notices, demands and requests required or permitted to be given hereunder shall be deemed duly given when personally delivered or on the third (3rd) day after postmark if mailed by certified mail, return receipt requested, to the following addresses or to such other addresses as either party shall request in writing:

If to Seller:

Prieur J. Leary, III

---

ASSET PURCHASE AND SALE AGREEMENT                                        PAGE 10

President
Forta Trust / Infolink Panama
3701 NW 82nd St.
Doral, Florida 33166

If to <u>Buyer</u>:

Liana Dunlap
President - CEO
Ace Colocation, Inc.
7575 W. Washington Avenue
Suite 127-270
Las Vegas, NV 89128

11.06    <u>Counterparts</u>.  This Purchase Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other party.

11.07    <u>Rules of Construction</u>.  The parties acknowledge that each has reviewed, or has had the opportunity to review this Purchase Agreement with counsel engaged to advise them on same; therefore, the parties agree that the normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Purchase Agreement.  All headings used herein are for convenience only and shall not be considered when interpreting the provisions of this Purchase Agreement.

11.08    <u>Publicity</u>.  Neither Seller, Shareholders nor Guarantor will release publicly or disclose to third parties this Purchase Agreement or the purchase and sale contemplated hereunder without the prior written consent of Buyer.

11.09    <u>Prior Agreement Superseded</u>.  This Purchase Agreement constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter.

*[Remainder of Page intentionally left blank]*

IN WITNESS HEREOF, each of the parties hereto has caused this Purchase Agreement to be duly executed on its behalf in duplicate on the day and year indicated above.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
    Liana Dunlap, President-CEO


**SELLERS:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____      _____
    Prieur J. Leary, III, President              Date

**InfoLink Panama Corp.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____      _____
    Prieur J. Leary, III, President              Date


**SHAREHOLDERS OF INFOLINK PANAMA CORP:**

**Grupo Pronto, S.A.**
a Panamanian corporation

By: _____      _____
    Prieur J. Leary, III, President              Date

**IT Experts, Inc.**
a Panamanian corporation

By: _____      _____
    Luciano E Maiello, President                Date


**GUARANTOR:**

_____
**Prieur J. Leary, III**


**ASSET PURCHASE AND SALE AGREEMENT**                                   **PAGE 12**

**LIST OF SCHEDULES AND EXHIBITS**
**TO**
**ASSET PURCHASE AND SALE AGREEMENT**

**Schedules:**

Schedule 1                                List of Assets
Schedule 2                                List of Previously Conveyed Assets

**Exhibits:**

Exhibit A                                 Form of Bill of Sale

**SCHEDULE 1**

LIST OF ASSETS PURCHASED

- Hardware
  - Miami
    - Liebert 600T 225KVA UPS
    - Cisco 12416 w/10GE Ports
    - 2 Cisco 3750
    - 12 Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 250 Rackable 1U Dual Quad Core Opteron Servers
    - 350 Dell 1U Dual Quad Core Xeon Servers
  - Panama
    - Russel Electric ATS
    - Powerware 400/500KVA 9315 UPS
    - 2 Airflow 22 Ton HVAC
    - Cisco 12008 with GE Ports
    - 2 Cisco 3650
    - 40+ Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 1200 White Box Tower Servers
    - 50 1U Various Servers
- Complete customer list, both active and inactive
- Software:
  - WHMCS
  - FortaTrust email server and all email accounts
  - All other software applications and licenses
- Other:
  - IP Addresses
    - LACNIC IPs
      - 190.120.224/20 and 200.35.144/21
    - ARIN
      - 199.195.212.0/22 and some IPV6 - 2607:9300::/32(from June 2012)
      - 198.154.60.0/22 (from Sept 2012)
      - 162.213.152.0/22 (from June 2013)
      - 2607:FEB8::/32 (ipv6) ORG ID IIS-129
      - AS15083, AS262272
      - ORG ID FUC-9
  - All websites and content
  - Domain names:
    - FortaTrust.com
    - _____ (Other domains here)
  - Phone Numbers
    - _____ (NUMBERS HERE)

## **SCHEDULE 2**

LIST OF PREVIOUSLY CONVEYED ASSETS

1.  UPS (Miami):  Liebert 600T 225KVA UPS

2.  UPS (Panama):  Powerware 400/500KVA 9315 UPS

3.  Fortatrust.com domain and existing SEO

# EXHIBIT A

FORM OF BILL OF SALE

[See attached]

## BILL OF SALE

THIS BILL OF SALE (the "*Agreement*") is executed to be effective as of the ____ day of _____, 2014, by INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama ("*Infolink*"), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 ("*FortaTrust USA*") (Infolink and FortaTrust USA being sometimes referred to collectively as "*Seller*") and GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the "*Shareholders*"), and Prieur J. Leary, III, the guarantor of the obligations of Seller ("*Guarantor*"), in favor of ACE COLOCATION, INC., a Nevada corporation ("*Buyer*").

## WITNESSETH:

A.     Seller, Shareholder and Buyer have entered into an Agreement for Colocation and Purchase dated on even date herewith (the "*Agreement*"), pursuant to which Seller and Shareholder have agreed to sell and Buyer has agreed to purchase certain assets in exchange for the consideration described therein.

B.     Seller and Shareholder desire to sell and convey certain personal property, as more specifically listed on Exhibit "A" attached hereto and made a part hereof (the "*Property*"), to Buyer for the consideration recited herein and also set forth in the Agreement.

NOW, THEREFORE, for and in consideration of Buyer's payment to Seller in the amount of US$10,000.00, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Bill of Sale.  Seller has GRANTED, BARGAINED, SOLD, TRANSFERRED and CONVEYED, and by these presents does GRANT, BARGAIN, SELL, TRANSFER and CONVEY unto Buyer all right, title and interest of Seller and Shareholder, if any, in and to the Property.

2.     Warranty of Title.  Seller and Shareholder warrant that Seller is the lawful owner in every aspect of all the Property, including but not limited to all warranties, guarantees, and the like, and that such ownership consists of good and marketable title to the Property.  Seller, Shareholder and Guarantor bind themselves and their successors and assigns to warrant and defend the title to all the Property to Buyer, its successors and assigns, forever against every person lawfully claiming the Property or any part thereof.

3.     Assurance of Interest.  Seller agrees to indemnify, defend and hold Buyer harmless from any and all loss, cost, claim, liability, expense or demand of any nature under the Property (including reasonable attorneys' fees) arising out of the Property hereby conveyed.

4.     Governing Law.  This Agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Dallas County, Texas.

5.     Successors and Assigns.  This Agreement and the rights and obligations contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

6.　_Multiple Counterparts_.  This Agreement may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original.

7.　_Further Assurances_.  Each party shall, upon the request of the other party, execute, acknowledge and deliver any and all instruments reasonably necessary or appropriate to carry into effect the intention of the parties as expressed in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed to be effective as of the day and year first above written.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
　　　Liana Dunlap, President-CEO

**SELLER:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____
　　　Prieur J. Leary, III, President

**InfoLink Panama Corp., S.A.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____
　　　Prieur J. Leary, III, President

**GUARANTOR:**

_____
**Prieur J. Leary, III**

**EXHIBIT "A"**

**LIST OF ASSETS PURCHASED**

**EXHIBIT "B"**

Form of Bill of Sale

## BILL OF SALE

THIS BILL OF SALE (the "*Agreement*") is executed to be effective as of the ___ day of _____, 2014, by INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama ("*Infolink*"), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 ("*FortaTrust USA*") (Infolink and FortaTrust USA being sometimes referred to collectively as "*Seller*") and GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the "*Shareholders*"), and Prieur J. Leary, III, the guarantor of the obligations of Seller ("*Guarantor*"), in favor of ACE COLOCATION, INC., a Nevada corporation ("*Buyer*").

### W I T N E S S E T H :

A.   Seller, Shareholder and Buyer entered into an Agreement for Colocation and Purchase dated January 24, 2014 (the "*Agreement*"), pursuant to which Seller and Shareholder have agreed to sell and Buyer has agreed to purchase certain assets in exchange for the consideration described therein.

B.   Seller and Shareholder desire to sell and convey certain personal property, as more specifically listed on Exhibit "A" attached hereto and made a part hereof (the "*Property*"), to Buyer for the consideration recited herein and also set forth in the Agreement.

NOW, THEREFORE, for and in consideration of Buyer's payment to Seller in the amount of US$10,000.00, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Bill of Sale.   Seller has GRANTED, BARGAINED, SOLD, TRANSFERRED and CONVEYED, and by these presents does GRANT, BARGAIN, SELL, TRANSFER and CONVEY unto Buyer all right, title and interest of Seller and Shareholder, if any, in and to the Property.

2.   Warranty of Title.   Seller and Shareholder warrant that Seller is the lawful owner in every aspect of all the Property, including but not limited to all warranties, guarantees, and the like, and that such ownership consists of good and marketable title to the Property.   Seller, Shareholder and Guarantor bind themselves and their successors and assigns to warrant and defend the title to all the Property to Buyer, its successors and assigns, forever against every person lawfully claiming the Property or any part thereof.

3.   Assurance of Interest.   Seller agrees to indemnify, defend and hold Buyer harmless from any and all loss, cost, claim, liability, expense or demand of any nature under the Property (including reasonable attorneys' fees) arising out of the Property hereby conveyed.

4.   Governing Law.   This Agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Dallas County, Texas.

5.   Successors and Assigns.   This Agreement and the rights and obligations contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

6.   Multiple Counterparts.   This Agreement may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original.

7.    <u>Further Assurances</u>.    Each party shall, upon the request of the other party, execute, acknowledge and deliver any and all instruments reasonably necessary or appropriate to carry into effect the intention of the parties as expressed in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed to be effective as of the day and year first above written.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
    Liana Dunlap, President-CEO


**SELLER:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____
    Prieur J. Leary, III, President


**InfoLink Panama Corp., S.A.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____
    Prieur J. Leary, III, President


**GUARANTOR:**

_____
**Prieur J. Leary, III**

**<u>EXHIBIT "A"</u>**

<u>LIST OF ASSETS PURCHASED</u>

## ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT (the *"Purchase Agreement"*) is made and entered into this ___ day of January, 2014, (the *"Effective Date"*) by and between INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama (*"Infolink"*), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 (*"FortaTrust USA"*) (Infolink and FortaTrust USA being sometimes referred to collectively as *"Seller"*), and GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the *"Shareholders"*), and Prieur J. Leary, III, the guarantor of the obligations of Seller (*"Guarantor"*), on the one hand, and ACE COLOCATION, INC., a Nevada corporation having its registered place of business located at 7575 W. Washington Avenue, Suite 127-270, Las Vegas, NV 89128 (the *"Buyer"*), on the other hand.

### RECITALS:

A.      Seller is principally engaged in the business of providing dedicated servers, VPS, managed hosting and server colocation to its customers, such business operations being hereinafter referred to as *"Seller's Business"*.

B.      Seller, contemporaneously with this Agreement, has entered into an Agreement for Colocation and Purchase (the *"Agreement"*), and a Colocation Agreement (the *"Colocation Agreement"*) with Buyer.

C.      In addition to this Purchase Agreement, the parties also set forth in the Agreement certain terms and conditions to be satisfied prior to the consummation of the transaction covered in this Purchase Agreement.

D.      Seller and Buyer desire to enter into this Purchase Agreement to provide for the sale and purchase of certain assets of Seller upon the satisfaction of the conditions set forth herein and in the Agreement.

NOW, THEREFORE, in consideration of the mutual conditions, agreements, covenants and premises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the parties agree as follows:

### ARTICLE ONE
### SALE OF ASSETS

1.01    Purchase and Sale of Assets.  Seller does hereby agree to sell, assign, transfer and deliver to Buyer and Buyer agrees to purchase, accept and receive from Seller, the equipment of Seller described on Schedule 1 attached hereto and made a part hereof (the *"Equipment"*), together with:

(i)      all of Seller's current customers and customer relationships as itemized or otherwise identified on Seller's books and records as of the Effective Date of this Agreement (collectively, the *"Customers"*), together with all assignable rights and privileges of Seller with respect to such Customers, including but not limited to service agreements, service contracts, and service orders (collectively, the *"Customer Contract Rights")*;

(ii)     all information and data concerning the Customers arising from or in obtained connection

---

with the Seller's Business, including but not limited to Customer accounts, accounts receivable, contacts and other information, billing rates, and payment histories (collectively, the "**Customer Data**");

(iii)    all assignable licenses, permits, authorizations and consents issued by third parties, including any federal, state or local administrative agency, in the name of or in favor of Seller or which Seller has used or is currently using in connection with the Customers;

(iv)    all files, documents, records, warranties and any other material relating to the Customers (collectively, the "**Customer Records**");

(iv)    all Seller's rights, title and interest in and to all online and direct channel presences utilized or maintained in connection with Seller's Business as relating to the Customers, including but not limited to advertising listings, SEO plans and strategies, and Google rankings; and

(v)    any and all goodwill and other intangible property owned by Seller to the extent utilized in connection with Seller's Business as relating to the Customers.

For purposes hereof, the assets described in this Section 1.01 are referred to collectively as the "**Assets**", all which are to be conveyed to Buyer free and clear of all liens, encumbrances or other security interests.

1.02    Excluded Assets.  The parties acknowledge and agree that this Purchase Agreement does not involve the sale and purchase of all the assets of Seller. Only the equipment, rights and other assets described in Section 1.01 or listed on Schedule 1 , shall comprise the Assets, and all other personal and real property of Seller shall comprise the "**Excluded Assets**" (herein so called).  The parties acknowledge that the Previously Conveyed Assets have already been sold and conveyed to Buyer pursuant to the terms of the Agreement.

ARTICLE TWO
PURCHASE PRICE AND PAYMENT

2.01    Purchase Price of Assets.  Subject to the terms and conditions of this Purchase Agreement, Buyer shall purchase the Assets from Seller on the Closing Date, and in consideration therefor Buyer shall pay to Seller the Purchase Price (as defined below).  The purchase price of the Assets (the "**Purchase Price**") shall consist of and be computed as follows:

(i)    A sum equal to one-half (1/2), or fifty percent (50%) of the Collected Revenue (as defined below) received by Buyer during the twelve (12) month period following Closing (the "**Payout Period**") shall be paid to Seller, up to a maximum amount not to exceed $650,000; provided, however, during the final three (3) months of the Payout Period, there shall be deducted from the amount due Seller each month, an amount equal to 1/3 of the amount previously advanced under Section 2.01(ii) and Section 2.01(iii) below; and further provided, however, in any month that the Collected Revenue falls below the amount of $42,000 (a "**Threshold I Failure**"), the payout amount to Seller for such month shall be paid at the rate of twenty-five percent (25%) of the Collected Revenue, and any in month that the Collected Revenue falls below the amount of $25,000 (a "**Threshold II Failure**"), the payout amount to Seller for such month shall be paid at the rate of zero percent (0%) of the Collected Revenue.

(ii)    The sum of $40,000.00 payable for the Equipment, other than the items described on Schedule 2 (the "**Previously Conveyed Assets**"), sold and conveyed by Seller to Buyer in

conjunction with the execution and delivery of the Agreement.

      2.02   <u>Payments</u>.  The Purchase Price shall be payable to Seller at Closing or from time to time after Closing as follows:

      (i)     The portion of the Purchase Price described in <u>Section 2.01(i)</u> shall be payable to Seller on a monthly basis, in arrears, beginning on the 10th day of the first month following the month of Closing, and continuing regularly and monthly thereafter during the Payout Period.  On each payment date, Buyer shall pay to Seller an amount equal to one-half (1/2) (or 25% in the event of a Threshold I Failure, or 0% in the event of a Threshold II Failure) of all of the post-Closing revenue collected by Buyer in the prior month from the FortaTrust Customers, less all net chargebacks (reversals shall be credited) and refunds paid by Buyer (the "*Collected Revenue*"), subject to Seller and Guarantor not being in default under the terms of this Purchase Agreement.  Non-pays or cancelled subscriptions shall not be included in the Collected Revenue amount, nor shall amounts paid to Seller prior to Closing.  In addition to the foregoing, in the event Seller shall have unpaid amounts due, or otherwise be in default, under the Colocation Agreement, all amounts needed to cure such defaults shall be deducted from the payments that would otherwise be paid to Seller until all defaults have been cured.  As used herein, the term "*FortaTrust Customers*" shall mean and consist of the Customers as well as new customers added by FortaTrust from time to time during the Payout Period and consistent with Buyer's client service policies, provided, however, FortaTrust shall not be eligible for any revenue growth from new customer adds, from enhancement and additional investment into the brand.

      (ii)    The portion of the Purchase Price described in <u>Section 2.01(ii)</u> shall be payable at Closing; provided, however, that Buyer shall be given a dollar-for-dollar credit against any funds advanced by or on behalf of Buyer to Seller for the conduct of Seller's Business prior to Closing; and further provided that if Buyer elects to close prior to the time that all the Equipment is located in Buyer's facility, then Buyer shall pay only a pro rata amount based on the Equipment then located within its facility, and will pay the remainder as and when the rest of the Equipment is delivered to Buyer's facility.

      2.03   <u>No Liabilities</u>.  The parties expressly agree that Buyer shall not assume nor have any express or implied responsibility for any liabilities or obligations of Seller, Shareholders or Guarantor, and all of such parties shall hold Buyer harmless from all such liabilities or obligations pursuant to the indemnity provisions of this Purchase Agreement.

      2.04   <u>No Obligation to Employ</u>.  The parties expressly agree that Buyer shall not have any obligation to offer, or consider for employment, any persons associated with Seller.  In addition, Buyer shall have no obligation or liability for any employee or other personnel wages, expenses or other costs associated with any Seller employees, whether accruing before or after the Closing Date, except to the extent otherwise expressly assumed by Buyer pursuant to a separate written agreement.

## ARTICLE THREE
## CLOSING AND CONVEYANCE MATTERS

      3.01   <u>Pre-Closing Inspection</u>.  On the morning of the Closing, or at any prior time selected by Buyer, Buyer shall have the right to inspect the Assets to verify the existence, quantities and value thereof.

---

**ASSET PURCHASE AND SALE AGREEMENT**              **PAGE 3**

3.02    Closing Date.  The sale of Assets and delivery of related documents contemplated by this Purchase Agreement (the "*Closing*") shall occur and be effective as of the close of business on May 31, 2014 (the "*Closing Date*"), provided, however, upon at least ten (10) days prior written notice to Seller, Buyer may accelerate the Closing and Closing Date at its option.

3.03    Extension of Closing.  Notwithstanding Section 3.02 above, Buyer shall have the right to extend the Closing and the Closing Date if any of the Closing Conditions set forth in Section 7.01 have not been satisfied or performed.

3.04    Instruments of Conveyance, Transfer, etc.  Effective as of the Closing Date, Seller shall deliver to Buyer:

A.    The Bill of Sale for all the Assets transferred pursuant to this Purchase Agreement, the form of which is attached hereto as Exhibit A, which Bill of Sale shall be executed in conjunction with this Purchase Agreement and deposited with Buyer's counsel for holding until the Closing;

B.    Such certificates of Seller, certifying to the matters set forth therein, and such other instruments as may be necessary (and in a form reasonably satisfactory to Buyer and its counsel) to convey the Assets and otherwise consummate the transaction contemplated in this Purchase Agreement, or as may be reasonably requested by Buyer to assure Buyer's continued use and operation of the Assets;

C.    Possession of, and all Seller's records which establish rights relating to, the Assets.

3.05    Instruments of Closing.  At and after the Closing, Buyer shall deliver to Seller:

A.    The cash portion of the Purchase Price, less such deductions and offsets as provided in Article Two;

B.    Such certificates of Buyer, certifying to the matters set forth therein, as may be reasonably necessary consummate the transaction contemplated in this Purchase Agreement and to assure Seller's receipt of the Purchase Price.

3.06    Closing and Post-Closing Obligations.

A.    At and before Closing, Seller shall coordinate with Buyer and shall act on the instructions given by Buyer from time to time to establish and/or modify the Point of Contact ("*POC*") information with ARIN.  Seller agrees to respond promptly to all requests for POC changes submitted by Buyer.  Seller, Shareholders and Guarantor further agree that for a period of sixty (60) days after Closing they will make themselves available to consult with Buyer with respect to the Assets in order to fully consummate the conveyance of same to Buyer.

B.    From and after Closing, Seller agrees to assist Buyer with the transfer of any warranties, contracts, licenses, and other components of the Assets that may require coordination with Seller to accomplish such transfers.  Notwithstanding anything herein to the contrary, Seller, Shareholders, Guarantor and Buyer agree to cooperate to timely perform the various functions and actions required to facilitate the transition and conveyance of the Assets.

C.    Seller, Shareholders and Guarantor agree that for a period of two (2) years after the end of the Payout Period, neither will solicit Clients to compete with Buyer selling products and services, nor will either contact any Clients for any reason without the prior written consent of Buyer.  As used in this Section 3.06.C,

---

ASSET PURCHASE AND SALE AGREEMENT                                                         PAGE 4

the term "Client" means and includes any person, firm, entity or association to which any sale was made, or with which Seller, Shareholders or Guarantor has had any contact as evidenced by a written documents sent or received, during the two (2) year period prior to the date of Closing.

      3.07    <u>Other Action</u>.  Seller shall take all other actions prior, on or after the Closing Date as shall be reasonably required to comply with all other terms of this Purchase Agreement, or which shall be required to put Buyer in actual possession and operating control of the Assets, or to effect the consummation of the transaction contemplated by the parties and described in this Purchase Agreement (the "***Transaction***").

ARTICLE FOUR
<u>SELLER'S REPRESENTATIONS AND WARRANTIES</u>

      4.01    <u>Covenants, Representations and Warranties of Seller, Shareholders and Guarantor</u>.  Seller, Shareholders and Guarantor covenant, represent and warrant to Buyer as follows, all of which Buyer will rely solely upon in consummating this Transaction, notwithstanding any investigation by Buyer into any of the following matters.

      A.    <u>Legal Authority</u>.  Seller is a corporation duly organized and validly existing under the laws of the State of Delaware and Panama, as applicable.  Seller has full legal power and authority to own, operate and sell the Assets and to carry on the business associated with the Assets wherever such business is being transacted.  Shareholders are the controlling shareholders of Seller.

      B.    <u>Authorization</u>.  Seller, Shareholders and Guarantor have duly taken all action necessary to authorize the execution, delivery and performance of this Purchase Agreement and have executed and delivered all other documents as required herein, and have and shall have at Closing the full right, power and authority to sell, transfer and convey the Assets to Buyer and consummate the Transaction.  This Purchase Agreement and all other agreements referred to herein and executed by Seller, Shareholders and Guarantor are legal, valid and binding obligations of Seller, enforceable in accordance with their terms.  The performance of this Purchase Agreement does not require the consent of or approval of any person, agency or court, and will not conflict with, result in a breach of any term of, or constitute a default under any material agreement or instrument to which Seller is a party or any judgment, decree, order, statute, rule or regulation to which Seller is subject

      C.    <u>Litigation and Other Proceedings</u>.  There is no litigation, action, suit, investigation or proceeding pending or, to the knowledge of Seller, threatened against or affecting Seller, Shareholders or Guarantor, or the Assets before any court, agency or other governmental body which may result in any material adverse effect upon the Assets or the business associated therewith, or which seeks to enjoin or prohibit or otherwise challenge the Transaction, or would affect Buyer's ability to engage in business using the Assets or otherwise.

      D.    <u>Title to Assets; Condition</u>.  Seller shall convey to Buyer, on the Closing Date, good and marketable title to the Assets free and clear of all pledges, claims, liens, charges, or other encumbrances.  None of Seller, Shareholders or Guarantor has sold, licensed or otherwise assigned any of its rights in, to or under the Assets (or entered into an agreement to do any of the foregoing), and Seller has not received any notice, and otherwise has no knowledge, of any termination, suspension, recision or requested amendment or modification of the Assets.  Seller shall assign to Buyer, to the extent possible if any exist, all warranty rights, owned by Seller with respect to the Assets.  All Assets, including but not limited to all vendor agreements, software licenses, and other contracts may be assigned and transferred by Seller, and Seller has the right and power to make such assignments in accordance with the terms of this Purchase Agreement.

---

E.   Taxes.  All taxes of every kind and description (whether incurred in respect of, or measured by, income or otherwise) relating to any date or period of time prior to the Closing Date and payable by the Seller to any federal, state, county or municipal taxing authorities, have either been paid in full or, with respect to any such taxes which have not been paid on or before the Closing Date, will be paid by the Seller when due, and Seller is not delinquent with respect to any tax payment or assessment.  There are no audits or material claims pending, or to the knowledge of Seller threatened, concerning taxes or assessments asserted against Seller, Guarantor or the Assets.  Any taxes attributable to this sale shall be paid by Seller on or before the date due.

F.   Tax Returns, Reports and Statements.  Seller and Guarantor have timely filed all income, franchise and other tax returns, reports and statements required by all taxing authorities to be filed by Seller and Guarantor for all dates and periods of time prior to the Closing Date.  Each party agrees to cooperate with the other and furnish to the other any information in the possession of either party in order to assist the other in the preparation of its federal, state and other tax returns, reports and assessments and statements of the business associated with the Assets.

G.   Licenses and Permits, etc.  Seller has all necessary licenses, permits, rights, certificates, approvals and other authorizations required to own, lease, use and operate the Assets at the places and in the manner previously conducted and operated.  Seller will preserve, make available for inspection, and assign at the Closing, all such licenses, permits, rights, certificates, approvals and other authorizations.  Seller has not received any notice of any event or condition which indicates that the Assets or the operation thereof are not in substantial conformity with all applicable laws, ordinances, regulations, rules, judgments and orders.

H.   Records and Inspections.  Buyer and its counsel shall have full and complete access at all reasonable times to all the books of account, records, files, leases and other information relating to the Assets for the purpose of examination and copying.

I.   Value.  Seller warrants and represents that the transfer of the Assets is (i) for reasonably equivalent value as negotiated and agreed to by Buyer and Seller, (ii) not a fraud on the rights of any creditor, and (iii) does not and will not render Seller insolvent as of the time of the transfer.

4.02   Seller's Covenants.

A.   Seller Conduct.  Seller has and through the time of Closing will: (i) conduct the business associated with the Assets in the usual, regular and ordinary course in accordance with Seller's past practice, save and except for the relocation of Seller's business to the DFW Facility and operation of such Assets under the Colocation Agreement; (ii) other than in the ordinary course of business of Seller as noted above, not: (a) sell, dispose of, mortgage or encumber any of the Assets; (b) acquire any Assets for which the purchase price has not been paid in full, without first obtaining Buyer's prior written approval; or (c) incur any indebtedness for which any of the Assets are, or may be, subject to any lien or claim, either expressed or implied; and (iii) not solicit or negotiate with any other party, any offers for the sale of the Assets.  During the same period of time, and for a period of ninety (90) days following this Closing, neither Shareholders nor Guarantor will sell, grant, gift or otherwise transfer any equity interest in Seller to any third party without Buyer's written consent.

B.   No Existing Liens.  There are no currently effective financing statements under the Uniform Commercial Code which names Seller as debtor has been filed in any jurisdiction and Seller has not signed any such financing statement or any security agreement authorizing any secured party to file any such financing statement, that covers the Assets, either directly or indirectly.  Should any such lien arise with respect to the Assets, Seller and Guarantor agree to promptly discharge all such liens and encumbrances at their expense.

---

C.      Misrepresentations.  If any of the representations and warranties of Seller, Shareholders or Guarantor made in Section 4.01, or any of the undertakings Seller, Shareholders or Guarantor in Article Six, are, or at any time prior to Closing become, untrue, incorrect, inaccurate or unfulfilled in any respect whatsoever, Seller covenants and agrees to take immediate and corrective action to remedy same and shall provide Buyer written notice thereof of the discovery, the remedial actions being undertaken, and the results of such remedial action.

4.03     Definition of Knowledge.  As used in this Purchase Agreement, the term "knowledge", "actual knowledge" or "best knowledge" of Seller shall mean the knowledge which any officer of Seller has or should have acquired upon reasonable inquiry into facts known by or disclosed to such person.

## ARTICLE FIVE
## BUYER'S REPRESENTATIONS AND WARRANTIES

5.01     Buyer's Acknowledgments, Covenants, Representations and Warranties.

A.      Buyer is a corporation duly organized under the laws of the State of Nevada.  Buyer covenants, represents and warrants to Seller that Buyer has duly taken, or will have taken by the Closing Date, all action necessary to authorize the execution, delivery and performance of this Purchase Agreement and the Transaction, and has executed and delivered, or will execute and deliver, all other documents required herein. Buyer further covenants that it shall have as of the date of Closing, full right, power and authority to purchase the Assets from Seller.  The Agreement and all other agreements referred to herein and executed by Buyer are legal, valid and binding obligations of Buyer, enforceable in accordance with their terms.

B.      Unless otherwise disclosed in this Purchase Agreement, the performance hereof does not require the consent or approval of any person, agency or court, and will not conflict with, result in a breach of any term of, or constitute a default under any material agreement or instrument to which Buyer is a party or any judgment, decree, order, statute, rule or regulation to which Buyer is subject.

## ARTICLE SIX
## INTERIM OPERATIONS

6.01     Further Agreements for Interim Operations.

A.      Pending the Closing Date, Buyer is not and shall not in any event be responsible or liable for any loss or damage to the Assets from any cause whatsoever.  Seller shall give prompt notice to Buyer of any such loss or damage and Buyer shall, at its election, have the right to terminate this Purchase Agreement.

B.      Pending the Closing Date, Seller and Guarantor shall perform under all contracts pertaining to the Assets.  If Seller enters into any new contracts affecting the Assets, without the prior written consent of Buyer, Buyer shall have the right to terminate this Purchase Agreement and all obligations hereunder, and receive a return of the Purchase Price (or any portion thereof) previously deposited with or advanced to Seller; and following termination of this Purchase Agreement, Seller shall return the full amount of all funds previously deposited with or advanced to Seller.

C.      Seller, Shareholders and Guarantor shall, on or prior to the Closing Date, assist Buyer in obtaining from each person, firm, association, corporation, partnership and governmental authority, all consents and approvals to the sale, conveyance, transfer and assignment of the Assets, which is required by the terms of any statute, ordinance, regulation, lease or contract to which Seller is a party, or is otherwise subject.

D.      Seller, Shareholders and Guarantor agree that from and after the date of this Purchase Agreement it will not make any changes to any vendor contracts of Seller, nor communicate with any of such vendors regarding any changes to their contracts, without the prior written consent of Buyer. The parties acknowledge that Buyer will not acquire or otherwise obtain any rights with respect to Seller's existing vendor relationships, and the foregoing covenant not to alter such agreements is intended to prevent any such changes from negatively impacting the Equipment or other Assets being purchased. Notwithstanding the foregoing, if Buyer determines, at its sole and absolute discretion, that it desires to acquire a particular vendor relationship(s), then Seller and Guarantor agree to cooperate with Buyer in connection the assignment of such relationship(s).

E.      Seller and Shareholder agree that from and after the date of this Purchase Agreement it will not initiate any contact with ARIN or LACNIC or respond to any email, inquiries or other communication from ARIN or LACNIC, and will forward to Buyer all emails (and any other communications) received from ARIN and LACNIC. Until the date of Closing, Seller and Buyer will prepare a mutually agreed response, and after Closing, Buyer shall have the sole right to prepare and respond to all ARIN and LACNIC inquiries.

## ARTICLE SEVEN
## CONDITIONS

7.01     Conditions Precedent to Buyer's Obligations. The performance of the obligations of Buyer hereunder is subject, at the election of Buyer, to the following conditions (the "**Closing Conditions**"):

A.      Seller's Representations, Warranties and Covenant. The representations, warranties and covenants of Seller Shareholders and Guarantor shall be true and correct in all respects as of and at the Closing Date with the same force and effect as though made on such date, and all obligations and covenants required by this Purchase Agreement to be performed or complied with by Seller on or prior to the Closing Date shall have been duly performed or complied with by Seller.

B.      Violation of Laws, Ordinances, etc. On or before the Closing Date, none of Seller, Shareholders or Guarantor shall have received any notice or have knowledge of any pending or threatened lawsuit, or any violation or alleged violation of any city ordinance, state law, rule or regulation of any governmental authority with respect to Seller's use of the Assets or operation of any of Seller's Business.

C.      Documentation. All documentation described herein or otherwise required to consummate this Purchase Agreement and the Transaction has been prepared to the reasonable satisfaction of Buyer and its counsel and delivered prior to or at Closing.

D.      Final Adjustment to Price. Any adjustment to the Purchase Price, and any adjustment of related expenses and/or customer revenues, that is provided in this Purchase Agreement, shall have been made and communicated to Seller prior to the Closing.

E.      Conveyances. Seller and Shareholder shall be able to deliver to Buyer good and marketable title to all the Assets.

F.      Other Conditions. Seller shall have complied with and otherwise satisfied all conditions of closing set forth in the Agreement, and Seller, Shareholders and Guarantor shall not be in default under any of the terms and conditions of the Agreement or Colocation Agreement, and all representations, warranties, covenants and agreements of Seller, Shareholders and Guarantor, as set forth in the Agreement and Colocation Agreement shall be true and correct in all material respects and in no way misleading.

## ARTICLE EIGHT
## SURVIVAL

8.01    Survival of Representations, Warranties and Covenants.  All covenants, representations and warranties made in this Purchase Agreement shall be deemed to be material and to have been relied upon by Seller or Buyer, as the case may be, notwithstanding any investigation made by or on behalf of any party prior to or after the Effective Date, and the indemnification and other provisions of this Purchase Agreement which by their terms are to be performed or observed after the Closing Date shall survive the Closing Date for a period of four (4) years.

8.02    Special Survival Provisions.  Seller, Shareholders, Guarantor and Buyer agree that the obligations regarding communications with ARIN and LACNIC set forth in Section 6.01.E. will continue after closing for a period of seven (7) years.

## ARTICLE NINE
## INDEMNIFICATION

9.01    Indemnification by Seller.  Seller, Shareholders and Guarantor hereby indemnify and agree to hold Buyer harmless from and to pay and reimburse Buyer for any and all liability, claim, cause of action, damage, demand, loss, cost or expense, including legal and accounting fees, incurred by reason of or arising out of: (i) misrepresentations by Seller, Shareholders or Guarantor in connection with Transaction; (ii) breaches by Seller, Shareholders or Guarantor of any representations, warranties, covenants or provisions of this Purchase Agreement not waived in writing by Buyer; or (iii) defending or otherwise contesting any claims which, if proven, would be covered in whole or in part by the indemnity provisions of this Purchase Agreement.

9.02    Indemnification by Buyer.  Buyer hereby indemnifies and agrees to hold Seller harmless from and to pay and reimburse Seller for any and all liability, claim, cause of action, damage, demand, loss, cost or expense, including legal and accounting fees, incurred by reason of or arising out of: (i) misrepresentations by Buyer in connection with Transaction; (ii) breaches by Buyer of any representations, warranties, covenants or provisions of this Purchase Agreement not waived in writing by Seller; or (iii) defending or otherwise contesting any claims which, if proven, would be covered in whole or in part by the indemnity provisions of this Purchase Agreement.

9.03    Indemnification Claims.  If any action, suit or proceedings shall be commenced against, or any claim or demand be asserted against either party, for which indemnification is to be provided hereunder, such party shall provide written notice to the other. Within thirty (30) days after receipt of demand for indemnification, such party shall have the right to assume the entire control of the defense, including the right of the selection of counsel, subject to the right to participate in such action, suit or proceedings with counsel of its choice and at its expense. In connection therewith, the parties shall reasonably and fully cooperate with each other in all respects in any such defense, compromise or settlement, including, without limitation, using its best reasonable efforts to make available all pertinent information under the direct control of each party. Neither party will compromise or settle any such action, suit, proceeding, claim or demand without the prior written consent of the other party.

## ARTICLE TEN
## REMEDIES

10.01   Remedies Upon Default.

A.     Seller's Remedies.  If Buyer shall materially default in the performance of its representations, warranties and covenants under this Purchase Agreement or shall for any reason fail to consummate this Purchase Agreement at the Closing Date other than for the failure of any of the specified conditions of Closing, and Seller is not then in default of any of its representations, warranties and covenants hereunder, Seller shall then be entitled, as its sole and exclusive remedy, to terminate this Purchase Agreement without any liability on Seller's part and shall be entitled to retain any earnest money, advance payments, or other amounts tendered by Buyer.

B.     Buyer's Remedies.  If Seller, Shareholders or Guarantor shall materially default in the performance of their respective representations, warranties and covenants under this Purchase Agreement, the Agreement or the Colocation Agreement, or shall for any reason fail to consummate this Purchase Agreement at the Closing Date, other than due to a material default by Buyer, Buyer shall be entitled at its option to either enforce specific performance of the obligations of Seller, Shareholders and Guarantor, or to terminate this Purchase Agreement without any liability on Buyer's part and shall be entitled to retain or recover, as applicable, any earnest money, advance payments, or other amounts tendered by Buyer.  In furtherance of the rights afforded Buyer under this Purchase Agreement in the event of a failure of Buyer to close, Seller hereby appoints Buyer, or its designee, to act as Seller's attorney-in-fact, and grants to Buyer or its designee an interest in the Assets for the limited purpose of transferring same under the terms of this Purchase Agreement, including but not limited to the power to execute and deliver any documents deemed necessary by Buyer to consummate the Transaction.  The power of attorney granted above shall be irrevocable and coupled with an interest.

ARTICLE ELEVEN
GENERAL PROVISIONS

11.01   Expenses.  Each of the parties hereto shall bear all expenses incurred by them in connection with this Purchase Agreement, and in the preparation for and consummation of the Transaction.

11.02   Broker.  No Broker or Finder has been involved in this transaction, other than the broker representing Buyer, who will be compensated solely by Buyer pursuant to the terms of a separate agreement outside of this Purchase Agreement.  Seller and Buyer agree to indemnify each other for any other broker's, finder's, or other fee due by reason of actions of the other party as a result of this Purchase Agreement and the Transaction.

11.03   Benefit.  This Purchase Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, personal representatives, successors and permitted assigns, if applicable.

11.04   Construction.  This Purchase Agreement shall be construed and enforced in accordance with laws of the State of Texas, and venue for any action arising hereunder shall be proper only in Dallas County, Texas.

11.05   Notices.  All necessary notices, demands and requests required or permitted to be given hereunder shall be deemed duly given when personally delivered or on the third (3rd) day after postmark if mailed by certified mail, return receipt requested, to the following addresses or to such other addresses as either party shall request in writing:

If to Seller:

Prieur J. Leary, III

---

President
Forta Trust / Infolink Panama
3701 NW 82nd St.
Doral, Florida 33166

If to Buyer:

Liana Dunlap
President - CEO
Ace Colocation, Inc.
7575 W. Washington Avenue
Suite 127-270
Las Vegas, NV 89128

11.06   Counterparts.  This Purchase Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other party.

11.07   Rules of Construction.  The parties acknowledge that each has reviewed, or has had the opportunity to review this Purchase Agreement with counsel engaged to advise them on same; therefore, the parties agree that the normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Purchase Agreement.  All headings used herein are for convenience only and shall not be considered when interpreting the provisions of this Purchase Agreement.

11.08   Publicity.  Neither Seller, Shareholders nor Guarantor will release publicly or disclose to third parties this Purchase Agreement or the purchase and sale contemplated hereunder without the prior written consent of Buyer.

11.09   Prior Agreement Superseded.  This Purchase Agreement constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the within subject matter.

*[Remainder of Page intentionally left blank]*

---

**ASSET PURCHASE AND SALE AGREEMENT**                                          **PAGE 11**

IN WITNESS HEREOF, each of the parties hereto has caused this Purchase Agreement to be duly executed on its behalf in duplicate on the day and year indicated above.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: *Liana Dunlap*
Liana Dunlap, President-CEO

**SELLERS:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____        _____
    Prieur J. Leary, III, President                Date

**InfoLink Panama Corp.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____        _____
    Prieur J. Leary, III, President                Date

**SHAREHOLDERS OF INFOLINK PANAMA CORP:**

**Grupo Pronto, S.A.**
a Panamanian corporation

By: _____        _____
    Prieur J. Leary, III, President                Date

**IT Experts, Inc.**
a Panamanian corporation

By: _____        _____
    Luciano E Maiello, President                 Date

**GUARANTOR:**

_____
Prieur J. Leary, III

---

IN WITNESS HEREOF, each of the parties hereto has caused this Purchase Agreement to be duly executed on its behalf in duplicate on the day and year indicated above.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
    Liana Dunlap, President-CEO

**SELLERS:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____      24-Jan-14
    Prieur J. Leary, III, President       Date

**InfoLink Panama Corp.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____      24-Jan-14
    Prieur J. Leary, III, President       Date

**SHAREHOLDERS OF INFOLINK PANAMA CORP:**

**Grupo Pronto, S.A.**
a Panamanian corporation

By: _____      24-Jan-14
    Prieur J. Leary, III, President       Date

**IT Experts, Inc.**
a Panamanian corporation

By: _____      _____
    Luciano E Maiello, President       Date

**GUARANTOR:**

_____
Prieur J. Leary, III

---

**ASSET PURCHASE AND SALE AGREEMENT**      **PAGE 12**

IN WITNESS HEREOF, each of the parties hereto has caused this Purchase Agreement to be duly executed on its behalf in duplicate on the day and year indicated above.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
       Liana Dunlap, President-CEO

**SELLERS:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____        _____
       Prieur J. Leary, III, President                    Date

**InfoLink Panama Corp.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____        _____
       Prieur J. Leary, III, President                    Date

**SHAREHOLDERS OF INFOLINK PANAMA CORP:**

**Grupo Pronto, S.A.**
a Panamanian corporation

By: _____        _____
       Prieur J. Leary, III, President                    Date

**IT Experts, Inc.**
a Panamanian corporation

By: _____        29/01/201
       Luciano E Maiello, President                    Date

**GUARANTOR:**

_____
**Prieur J. Leary, III**

ASSET PURCHASE AND SALE AGREEMENT                    PAGE 12



7º TABELIÃO DE NOTAS DA CAPITAL - SP
RUA BENJAMIN CONSTANT, 177 - PABX: 3293-1400 .
RECONHEÇO por SEMELHANÇA 1 firma(s) COM VALOR ECONÔMICO de:
LUCIANO ELIAS MATHEUS
São Paulo, 27 de janeiro de 2014.
            Em Testemunho            da verdade.

ANTONIO ROBERTO GARCIA - MAURICIO K.S. CRUZ - ALFREDO K. S. CRUZ
Totais:R$ 6,80.VALIDO SOMENTE COM SELO DE AUTENTICIDADE
Cartebr:908203 Selo(s): 173589- AA

<u>LIST OF SCHEDULES AND EXHIBITS</u>
<u>TO</u>
<u>ASSET PURCHASE AND SALE AGREEMENT</u>

<u>Schedules:</u>

Schedule 1                          List of Assets
Schedule 2                          List of Previously Conveyed Assets

<u>Exhibits:</u>

Exhibit A                           Form of Bill of Sale

**SCHEDULE 1**

LIST OF ASSETS PURCHASED

- Hardware
  - Miami
    - Liebert 600T 225KVA UPS
    - Cisco 12416 w/10GE Ports
    - 2 Cisco 3750
    - 12 Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 250 Rackable 1U Dual Quad Core Opteron Servers
    - 350 Dell 1U Dual Quad Core Xeon Servers
  - Panama
    - Russel Electric ATS
    - Powerware 400/500KVA 9315 UPS
    - 2 Airflow 22 Ton HVAC
    - Cisco 12008 with GE Ports
    - 2 Cisco 3650
    - 40+ Layer 2 48 Port Switches
    - Ladder Racking
    - Cabinets
    - 1200 White Box Tower Servers
    - 50 1U Various Servers
- Complete customer list, both active and inactive
- Software:
  - WHMCS
  - FortaTrust email server and all email accounts
  - All other software applications and licenses
- Other:
  - IP Addresses
    - LACNIC IPs
      - 190.120.224/20 and 200.35.144/21
    - ARIN
      - 199.195.212.0/22 and some IPV6 - 2607:9300::/32(from June 2012)
      - 198.154.60.0/22 (from Sept 2012)
      - 162.213.152.0/22 (from June 2013)
      - 2607:FEB8::/32 (ipv6) ORG ID IIS-129
      - AS15083, AS262272
      - ORG ID FUC-9
  - All websites and content
  - Domain names:
    - FortaTrust.com
    - _____ (Other domains here)
  - Phone Numbers
    - _____ (NUMBERS HERE)

## SCHEDULE 2

LIST OF PREVIOUSLY CONVEYED ASSETS

1.  UPS (Miami):  Liebert 600T 225KVA UPS

2.  UPS (Panama):  Powerware 400/500KVA 9315 UPS

3.  Fortatrust.com domain and existing SEO

## EXHIBIT A

FORM OF BILL OF SALE

[See attached]

## BILL OF SALE

THIS BILL OF SALE (the "*Agreement*") is executed to be effective as of the _____ day of _____, 2014, by INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama ("*Infolink*"), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 ("*FortaTrust USA*") (Infolink and FortaTrust USA being sometimes referred to collectively as "*Seller*") and   GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the "*Shareholders*"), and Prieur J. Leary, III, the guarantor of the obligations of Seller ("*Guarantor*"), in favor of ACE COLOCATION, INC., a Nevada corporation ("*Buyer*").

### WITNESSETH:

A.      Seller, Shareholder and Buyer have entered into an Agreement for Colocation and Purchase dated on even date herewith (the "*Agreement*"), pursuant to which Seller and Shareholder have agreed to sell and Buyer has agreed to purchase certain assets in exchange for the consideration described therein.

B.      Seller and Shareholder desire to sell and convey certain personal property, as more specifically listed on Exhibit "A" attached hereto and made a part hereof (the "*Property*"), to Buyer for the consideration recited herein and also set forth in the Agreement.

NOW, THEREFORE, for and in consideration of Buyer's payment to Seller in the amount of US$10,000.00, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Bill of Sale.  Seller has GRANTED, BARGAINED, SOLD, TRANSFERRED and CONVEYED, and by these presents does GRANT, BARGAIN, SELL, TRANSFER and CONVEY unto Buyer all right, title and interest of Seller and Shareholder, if any, in and to the Property.

2.      Warranty of Title.  Seller and Shareholder warrant that Seller is the lawful owner in every aspect of all the Property, including but not limited to all warranties, guarantees, and the like, and that such ownership consists of good and marketable title to the Property.   Seller, Shareholder and Guarantor bind themselves and their successors and assigns to warrant and defend the title to all the Property to Buyer, its successors and assigns, forever against every person lawfully claiming the Property or any part thereof.

3.      Assurance of Interest.  Seller agrees to indemnify, defend and hold Buyer harmless from any and all loss, cost, claim, liability, expense or demand of any nature under the Property (including reasonable attorneys' fees) arising out of the Property hereby conveyed.

4.      Governing Law.  This Agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Dallas County, Texas.

5.      Successors and Assigns.  This Agreement and the rights and obligations contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

7.    <u>Further Assurances</u>.  Each party shall, upon the request of the other party, execute, acknowledge and deliver any and all instruments reasonably necessary or appropriate to carry into effect the intention of the parties as expressed in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed to be effective as of the day and year first above written.

**BUYER:**

**Ace Colocation, Inc.**
a Nevada corporation

By: _____
     Liana Dunlap, President-CEO


**SELLER:**

**FortaTrust USA Corporation,**
a Delaware corporation

By: _____
     Prieur J. Leary, III, President


**InfoLink Panama Corp., S.A.**
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____
     Prieur J. Leary, III, President


**GUARANTOR:**

_____
**Prieur J. Leary, III**

---

**BILL OF SALE**                                                                                    **PAGE 2**

## EXHIBIT "A"

### LIST OF ASSETS PURCHASED

## BILL OF SALE

THIS BILL OF SALE (the "*Agreement*") is executed to be effective as of the 24th day of January, 2014, by INFOLINK PANAMA CORP., a Panamanian corporation having an address located at Corozal Oeste, Panama, Republic of Panama ("*Infolink*"), and its wholly owned subsidiary, FORTA TRUST USA CORPORATION, a Delaware corporation, having an address 3701 NW 82nd St., Doral, Florida 33166 ("*FortaTrust USA*") (Infolink and FortaTrust USA being sometimes referred to collectively as "*Seller*") and GROUPO PRONTO, S.A., a Panamanian corporation, and IT EXPERTS S.A., a Panamanian corporation, as the controlling shareholders of InfoLink (collectively, the "*Shareholders*"), and Prieur J. Leary, III, the guarantor of the obligations of Seller ("*Guarantor*"), in favor of ACE COLOCATION, INC., a Nevada corporation ("*Buyer*").

### W I T N E S S E T H :

**A.**      Seller, Shareholder and Buyer have entered into an Agreement for Colocation and Purchase dated on even date herewith (the "*Agreement*"), pursuant to which Seller and Shareholder have agreed to sell and Buyer has agreed to purchase certain assets in exchange for the consideration described therein.

**B.**      Seller and Shareholder desire to sell and convey certain personal property, as more specifically listed on Exhibit "A" attached hereto and made a part hereof (the "*Property*"), to Buyer for the consideration recited herein and also set forth in the Agreement.

NOW, THEREFORE, for and in consideration of Buyer's payment to Seller in the amount of US$10,000.00, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Bill of Sale**.   Seller has GRANTED, BARGAINED, SOLD, TRANSFERRED and CONVEYED, and by these presents does GRANT, BARGAIN, SELL, TRANSFER and CONVEY unto Buyer all right, title and interest of Seller and Shareholder, if any, in and to the Property.

2.      **Warranty of Title**.   Seller and Shareholder warrant that Seller is the lawful owner in every aspect of all the Property, including but not limited to all warranties, guarantees, and the like, and that such ownership consists of good and marketable title to the Property.   Seller, Shareholder and Guarantor bind themselves and their successors and assigns to warrant and defend the title to all the Property to Buyer, its successors and assigns, forever against every person lawfully claiming the Property or any part thereof.

3.      **Assurance of Interest**.   Seller agrees to indemnify, defend and hold Buyer harmless from any and all loss, cost, claim, liability, expense or demand of any nature under the Property (including reasonable attorneys' fees) arising out of the Property hereby conveyed.

4.      **Governing Law**.   This Agreement shall be construed under and in accordance with the laws of the State of Texas, and all obligations of the parties created hereunder are performable in Dallas County, Texas.

5.      **Successors and Assigns**.   This Agreement and the rights and obligations contained herein shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

6.      **Multiple Counterparts**.   This Agreement may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original.

7.    <u>Further Assurances</u>.   Each party shall, upon the request of the other party, execute, acknowledge and deliver any and all instruments reasonably necessary or appropriate to carry into effect the intention of the parties as expressed in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed to be effective as of the day and year first above written.

**BUYER:**

Ace Colocation, Inc.
a Nevada corporation

By: _____
    Liana Dunlap, President-CEO

**SELLER:**

FortaTrust USA Corporation,
a Delaware corporation

By: _____
    Prieur J. Leary, III, President

InfoLink Panama Corp., S.A.
a Panamanian corporation and sole parent
company of FortaTrust USA Corporation

By: _____
    Prieur J. Leary, III, President

**GUARANTOR:**

_____
Prieur J. Leary, III

<u>**EXHIBIT "A"**</u>

<u>**LIST OF ASSETS PURCHASED**</u>

1.  UPS (Miami):  Liebert 600T 225KVA UPS

2.  UPS (Panama):  Powerware 400/500KVA 9315 UPS

3.  Fortatrust.com domain and existing SEO

# *ACE*
## *COLOCATION, INC.*

## Colocation Agreement
## and
## Service Order Form

# *Custom Designed For:*

# FortaTrust USA Corporation/InfoLink Panama Corp

# ACE
## COLOCATION, INC.

## COLOCATION SERVICES AGREEMENT

### SERVICE ORDER FORM

| | | | |
|---|---|---|---|
| **Business Name:** | FortaTrust USA Corporation / InfoLink Panama Corp. ("Customer") | **Primary Contact:** | Prieur J. Leary, III |
| **Street Address:** | | **Primary Phone:** | |
| **City, State, Zip:** | Dallas, TX  75247 | **Primary Cell:** | |
| **Main Phone:** | | **Primary Email:** | |
| **Fax:** | | **Technical Contact:** | |
| **Billing Contact:** | | **Technical Cell:** | |
| **Billing Phone:** | | **Technical Email:** | |
| **Billing Address:** | | **Abuse Contact:** | |
| **City, State, Zip:** | | **Abuse Phone:** | |

<u>PREMISES:</u>    Facility located at 7505 John Carpenter Freeway, Dallas, TX 75247

<u>SERVICES:</u>

| SERVICES (See Service Summary for details) | MONTHLY-RECURRING CHARGE (MRC) | NON-RECURRING CHARGE (NRC) |
|---|---|---|
| **BUNDLED SPACE, POWER AND BANDWIDTH AND OPERATIONAL EXPENSES SHALL BE CHARGED AT THE BASE RATE OF:** | $30.00 PER INSTALLED SERVER* (See Note 1) | |
| **DISCOUNT FOR PROMPT PAYMENT:** | $15.00 PER INSTALLED SERVER (See Note 1) | |
| **EXCESS EXPENSES:** | TBD | TBD |

TOTAL MRC: $ (See Above)

\* As used in this Agreement, the term "Installed Server" means each server that is installed and operating in the Premises and utilized for Customer's business.  Installed Servers shall include equipment relocated to the Premises by Customer, and may also include servers provided by Ace to Customer upon its request.

Note 1:   Customer shall be afforded a 50% discount off the agreed market rate of $30.00 per Installed Server for Customer ("Market Rate") for prompt payment of each Ace invoice.  Ace will prepare each Customer invoice to reflect the Market Rate per Installed Server, and will also reflect the discounted rate of $15.00 per Installed Server ("Discount Rate").  The Discount Rate will be available to Customer for each month that the invoice is paid within ten (10) days of receipt by Customer.  Date of payment will be the date good funds are tendered to Ace, as specified in this Agreement.  If payment is not received by Ace on or before the tenth (10th) day after Customer's receipt of invoice, the amount due will be the agreed Market Rate reflected on the invoice.  All invoices not paid within thirty (30) days after the due date will accrue interest at the rate of 1.5% per month until paid.

*Customer Initial:*_____

# ACE
## COLOCATION, INC.

## COLOCATION SERVICES AGREEMENT

**SERVICE SUMMARIES:**

1.   **Space:** Ace will provide such space within the Premises sufficient to render the colocation services set forth herein (the "Colocation Space"). Ace may relocate the Customer Equipment (as defined herein) and the License Agreement as it may determine from time to time, to another area of the Premises, which area will then become the Colocation Space, provided, however, Ace will bare any and all costs, including personnel costs, to effectuate such move. Customer Equipment shall be moved at a time to be determined by Ace but Ace will endeavor to accommodate the schedule of Customer.

2.   **Power and Bandwidth:** Ace will provide Customer up to two thousand Mbps (2,000 Mbps) of bandwidth to be included in the Base Rate. Any bandwidth used by Customer in excess of 2,000 Mbps will be billed to Customer at the rate of $3.00 per 1 Mbps.

3.   **Operational Expenses:** Includes, but not limited to: AC Maintenance, ADT, HVAC parts, Generator.

4.   **Staffing and Technical Support:** Ace will provide Customer with limited, hands on technical and operational support.  Also included is hands on server support, infrastructure maintenance and basic ticket based customer service. Technical support is available 24/7.  If other types of support are requested, for example overtime, additional charges may apply at standard rates.

5.   **Other Services:** Includes, but not limited to: Utilities (Water, Gas, etc.), Pest Management, Supplies, Insurance. Any reductions in these other service expenses payable to third party vendors will have no impact on Customer since Customer's rate is a flat base rate.

6.   **Repayments:** N/A.

7.   **Excess Expenses:** Additional services requested or incurred by Customer, including but not limited to, special orders, and additional commissions. Services ordered that will change the Monthly Recurring Charges will require a Change Order

**TERM LENGTH, PAYMENT AND COMMENCEMENT:**

- **Term Length:** The Initial Contract Term is 4 Months.

- **Payment:** Payment is due <u>ten (10) days</u> after receipt of invoice.  Payments made on or before the due date will be payable at the Discounted Rate.  Payments not received by the due date will be payable at the Market Rate.  Payments not paid within thirty (30) days after the due date will accrue interest until paid in full at the greater of (i) 1.5% per month, or (ii) the highest rate allowed by applicable law.

- **Service Commencement:** The Commencement Date of this Contract will be the date of execution by both of the parties hereto.  Ace does not represent to Customer that it owns the Premises, but rather that it has the right to provide the colocation services specified hereunder pursuant to its agreement with the owner of the Premises.

- **Customer's Contracts and Renewals:** Customer shall not initiate or renew a client account on other than a monthly or quarterly basis, nor shall Customer agree to accept Annual and Semi-Annual payments from clients during the Colocation period.  All of Customer's clients must either pay a monthly rate or quarterly rate until the Colocation period ends.  If Customer initiates or renews a client account that allows for the payment of fees to Customer on other than a monthly or quarterly basis (such unauthorized period in excess of a quarter being the "Excess Period"), Customer shall pay to Ace, for each such affected client, an amount equal to the number of months in such Excess Period x the agreed Market Rate of $30.00 per month, for each server or portion thereof utilized by such client. All amounts due for Excess Periods shall be paid on the earlier of the expiration of the Colocation Period or the breach or default by Customer under this Colocation Agreement.

*Customer Initial:*_____

# ACE
## COLOCATION, INC.

**COLOCATION SERVICES AGREEMENT**

---

- **Payment Remittance:** All payments must be made by wire transfer:

  Beneficiary Name: Ace Colocation, Inc.
  Bank Account Number: _____
  Wire Routing Transit Number: _____
  Bank Name and Address:     Wells Fargo Bank NA
                             5410 W. Charleston Blvd. Las Vegas, NV 89146

STANDARD MASTER SERVICE AGREEMENT EXCEPTIONS (if not otherwise noted in the Service Order Form):

- TERMS OF SERVICE:  There is no automatic Term renewal for this Agreement.  There will be no service credits.
- Acceptable Use Policy and Privacy Policy: NO EXCEPTIONS
- Service Level Agreement:  The Ace standard SLA does not apply to this Agreement.

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

# COLOCATION SERVICES AGREEMENT

---

**COLOCATION SERVICES AGREEMENT**

THIS COLOCATION SERVICES AGREEMENT (this "Agreement"), including the SERVICE ORDER FORM, is made as of January ___, 2014 (the "Effective Date") by and between Ace Colocation, Inc., a Nevada corporation (hereinafter referred as "Ace") and FortaTrust USA Corporation and InfoLink Panama Corp., S.A. (hereinafter referred to collectively as "Customer"), for colocation services to be provide by Ace at 7505 John Carpenter Fwy, Dallas, TX 75247 (hereinafter referred to as "Premises"). In consideration of the mutual agreements and promises contained herein, the parties agree as follows:

**1. Grant of Access; Customer Equipment**

**a.** Equipment

    (i) *Customer Equipment.* Subject to the terms and conditions of this Agreement, commencing on the Commencement Date set forth in the Service Order Form and subject to Ace approval, Ace agrees to allow Customer to place certain equipment, which is not part of the License Equipment and not otherwise provided to Customer by Ace (the "Customer Equipment"), in the designated space within the Premises (the "Colocation Space"). Customer's right to place Customer Equipment in the Colocation Space at the Premises shall commence on the Commencement Date as set forth on Service Order Form.

    (ii) *License Equipment.* Subject to the terms and conditions of this Agreement, commencing on the Commencement Date set forth in the Service Order Form, Ace may license to Customer the right, subject to certain terms and conditions, to use certain equipment acquired or to be acquired by Ace (the "License Equipment"). Customer's right to use the License Equipment in the Premises shall commence on the Commencement Date and shall continue for the duration of the Term, or such shorter period of time as may be determined by Ace, at its discretion.

**b.** Installation And Removal Of Equipment

    (i) *License Equipment.* All License Equipment in or to be delivered to the Premises shall remain therein, and Customer shall not have the right to remove, replace, relocate, modify or otherwise alter any of the License Equipment without the prior written approval of Ace, except to the extent necessary to discharge Customer's obligation to keep the License Equipment in good repair and working order, and then only with the written consent of Ace. In no event shall any information stored, except personal email, on the License Equipment be downloaded, uploaded, copied or deleted by Customer without the prior written consent of Ace.

    (ii) *Customer Equipment.* Customer shall arrange for delivery of each unit of Customer Equipment to the Colocation Space at Customer's expense. Ace agrees to reimburse Customer for the reasonable and necessary expenses incurred in connection with the relocation of Customer Equipment to the Facility, provided such expenses are approved in advance by Ace. Reimbursement shall be made within five (5) days following Ace's receipt of detailed expenses. When possible, Customer shall provide Ace with no less than one (5) day prior written notice of the actual delivery date, but same-day delivery shall not be a violation of this provision. Unless otherwise agreed in writing, Customer shall collaborate with Ace on the install of the Customer Equipment at the Colocation Space and any necessary cabling from the junction panel provided by Ace to the Customer Equipment. Customer may not install any equipment at the Colocation Space or the Premises without Ace's prior written approval.

**c.** Use Of Equipment

Customer shall utilize the Colocation Space only for interconnection of the License Equipment and Customer Equipment with the Internet Connectivity services to be provided herein by Ace to Customer, unless Ace otherwise agrees in writing in advance.

**d.** Responsibility For Equipment And Colocation Space

Customer shall be solely responsible for the Customer Equipment, which shall remain Customer's sole property, and all software and data stored thereon (the "Stored Information"). Unless otherwise specifically agreed in writing, Ace shall have no

*Customer Initial:*_____

---

# ACE
## COLOCATION, INC.

## COLOCATION SERVICES AGREEMENT

duty to monitor, maintain or care for the Customer Equipment or Stored Information. Customer shall protect, maintain and keep in good order the Colocation Space, the License Equipment, and the Customer Equipment, and shall ensure that neither Customer nor its agents or contractors damage any part of the Premises, the Colocation Space or any equipment located on or about the Premises unless agreed to in writing by the parties. Customer shall be responsible for the License Equipment, and such License Equipment and all software and data stored thereon shall remain Ace's sole property, unless such License Equipment is purchased by Customer and then only to the extent the information stored thereon is of a type included. Unless otherwise specifically agreed in writing, Customer shall have the duty to protect, maintain and keep in good order the License Equipment and all information stored thereon, subject to the restrictions about removing such information as provided in this Agreement. Customer shall ensure that neither Customer nor its agents or contractors damage any part of the Premises, the Colocation Space or any License Equipment located on or about the Premises.

### e. Acceptance of Colocation Space

Customer accepts the Colocation Space "as is", and that the Colocation Space is in satisfactory condition and is suitable for the use intended by Customer.

### 2. Use of Colocation Space

#### a. Access and Security

Ace shall have the right to require the removal of, or deny access to, any Approved Personnel, such right not to be unreasonably exercised. Approved Personnel may access the Customer Equipment at Colocation Space at any time, provided that Customer is not delinquent on invoices and is otherwise not in default under this Agreement. Approved Personnel shall at all times while on the Premises comply with Ace's current security and safety procedures.

#### b. Alterations And Removal

Customer shall not make any construction changes or alterations (collectively "alterations") to the Colocation Space or any other part of the Premises, including cabling and power supplies, without Ace's prior written consent. All fixtures, alterations, additions, repairs, improvements and/or appurtenances attached to or built into, on or about the Colocation Space, (collectively "fixtures") shall be and remain part of the Colocation Space and shall not be removed by Customer unless so required by Ace, in which event the items required to be removed shall be removed at Customer's sole cost and expense. Upon termination or expiration of this Agreement, Customer shall remove all Customer Equipment (except fixtures), within thirty (30) days from the date of such termination or expiration of this Agreement ("removal period"), and except to the extent any payments or other obligations owed to Ace remain unpaid or unfulfilled, in which event Customer shall have no right to remove any Customer Equipment until all such payments and obligations are satisfied. Within this same thirty (30) days Customer shall restore the Colocation Space, at its expense, to the condition that it was in before the installation of such Customer Equipment. Notwithstanding anything herein to the contrary, in no event may Customer remove any License Equipment without the prior written consent of Ace

#### c. Inspection

Ace and its designees may inspect or observe the Customer Equipment and License Equipment at any time. If any Customer Equipment or License Equipment is located in a security enclosure, Customer shall at all times have access thereto, and Customer shall furnish to Ace the appropriate keys or information needed to enter into the enclosure prior to completion of such enclosure.

#### d. Compliance With Laws And Regulations

Customer shall comply at all times with all applicable laws, regulations, and ordinances relating to its use of the Colocation Space, the Customer Equipment and Stored Information, the License Equipment and shall also comply with Ace's general rules and regulations relating to the Premises and to the provision by Ace of the Services hereunder, including Ace's Acceptable Use Policy as amended from time to time (collectively, "Ace Rules and Regulations").

#### e. Third Parties

Customer may not permit any other person to occupy or use the Colocation Space (including by placing such person's equipment in the Colocation Space) without first obtaining Ace's prior written consent, which consent may be withheld or

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

## COLOCATION SERVICES AGREEMENT

conditioned at Ace's sole discretion.

### f. Use Of Capacity

N/A.

### g. Lien

Ace shall have a statutory and contractual landlord's lien on all Customer Equipment and other property of Customer (collectively, the "Customer Property") located in the Colocation Space. Ace may exercise and enforce such lien rights over the Customer Property to secure payment of any charges due and payable by Customer to Ace that remain unpaid after the due date. Such rights shall include the right to deny Customer access to such Customer Property until all charges due under this Agreement have been paid in full.

### h. No Lease.

Customer acknowledges and agrees that this Agreement is not a lease, but rather a license that allows Customer to locate and operate certain equipment, via direct or remote access, within the confines of the Premises, and Customer waives and releases all rights to claim the that this Agreement is a lease or that Customer is a tenant or other holder of a leasehold interest. Customer shall have no specific right to any identifiable area within the Premises, except to the extent Ace provides an area for secured access to certain equipment, and Ace shall in all events retain the right to relocate from time to time any area (including racks) designated for Customer's equipment, including any secured areas. Customer also acknowledges and agrees that it has no right, power or authority: (i) to sub-license any of its rights under this Agreement to any other party; (ii) to mortgage, pledge, encumber or otherwise utilize any of Customer's rights under this Agreement as any collateral or other security for any purpose whatsoever; or (iii) transfer or assign its interests under this Agreement to any party without the prior written consent of Ace, which consent may be given or withheld in Ace's sole discretion. In addition, Customer acknowledges and agrees that Ace may and will allow others to use the Colocation Space, including but not limited to allowing others to locate equipment and other property in the Colocation Space.

## 3. Services

During the Term (as set out in the Service Order Form) of this Agreement, and subject to the terms and conditions of this Agreement, Ace will provide to Customer the Colocation, Connectivity, and related Services. The Services shall be performed in accordance with Ace's then applicable policies and specifications and, unless expressly stated otherwise, shall be provided at the Colocation Space and under the direction of Customer.

### a. Connectivity Services.

i. Right to Modify.  Ace reserves the right to modify its network and facilities used to provide the Connectivity Services for purposes including but not limited to accommodating evolving technology and increased network demand, and providing enhanced services. Ace shall use reasonable efforts to notify Customer of any planned changes to Ace's network or facilities that may adversely affect the Services provided hereunder.

ii. Bandwidth and/or Disk Usage.  Ace reserves the right to monitor Customer's usage and if such bandwidth or disk usage exceeds the amount ordered by Customer, Ace, in its sole discretion, may (i) assess additional standard charges, or (ii) put into place and exercise technical solutions which prevent such excessive use, so long as such measure does not unreasonably impede Customer's ability to fulfill its customary SLA requirements with Customer's customers.

### b. Service Level Agreement.  Except to the extent otherwise provided in the Service Order Form, Ace will provide Customer with a Service Level Agreement ("SLA") which may be amended from time to time by Ace effective upon posting of the revised policy on the Ace Website or mailing to customers.

## 4. Fees and Billing

### a. Fees

Customer will timely pay Ace the fees listed in the Service Order Form for the provision of the Colocation Space and the

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

**COLOCATION SERVICES AGREEMENT**

Services.

### b.  Bandwidth Usage & Overages

If Ace provides Bandwidth through Customer's existing provider, and service under that contract or service agreement is suspended, cancelled or terminated as a result of past or future acts or omissions of Customer, including but not limited to non-payment of fees and charges due, then Ace will use reasonable commercial efforts to secure a replacement Bandwidth provider as soon as reasonably practicable.

### c.  Billing

The Commencement Date on the Service Order Form will become the anniversary date for the Term on the services. Ace will endeavor to deliver all invoices to Customer on or before the 10th day of the following month.  All invoices will be due ten (10) days from the date of invoice to Customer.  Invoices paid on or before the due date will be payable at the Discount Rate, and all invoices paid after the due date will be payable at the agreed Market Rate.  Invoices not paid within thirty (30) days of the due date may accrue interest from the date originally due at the rate of one and one-half percent (1-1/2%) per month, or the highest rate allowed by applicable law, whichever is higher.  Invoices that are more than thirty (30) days past due shall afford Ace the additional collection remedy of interrupting service to Customer's clients and customers, and Ace shall have no liability or obligation for any such interruption.  All payments shall be made in U.S. dollars.

### d.  Assurances

If Customer has failed to timely pay at least three (3) monthly payments during the Term, Ace, at its sole discretion, may require that payments due under this Agreement be made in quarterly payments, in advance, with each quarterly payment due thirty (30) days prior the date for the commencement of services for the ensuing quarter.  If Customer has failed to timely pay at least six (6) monthly or quarterly payments during the Term, Ace, at its sole discretion, may require that payments due under this Agreement be made in semi-annual payments, in advance, with each semi-annual payment due thirty (30) days prior the date for the commencement of services for the ensuing six (6) month period.

### e.  Taxes

Ace may invoice and Customer shall pay all taxes, fees or assessments and other charges imposed on or required to be collected by Ace by any governmental agency that may result from this Agreement, or any of the activities contemplated hereunder. Customer shall pay all taxes, fees or assessments and other charges imposed on Customer by any governmental agency that may result from this Agreement, or any of the activities contemplated hereunder.

### 5. Term, Renewal and Termination

#### a. Term

This Agreement shall commence on the Effective Date and shall continue for the minimum term set forth in the Service Order Form (the "Term"), beginning with the Commencement Date; provided, however, if the Commencement Date has not occurred by January 31, 2014, Ace shall have the right and option to terminate this Agreement. The foregoing notwithstanding, in no event shall Customer's right to occupy the Colocation Space begin prior to the Commencement Date or extend beyond the Term.

#### b.  Renewal

Except to the extent otherwise provided in the Service Order Form, Ace must expressly approve any extension or continuation of this Agreement after the expiration of the initial Term.

### 6. Insurance

Customer will keep in full force and effect during the Term proper insurance coverage with reputable insurance companies licensed to do business in the state in which the Premises are located. Customer also agrees that it will ensure that its agents (including contractors and subcontractors) who access or perform work in the Colocation Space maintain comparable insurance coverage.

### 7. Limitation of Liability

*Customer Initial:*_____

# ACE
## COLOCATION, INC.

## COLOCATION SERVICES AGREEMENT

**a.** ACE LIABILITY; INDEMNIFICATION.

CUSTOMER AGREES THAT ACE SHALL NOT BE LIABLE FOR, AND CUSTOMER AGREES TO INDEMNIFY, DEFEND AND HOLD ACE HARMLESS FROM, ALL CLAIMS INVOLVING, CONCERNING OR RELATED TO THE LOSS OR DESTRUCTION OF CUSTOMER DATA OR ANY PORTION THEREOF OR FOR ANY DAMAGE EITHER TO PERSON OR PROPERTY SUSTAINED BY CUSTOMER OR BY OTHER PERSONS DUE TO THE PREMISES OR COLOCATION SPACE OR ANY PART THEREOF BECOMING OUT OF REPAIR OR DUE TO THE HAPPENING OF ANY ACCIDENT OR EVENT IN OR ABOUT THE PREMISES OR COLOCATION SPACE OR DUE TO THE ACT OR NEGLECT OF ANY OCCUPANT OF THE PREMISES OR OF ANY OTHER PERSON, INCLUDING BUT NOT LIMITED TO ANY ACT OR OMISSION ALLEGED TO BE THE DIRECT OR INDIRECT RESULT OF THE NEGLIGENCE OF ACE, AND FURTHER INCLUDING, BUT NOT LIMITED TO, DAMAGE CAUSED BY GAS, ELECTRICITY, POWER OUTAGE, SNOW, FROST, STEAM, SEWAGE, SEWER GAS OR ODORS, FIRE, WATER OR THE BURSTING OR LEAKING OF PIPES, FAUCETS, SPRINKLERS AND PLUMBING FIXTURES (COLLECTIVELY, "LIABILITY"), UNLESS SUCH LIABILITY AROSE AS THE DIRECT AND PROXIMATE RESULT OF THE INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF ACE

**b.** Limitation

In no event will Ace be liable to Customer, any employee, agent or contractor of Customer, or any third party for any claims arising out of or related to this Agreement, including in relation to the Colocation Space, the equipment, the services, including without limitation the services set forth in the service order form and schedule(s), Customer's business or otherwise, which claims involve indirect, incidental, punitive, or consequential damages, even if advised of the possibility of such damages, whether under theory of contract, tort (including negligence), strict liability or otherwise. Notwithstanding anything to the contrary in this Agreement, Ace's maximum aggregate liability to customer related to or arising under this Agreement will be limited to the total amount paid by customer to Ace pursuant to this agreement for the three (3) month period preceding the claim.

## 8. Casualty or Eminent Domain

In the event of any taking by eminent domain or damage by fire or other casualty to the Premises and/or the Colocation Space ("Event"), Customer shall be bound by any action taken by Ace and the owner of the Premises in relation to the Event. Customer shall have no claim against Ace in relation to an Event, including but not limited to a claim for relocation expenses, the value of any unexpired term, or loss of business from full or partial interruption or interference due to the operation of this provision. Without limiting the foregoing, Customer acknowledges that Ace shall have the right to terminate this Agreement on the happening of an Event, without any liability to Customer.

## 9. Confidentiality

Each party acknowledges that, in the course of the performance of this Agreement, it may have access to information and communications, including proprietary information claimed to be unique, secret, confidential, and which constitutes the exclusive property and trade secrets of the other party ("Confidential Information"). Except as provided in Ace's Acceptable Use Policy, each party agrees to maintain the confidentiality of the Confidential Information, to use the Confidential Information only to the extent necessary for legitimate business uses in connection with this Agreement. Upon request of either party or on termination or expiration of this Agreement, each party shall return the Confidential Information of the other party then in its possession. Nothing in this Agreement shall prohibit or limit either party's use of information which (a) is now, or hereafter becomes, publicly known or available through lawful means; (b) is rightfully in Receiving Party's possession, as evidenced by Receiving Party's records; (c) is disclosed to the Receiving Party without confidential or proprietary restriction by a third party who rightfully possesses and rightfully discloses the information; (d) is independently developed by the Receiving Party without any breach of this Agreement; or (e) is the subject of a written permission to disclose provided by the Disclosing Party. Customer further agrees and acknowledges that Ace may disclose Customer account information in accordance with Ace's Acceptable Use Policy and Privacy Policy, located at http://www.Ace.com, as amended from time to time by Ace effective upon posting of the revised policy at the URL.

## 10. General Provisions

**a.** Force Majeure

Subject to the next following sentence, neither party shall be deemed in default of this Agreement to the extent that performance of its obligations (other than an obligation to pay for services rendered by the other party) or attempts to cure

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

**COLOCATION SERVICES AGREEMENT**

any breach are delayed or prevented by reason of any act of God, fire, natural disaster, act of government, strikes, unavailability of material, facilities, telecommunications services or supplies or any other cause beyond the reasonable control of such party ("Force Majeure"). In the event of such a Force Majeure, the party shall give the other party prompt written notice within ten (10) days of the Force Majeure. In addition, the time for performance or cure shall be extended for a period equal to the duration of the Force Majeure but not in excess of three (3) months.

### b. Notices

All notices hereunder shall be delivered personally, made by certified or registered mail, return receipt requested, or sent by telecopy or facsimile transmission, answer back requested, and shall be sent to the parties at the following addresses (or at such other address for a party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof).

- Notices to Ace:

  7505 John Carpenter Fwy, Dallas, Texas 75247

- Notices to Customer will be sent to the address on the Service Order Form.

Such notice will be effective, (i) if sent by telecopy or facsimile on the date of transmission unless transmitted after normal business hours, in which case on the following date; (ii) if mailed, three (3) days after the date of posting; or (iii) as of the date delivered, if personally delivered.

With respect to any consents or approvals required of Ace under this Agreement, such consent or approval may only be provided by either Liana Dunlap or Mark Wulff. No other person, employee, agent or contractor shall be authorized to grant consent or approval for any matter set forth herein that requires the express approval of Ace, notwithstanding that Ace may have delivered any consent or approval through another party and thereafter relied on the consent or approval given.

### c. Severability

No determination by a court of competent jurisdiction that any term or provision of this Agreement is invalid or otherwise unenforceable shall operate to invalidate or render unenforceable any other term or provision of this Agreement and all remaining provisions shall be enforced in accordance with their terms.

### d. Governing Law

This Agreement will be governed by and construed under, and the legal relations between the parties hereto will be determined in accordance with, the laws of the State of Texas, without giving effect to such state's conflict of law principles.

### e. Customer Data

Customer is responsible for its content residing on Ace servers, and except as otherwise agreed with Ace, for the backup thereof.

### f. IP Address Ownership

Ace shall maintain and control ownership of all IP numbers and addresses that may be assigned to Customer by us and reserves, in its sole discretion, the right to change or remove any and all such IP numbers and addresses.

### g. No Photographs

Customer may not photograph, or electronically or otherwise reproduce any part of the interior of the Premises, without Ace's prior written permission.

### h. Entire Agreement; Amendments; Headings

This Agreement, including the Service Order Form and Schedule(s) hereto, constitutes the entire agreement between the Parties pertaining to the subject matter hereof, i.e., colocation services, and supersedes all prior or contemporaneous, written or oral negotiations, agreements, negotiations, correspondence and understandings between the parties respecting the subject matter of this Agreement, save and except the Agreement for Colocation and Purchase, and the Purchase Agreement, between the parties. This Agreement may be modified only by an instrument in writing duly executed by both parties. The Section headings in this Agreement are inserted for convenience of reference only and shall not be used in interpreting this Agreement.

*Customer Initial:*_____

# ACE
## COLOCATION, INC.

### COLOCATION SERVICES AGREEMENT

i. Colocation Access Cards and Keys

Access Cards: Access cards will be billed $25.00 each. Replacement access cards will be billed at $25.00 each.

Keys: There is a $100.00 deposit per key.  Replacement keys will be billed at $100.00 per replacement key.  Upon cancellation of this Agreement customer will return all access cards and keys.  Each access card not returned will incur a $25.00 fee and each key not returned will incur a $100.00 charge per key.

**CONTRACT AND AGREEMENT ACCEPTANCE:**

Notwithstanding anything herein to the contrary, this Agreement merely constitutes an offer by Ace to provide the Colocation and other services set forth herein until such time that this Agreement is approved by the authorized officers of Ace and fully executed by its authorized signatory below.  By signing below, the individual identified represents to Ace that all of the information provided is true and correct and that he/she is authorized to agree to this Service Order Form and these terms on behalf of Customer.

Customer acknowledges and agrees that Ace has provided adequate and sufficient consideration for this Agreement, including but not limited to certain agreements and undertakings between Ace and the owner of the Premises for the benefit of Customer, and Customer waives and releases any right to claim that this Agreement is not supported by adequate consideration as of the Effective Date so as to make this Agreement binding on the parties as of such date.  Customer also warrants and represents that the provision of colocation services by Customer, and obtaining the space and services required therefor, as set forth herein, constitute the normal part of Customer's business and that this Agreement is therefore within the normal course and scope of Customer's business.

*[Signatures appear on the following pages]*

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

**COLOCATION SERVICES AGREEMENT**

**Accepted by Customer:**

Company: _____

Name: _____

Title: _____

Date: _____

Authorized Signature: _____

**Accepted by Ace:**

Company: *ACE COLOCATION, INC.*

Name: *Liana Dunlap*

Title: *President*

Date: *1/27/14*

Authorized Signature: *Liana Dunlap*

*Customer Initial:_____*

# ACE
## COLOCATION, INC.

**COLOCATION SERVICES AGREEMENT**

---

**_Accepted by Customer:_**

Company: _FonTaines USA Corp._

Name: _Prieur J. Leary III_

Title: _President_

Date: _04-Jan-14_

Authorized Signature: _(signature)_

**_Accepted by Ace:_**

Company: _____

Name: _____

Title: _____

Date: _____

Authorized Signature: _____

**Customer Initial:** _____

# ACE COLOCATION, INC.
## 7575 W. WASHINGTON AVENUE, SUITE 127-270
## LAS VEGAS, NV 89128

January 24, 2014

*EMAIL: prieur3@infolinkco.com*

Mr. Prieur J. Leary, III
3701 NW 82nd St.
Doral, FL 33166

RE:     Retention of Consulting Services of Prieur J. Leary, III

Dear Mr. Leary:

This letter sets forth the arrangement previously discussed between you and Ace with respect to Ace's retention of your services. This letter is executed in conjunction with (i) that certain Agreement for Colocation and Purchase (the "*Agreement*"), dated effective January 24, 2014, by and among Ace, on the one hand, and FortaTrust USA Corporation, a Delaware corporation, InfoLink Panama Corp., S.A., a Panamanian corporation, and the respective shareholders thereof (collectively, "*FortaTrust*"), (ii) that certain Colocation Agreement of even date with the Agreement between FortaTrust, as customer, and Ace, as provider (the "*Colocation Agreement*"), (iii) that certain Purchase Agreement of even date with the Agreement between FortaTrust, as seller, and Ace, as purchaser (the "*Purchase Agreement*"), and (iv) your relocation of the FortaTrust businesses to the facility in Dallas, Texas designated by Ace, and from which Ace will provide or cause to be provided certain colocation and other business services. In connection with the transactions reflected in the above documents, the parties thereto are to deliver certain other certificates, bills of sale and other documents and instruments (the "*Related Instruments*") (the Agreement, Colocation Agreement, Purchase Agreement, and Related Instruments being sometimes referred to collectively herein as the "*Transaction Documents*").

1.      Retention of Services. Subject to the terms and conditions set forth herein, Ace agrees that beginning on the Commencement Date (defined below), it will retain your services as a consultant to advise Ace with respect to, among other things, customer generation, customer retention and customer service in the online server niche. The consulting services you are to provide will be those specified from time to time by Ace (the "*Services*").

2.      Performance of Services. You will be solely responsible for supplying, purchasing and maintaining your desktop, laptop, smartphone (and related data plans) and other computer equipment required to communicate with Ace for the performance of your Services, together with such other materials and supplies as may be needed, unless otherwise mutually agreed in writing by the parties. You will also be solely responsible for controlling the details, manner, time and location of the Services, but will use your best efforts to accommodate Ace's requested conferences days and times. The parties contemplate that the bulk of the Services requested by Ace and to be provided by you may be rendered from your residence in Florida or elsewhere, and do not have to be performed in Dallas, Texas. However, Ace may from time to time require your presence in person in Dallas, Texas, but no more often than one trip per calendar month without your approval. All such trips will be planned on as much advance notice as possible, and Ace will reimburse you for the reasonable cost of your travel and lodging on trips requested by Ace, which shall be agreed in advance of travel.

3.      Independent Contactor Status. For all purposes, including but not limited to any laws concerning Social Security, disability insurance, unemployment compensation, workers' compensation,

income-tax withholding and all other federal, state and local laws, rules and regulations relating to employees, you and your employees, agents, contactors, affiliates or representatives (collectively, "*Affiliates*") shall be treated as a self-employed independent contractor of Ace, and not as an employee or agent. Neither you nor your Affiliates, if any, will be covered by Ace's workers' compensation or liability insurance or are eligible for employee benefits provided by Ace to its employees. You further waive the right to participate in any such benefit programs. The only compensation, benefits and consideration that you will be entitled to receive from Ace during this Agreement are those items specifically set forth herein. You acknowledge that you are solely responsible for the payment of your own income, self-employment, Social Security and other applicable taxes and insurance premiums. Furthermore, you shall have no authority to bind Ace to any contract or agreement or otherwise to incur any obligations or liabilities or make any representations, warranties or guarantees on behalf of Ace.

4.    <u>Commencement Date</u>.   The commencement date of your Services will be the day following the closing date of the Purchase Agreement (the "*Commencement Date*"). In the event there is a partial closing or series of closings (whether or not provided under the Purchase Agreement), the Commencement Date will be the day after the conclusion and consummation of all such partial closing or series of closings. The Commencement Date will be memorialized in a letter from Ace to you at the time of such final closing.

5.    <u>Term</u>.   The term of your Services will be for a period of twelve (12) months beginning on the Commencement Date and ending twelve (12) months thereafter, subject to earlier termination as provided in this Letter (the "*Term*").

6.    <u>Compensation Rate</u>.   Subject to the thresholds described below and the absence of any default by you under the Transaction Documents, Ace will pay you at the rate of $12,000.00 per month. Payments will be made monthly in arrears on the fifth (5) business day of the month. Notwithstanding the foregoing, if in any month the amount of Collected Revenue (as defined below), falls: (i) below the amount of $42,000 (a "*Threshold I Failure*"), the amount to be paid to you at the beginning of the following month will be reduced to $6,000.00; or (ii) below the amount of $25,000 (a "*Threshold II Failure*"), the amount to be paid to you at the beginning of the following month will be reduced to $-0-. As used herein, the term "*Collected Revenue*" means the amount of all post-Closing revenue collected by Ace in the prior month from the FortaTrust Customers (as defined below) less all chargebacks and refunds paid by Ace. As used herein, the term "*FortaTrust Customers*" means current customers and customer relationships as itemized or otherwise identified on the books and records of FortaTrust as of the Effective Date of this Letter.

7.    <u>Agreement Regarding Intellectual Property</u>.   You acknowledge and agree that all intellectual property rights developed or created by you or your Affiliates on behalf of Ace as a result of the relationship created by this Letter shall be deemed to be "works made for hire" as contemplated by the U.S. Copyright Act (17 U.S.C. § 101), and solely and entirely owned by Ace, and, if for any reason they are deemed not to be "works made for hire," you and your Affiliates further agree to the following use covenants ("*Use Covenants*") (i) to assign, and hereby assign to Ace, any and all rights related thereto or arising therefrom, including but not limited to copyrights, he/she may obtain to such intellectual property; and (ii) to the extent that you and your Affiliates cannot assign the rights contemplated in clause (i), you and your Affiliates hereby grant to Ace a fully-paid, royalty free, worldwide, perpetual, exclusive license to use and otherwise exploit such rights. You and your Affiliates agrees to execute such further documents, which may, from time to time, be requested by Ace to evidence or register its rights to such intellectual property.

8.    <u>Agreement Regarding Inventions</u>.   You and your Affiliates further agree that all inventions, discoveries, concepts or ideas, and expressions thereof, whether or not subject to patent,

*Mr. Prieur J. Leary, III*
*January 24, 2014*
*Page 3*

copyright, trademark or service mark protection, and whether or not reduced to practice, which are made or conceived in whole or in part by you or your Affiliates in the course of or as a result of the Services, together with all copyrights and other intellectual property rights therein (collectively, "***Inventions***"), are and shall be the sole and exclusive property of Ace and to the extent they are eligible for any intellectual property protection, shall be deemed works made for hire, or if any Invention for any reason is not deemed to belong to Ace, you and your Affiliates hereby agrees to the same Use Covenants as set forth above.

9.   <u>Agreement Regarding Confidential Information</u>.  In the performance of your Services, you and your Affiliates will be exposed to the confidential or proprietary information of Ace ("***Confidential Information***").  You and your Affiliates may be advised from time to time that certain information is deemed Confidential Information or you and your Affiliates should be aware without being so advised, by virtue of your experience in the industry, that certain information is Confidential Information (in that its disclosure would harm Ace's competitive advantage or other legitimate business interests).  You and your Affiliates shall not disclose Confidential Information to anyone not employed by Ace except as authorized by Ace.  At any time and upon demand by Ace, and within two (2) days after the termination of your engagement with Ace, regardless of the reason for such termination, you and your Affiliates shall return all property of Ace to Ace in good condition.  Such property includes but is not limited to any Confidential Information in the possession or under control of you or your Affiliates.

10.   <u>Non-Compete; Non-Solicitation</u>.  You agree that for a period of two (2) years after the end of the Term, neither you nor any of your Affiliates will: (i) solicit Customers to compete with Ace selling products and services, nor will you contact any customers for any reason without the prior written consent of Ace; and (ii) solicit, encourage, facilitate or induce, or communicate with, any party who had an agreement or arrangement with Ace during the Term, to breach such agreement or arrangement, or alter, discontinue or curtail his, her, or its business relationships with, Ace.  As used in this Letter, the term "Customer" means and includes any person, firm, entity or association to which any sale was made, or with which Ace or you has had any contact as evidenced by a written documents sent or received, during the two (2) year period prior to the end of the Term.

11.   <u>Conditions</u>.  The agreement of Ace to retain your Services, and the occurrence of the Commencement Date, are in all events subject to: (i) the execution and delivery, and full and complete performance of FortaTrust under the Transaction Documents; (ii) the absence of any breach or default by you or any FortaTrust party of any of the Transaction Documents; and (iii) the absence of any claim or demand made against Ace (or any of its affiliates) due to, or arising from, the fact that Ace entered into the Transaction Documents with the FortaTrust parties.

12.   <u>Entire Agreement; Amendment</u>.  This Letter constitutes the entire understanding and agreement between the parties concerning the retention of the Services of Prieur J. Leary, III, and supersedes all prior agreements, statements, and understandings, both written and oral, between the parties with respect to such subject matter.  This Agreement shall not be modified or amended in any respect except by a written document signed by both parties.

13.   <u>Severability</u>.  If any provision of this Letter is held to be illegal, invalid, or unenforceable, then (a) this Letter shall be considered divisible, (b) such provision shall be deemed inoperative to the extent deemed illegal, invalid, or unenforceable, and (c) in all other respects this Letter shall remain in full force and effect; provided, however, that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

*Mr. Prieur J. Leary, III*
*January 24, 2014*
*Page 4*

      14.   <u>Dispute Resolution</u>.  If, upon the occurrence of a dispute or other disagreement between Ace and you regarding the type, quality, timing or performance of any of the Services, or of the request for Services made or not made by Ace, or any other issued under this Letter, and such dispute cannot be satisfactorily resolved by the parties, Ace shall have the sole and absolute discretion to terminate this Letter and your Services upon the full payment to you of the Termination Fee.  As used herein, the "*Termination Fee*" shall be an amount calculated at the rate of $12,000.00 per month for the number of months otherwise remaining in the Term (with prorations for any partial months in such period).  Upon tender of the Termination Fee to you, you shall have no further rights under this Letter and hereby agree to waive and release any and all rights and remedies against Ace.  The Termination Fee is a liquidated damages remedy available to Ace to fully and finally resolve any and all claims you may have under this Letter or under the Transaction Documents.

      15.   <u>Notices</u>.  For the purposes of this Letter, notices and all other communications provided for herein shall be in writing and shall be delivered by hand delivery, facsimile with overnight confirmation or certified mail, return receipt requested, postage prepaid, to the respective of such party.

      16.   <u>Governing Law; Venue</u>.  This Letter shall be governed by the laws of the State of Texas.  Exclusive venue for purposes of any dispute, controversy, claim, or cause of action between the parties arising out of or related to this Letter is in any state or federal court of competent jurisdiction presiding over Dallas County, Texas.  Nothing in this Letter, however, precludes Ace from seeking to remove a civil action from any state court to federal court.

      17.   <u>Counterparts</u>.  This Letter may be executed in one or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one in the same instrument.  The Letter may be executed and delivered electronically.

      18.   <u>No Public Announcement</u>.  You agree that you will not make or cause to be made any public announcement of this Letter or of the Transaction.

      If the foregoing reflects our agreement and understanding with respect to Ace's retention of you for the Services, please execute and return a signed copy of this Letter to me.  We look forward to receiving your prompt response.

                      Very truly yours,

                      Ace Technologies, Inc. a Nevada
                      corporation and/or its assigns

                      Authorized Representative

**Agreed and Accepted:**

_____
Prieur J. Leary, III          Date

*Mr. Prieur J. Leary, III*
*January ___, 2014*
*Page 4*

14.    Dispute Resolution.  If, upon the occurrence of a dispute or other disagreement between Ace and you regarding the type, quality, timing or performance of any of the Services, or of the request for Services made or not made by Ace, or any other issued under this Letter, and such dispute cannot be satisfactorily resolved by the parties, Ace shall have the sole and absolute discretion to terminate this Letter and your Services upon the full payment to you of the Termination Fee.  As used herein, the "*Termination Fee*" shall be an amount calculated at the rate of $12,000.00 per month for the number of months otherwise remaining in the Term (with prorations for any partial months in such period).  Upon tender of the Termination Fee to you, you shall have no further rights under this Letter and hereby agree to waive and release any and all rights and remedies against Ace.  The Termination Fee is a liquidated damages remedy available to Ace to fully and finally resolve any and all claims you may have under this Letter or under the Transaction Documents.

15.    Notices.  For the purposes of this Letter, notices and all other communications provided for herein shall be in writing and shall be delivered by hand delivery, facsimile with overnight confirmation or certified mail, return receipt requested, postage prepaid, to the respective of such party.

16.    Governing Law; Venue.  This Letter shall be governed by the laws of the State of Texas.  Exclusive venue for purposes of any dispute, controversy, claim, or cause of action between the parties arising out of or related to this Letter is in any state or federal court of competent jurisdiction presiding over Dallas County, Texas.  Nothing in this Letter, however, precludes Ace from seeking to remove a civil action from any state court to federal court.

17.    Counterparts.  This Letter may be executed in one or more counterparts each of which shall be deemed an original and all of which when taken together shall constitute one in the same instrument.  The Letter may be executed and delivered electronically.

18.    No Public Announcement.  You agree that you will not make or cause to be made any public announcement of this Letter or of the Transaction.

If the foregoing reflects our agreement and understanding with respect to Ace's retention of you for the Services, please execute and return a signed copy of this Letter to me.  We look forward to receiving your prompt response.

Very truly yours,

Ace Technologies, Inc. a Nevada
corporation and/or its assigns

_____
Authorized Representative

Agreed and Accepted:

_____        24-Jan-14
Prieur J. Leary, III                Date

# EXHIBIT "C"

Filing # 12682403 Electronically Filed 04/18/2014 02:33:19 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,        CIRCUIT/CIVIL DIVISION
a Panama corporation, FORTATRUST
USA CORPORATION, a Delaware              CASE NO.: 14-10104 CA 04
corporation,

       Plaintiffs,

v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

       Defendants.
_____/

### PLAINTIFFS FIRST REQUEST
### FOR ADMISSIONS TO DEFENDANT LIANA DUNLAP

INFOLINK PANAMA, CORP., and FORTATRUST USA CORPORATION ("Plaintiffs"), by

and through undersigned and  pursuant to Rule 1.370 of the Florida Rules of Civil Procedure, hereby

request Defendant LIANA DUNLAP, to be admitted or denied in writing within thirty (30) days:

1. Defendants engaged Cheval Capital ("Cheval") to seek out potential acquisitions.

2. Cheval introduced Defendants to Plaintiffs and/or representative(s) of Plaintiffs.

3. Defendants had communications with Plaintiffs and/or Plaintiffs' representative, Prieur
   Leary ("Leary") regarding consummating a transaction (the "Transaction") with
   Plaintiffs.

4. Defendant Corespace Inc. executed a confidentiality/Non-Disclosure agreement with
   Plaintiffs.

5. The discussions between Defendant and Plaintiffs and/or Plaintiffs' representative(s)
   resulted in a Letter of Intent ("LOI") that was executed by Voyage Technologies and
   Mark Wulff executed this LOI as an authorized representative of Voyage Technologies.

6. Voyage Technologies is not a company with daily business activity.

7. Voyage Technologies was used as an entity for the sole purpose of shielding
   Defendants from liability.

8. You represented to Plaintiffs and/or Plaintiffs representative(s) that Voyage
   Technologies was used just for "legal reasons".

9. After the LOI was executed, Defendants performed due-diligence with regards to the
   transaction contemplated in the LOI.

10. Defendants requested and were provided with materials from Plaintiffs and/or Plaintiffs' representative(s) with respect to the due diligence.

11. Leary, as representative of Plaintiffs, visited Defendants at the CoreSpace Inc. facility in Dallas to conduct meetings in connection with the due diligence process and you and Mark Wulff participated in the meetings with Leary.

12. After the due diligence was concluded, Defendants sent Plaintiffs and/or Plaintiffs' representative(s) documents (the "Final Documents") for the purpose of consummating the Transaction and one of the parties to the the Final Documents was "ACE Colocation".

13. ACE Colocation is not an entity that maintains daily business operations and was created for the primary purpose of shielding Defendants from liability.

14. The Final Documents were executed by Liana Dunlap, as a representative of ACE Colocation, and were counter-executed by Plaintiffs and/or Plaintiffs' representative(s).

15. After the Final Documents were executed, Plaintiffs and/or Plaintiffs' representative(s) caused to be delivered equipment consisting of more than two hundred computer servers and networking equipment (the "Equipment") from Miami, Florida, to the Corespace Inc. facility in Dallas.

16. Subsequent to executed the Final Documents, Leary, as a representative of Plaintiffs, visited the Corespace Inc. facility in Dallas, Texas, and conducted meetings with you and Mark Wulff.

17. You and/or Defendants' representative(s) were aware that the Equipment was shipped by the Plaintiffs prior to you and/or the Defendants' taking possession of the Equipment.

18. Defendants have not paid Plaintiffs for the servers that were delivered to the Corespace Inc. facility in Dallas, Texas.

19. Defendants represented to Plaintiffs and/or Plaintiffs' representative(s) that Plaintiffs would receive payment upon delivery of the Equipment to Dallas, Texas.

20. Defendants represented to Plaintiffs and/or Plaintiffs' representative(s) that the Transaction there was a $50,000 budget to offset the costs of Plaintiffs' migrating operating servers from Miami, Florida to Dallas, Texas.

21. Defendants requested various scenarios for migrating plaintiff's operating servers from its two data centers, in South Florida and Panama to the Corespace Inc. facility in Dallas.

22. Plaintiffs and or Plaintiffs' representative(s) furnished Defendants with price quotes, proposals, and analysis in connection with the migration of the operating servers from Miami, Florida to Dallas, Texas.

Xander Law Group, P.A.
One NE 2nd Avenue, Suite 200, Miami, FL 33131 * Tel. (305) 767-2001

23. Defendants never approved any of the proposals Plaintiffs and/or Plaintiffs' representative(s) provide to Defendants to migrate all of the Plaintiff's operating servers.

24. Defendants never approved any expenditures in relation to migrating Plaintiff's operating servers.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was sent by U.S. mail on this 18th day of April, 2014 to Corespace Inc., 7505 John W. Carpenter Fwy., Dallas, TX 75247, Mark Wulff, 4224 LOMO ALTO CT. DALLAS, TEXAS 75219, and Liana Dunlap, 4224 LOMO ALTO CT DALLAS, TEXAS 75219-1537.

Respectfully submitted,

XANDER LAW GROUP, P.A.

The White Building
One N.E. 2nd Avenue
Suite 200
Miami, Florida 33132
Tel: (305) 767-2001
Fax: (855) 926-3370
jason@xanderlaw.com

By: _s/Jason H. Weber_____
    Jason H. Weber, Esq.
    Fla. Bar No. 86832

# EXHIBIT "D"

Filing # 12682403 Electronically Filed 04/18/2014 02:33:19 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,       CIRCUIT/CIVIL DIVISION
a Panama corporation, FORTATRUST
USA CORPORATION, a Delaware       CASE NO.:  14-10104 CA 04
corporation,

       Plaintiffs,

v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

       Defendants.

_____/

**PLAINTIFFS FIRST REQUEST
FOR ADMISSIONS TO DEFENDANT MARK WULFF**

INFOLINK PANAMA, CORP., and FORTATRUST USA CORPORATION ("Plaintiffs"), by

and through undersigned and  pursuant to Rule 1.370 of the Florida Rules of Civil Procedure, hereby

request Defendant MARK WULFF, to be admitted or denied in writing within thirty (30) days:

1. Defendants engaged Cheval Capital ("Cheval") to seek out potential acquisitions.

2. Cheval introduced Defendants to Plaintiffs and/or representative(s) of Plaintiffs.

3. Defendants had communications with Plaintiffs and/or Plaintiffs' representative, Prieur
   Leary ("Leary") regarding consummating a transaction (the "Transaction") with
   Plaintiffs.

4. Defendant Corespace Inc. executed a confidentiality/Non-Disclosure agreement with
   Plaintiffs.

5. The discussions between Defendant and Plaintiffs and/or Plaintiffs' representative(s)
   resulted in a Letter of Intent ("LOI") that was executed by Voyage Technologies and
   Mark Wulff executed this LOI as an authorized representative of Voyage Technologies.

6. Voyage Technologies is not a company with daily business activity.

7. Voyage Technologies was used as an entity for the sole purpose of shielding
   Defendants from liability.

8. You represented to Plaintiffs and/or Plaintiffs representative(s) that Voyage
   Technologies was used just for "legal reasons".

9. After the LOI was executed, Defendants performed due-diligence with regards to the
   transaction contemplated in the LOI.

10. Defendants requested and were provided with materials from Plaintiffs and/or Plaintiffs' representative(s) with respect to the due diligence.

11. Leary, as representative of Plaintiffs, visited Defendants at the CoreSpace Inc. facility in Dallas to conduct meetings in connection with the due diligence process and you and Liana Dunlap participated in the meetings with Leary.

12. After the due diligence was concluded, Defendants sent Plaintiffs and/or Plaintiffs' representative(s) documents (the "Final Documents") for the purpose of consummating the Transaction and one of the parties to the the Final Documents was "ACE Colocation".

13. ACE Colocation is not an entity that maintains daily business operations and was created for the primary purpose of shielding Defendants from liability.

14. The Final Documents were executed by Liana Dunlap, as a representative of ACE Colocation, and were counter-executed by Plaintiffs and/or Plaintiffs' representative(s).

15. After the Final Documents were executed, Plaintiffs and/or Plaintiffs' representative(s) caused to be delivered equipment consisting of more than two hundred computer servers and networking equipment (the "Equipment") from Miami, Florida, to the Corespace Inc. facility in Dallas.

16. Subsequent to executed the Final Documents, Leary, as a representative of Plaintiffs, visited the Corespace Inc. facility in Dallas, Texas, and conducted meetings with you and Liana Dunlap.

17. You and/or Defendants' representative(s) were aware that the Equipment was shipped by the Plaintiffs prior to you and/or the Defendants' taking possession of the Equipment.

18. Defendants have not paid Plaintiffs for the servers that were delivered to the Corespace Inc. facility in Dallas, Texas.

19. Defendants represented to Plaintiffs and/or Plaintiffs' representative(s) that Plaintiffs would receive payment upon delivery of the Equipment to Dallas, Texas.

20. Defendants represented to Plaintiffs and/or Plaintiffs' representative(s) that the Transaction there was a $50,000 budget to offset the costs of Plaintiffs' migrating operating servers from Miami, Florida to Dallas, Texas.

21. Defendants requested various scenarios for migrating plaintiff's operating servers from its two data centers, in South Florida and Panama to the Corespace Inc. facility in Dallas.

22. Plaintiffs and or Plaintiffs' representative(s) furnished Defendants with price quotes, proposals, and analysis in connection with the migration of the operating servers from Miami, Florida to Dallas, Texas.

23. Defendants never approved any of the proposals Plaintiffs and/or Plaintiffs' representative(s) provide to Defendants to migrate all of the Plaintiff's operating servers.

24. Defendants never approved any expenditures in relation to migrating Plaintiff's operating servers.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was sent by U.S. mail on this 18th day of April, 2014 to Corespace Inc., 7505 John W. Carpenter Fwy., Dallas, TX 75247, Mark Wulff, 4224 LOMO ALTO CT. DALLAS, TEXAS 75219, and Liana Dunlap, 4224 LOMO ALTO CT DALLAS, TEXAS 75219-1537.

Respectfully submitted,

XANDER LAW GROUP, P.A.

The White Building
One N.E. 2nd Avenue
Suite 200
Miami, Florida 33132
Tel: (305) 767-2001
Fax: (855) 926-3370
jason@xanderlaw.com

By: s/Jason H. Weber
    Jason H. Weber, Esq.
    Fla. Bar No. 86832

EXHIBIT "E"

Filing # 14190498 Electronically Filed 05/29/2014 12:06:20 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,            CIRCUIT/CIVIL DIVISION
a Panama corporation and FORTATRUST
USA CORPORATION, a Delaware             CASE NO.: 14-10104 CA 04
corporation,

        Plaintiffs,

v.

CORESPACE, INC., a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

        Defendants.
_____/

## NOTICE OF FILING

        Plaintiffs, INFOLINK PANAMA CORPORATION, a Panama corporation and

FORTATRUST USA CORPORATION, a Delaware corporation, hereby give notice of filing the

attached Verified Return of Service of Summons and Summons served on Defendant,

CORESPACE, INC., a Texas corporation, on May 7, 2014.

## CERTIFICATE OF SERVICE

        **I HEREBY CERTIFY** that on this 29th day of May, 2014, the foregoing was mailed to

Corespace, Inc., 7505 John W. Carpenter Fwy, Dallas, TX  75247.

                                        XANDER LAW GROUP, P.A.
                                        *THE WHITE BUILDING*
                                        One N.E. 2nd Avenue
                                        Suite 200
                                        Miami, Florida 33132
                                        Tel/Fax (305) 767-2001
                                        wayne@xanderlaw.com

                                        By: s/Wayne R. Atkins
                                            WAYNE R. ATKINS
                                            Fla. Bar No.: 84000

                        Xander Law Group, P.A.
        One NE 2nd Avenue, Suite 200, Miami, FL 33132 * (305) 767-2001 (tel)

## VERIFIED RETURN OF SERVICE

State of Florida                    County of Dade                    Circuit Court

Case Number: 14-10104 CA 04

Plaintiff:
INFOLINK PANAMA CORPORATION, ET AL

vs.

Defendant:
CORESPACE, INC., ET AL.

THE ORIGINAL
FILED ON:

MAY 2 9 2014

For:
Jason H Weber, Esq.
XANDER LAW GROUP, P.A.
300 South Biscayne Blvd
#1802
Miami, FL  33131

IN THE OFFICE OF
CIRCUIT COURT DADE CO., FL

Received by LEGAL PROCESS SERVICE & INVESTIGATIONS, LLC on the 25th day of April, 2014 at 8:58 am
to be served on CORESPACE, INC, 7505 JOHN W CARPENTER FWY, DALLAS, TX 75147.

I, Carlos Barrera, do hereby affirm that on the 7th day of May, 2014 at 10:00 am, I:

EFFECTED CORPORATE SERVICE by delivering a true copy of the SUMMONS AND COMPLAINT WITH
EXHIBITS with the date and hour of service endorsed thereon by me to MARK SCHAFFER as I.T. DIRECTOR
and who stated they are an EMPLOYEE OF THE REGISTERED AGENT OR CORPORATION at the address of
7505 JOHN W CARPENTER FWY, DALLAS, TX 75147 and who further stated that the Registered Agent was
not present, therefore, was served in compliance with F.S. 48.081 (3a).

I do hereby certify that I am over the age of 18, have no interest in the above action, and am a Certified Process
Server, in good standing, in the judicial circuit in which the process was served. Under penalty of perjury I
declare that the facts contained herein are true and correct. NO NOTARY REQUIRED PURSUANT TO F.S.
92.525(S)

_Carlos_
_____
**Carlos Barrera**
Process Server

LEGAL PROCESS SERVICE & INVESTIGATIONS,
LLC
8770 SW 72nd Street
#402
Miami, FL 33173
(305) 412-1178
Our Job Serial Number: LIM-2014000854

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5r

EXHIBIT "F"

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,      CIRCUIT/CIVIL DIVISION
a Panama corporation and FORTATRUST
USA CORPORATION, a Delaware         CASE NO.:  14-10104 CA 04
corporation,

      Plaintiffs,

v.

CORESPACE, INC., a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

      Defendants.
_____/

## MOTION FOR DEFAULT AGAINST CORESPACE, INC.

Plaintiffs, INFOLINK PANAMA CORPORATION, a Panama corporation and
FORTATRUST USA CORPORATION, a Delaware corporation, pursuant to Rule 1.500 of the
Florida Rules of Civil Procedure, hereby move for a Court default to be entered against
Defendant CORESPACE, INC.  In support, Plaintiff states:

1.     Defendant, CORESPACE, INC., was served on May 7, 2014 with a Summons
and Complaint with Exhibits in this matter.

2.     To date, Defendant CORESPACE, INC. has not filed or served any paper as
required by law

3.     Therefore, a Court default is appropriate under Rule 1.500(b), which states that,
"[w]hen a party against whom affirmative relief is sought has failed to plead or otherwise defend
as provided by these rules or any applicable statute or any order of court, the court may enter a
default against such party; provided that if such party has filed or served any paper in the action,
that party shall be served with notice of the application for default."

4.    A Notice of Filing of the original Verified Return of Service with issued Civil

Action Summons was filed via the court's e-filing portal today under separate cover.

**WHEREFORE,** Plaintiffs respectfully requests that this honorable Court enter a default

against Defendant CORESPACE, INC. for failure to respond to the Complaint in accordance

with the Florida Rules of Civil Procedure.

XANDER LAW GROUP, P.A.

*THE WHITE BUILDING*
One N.E. 2nd Avenue
Suite 200
Miami, Florida 33132
Tel: (305) 767-2001
Fax: (855) 926-3370
wayne@xanderlaw.com


By: _____
        WAYNE R. ATKINS
        Fla. Bar No.: 84000

## DEFAULT

A default is entered in this action against Defendant, CORESPACE, INC., named in the

foregoing motion for failure to serve or file any paper as required by law.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on

05/29/14.


_____
BETH BLOOM
CIRCUIT COURT JUDGE

```
No Further Judicial Action Required on THIS
                    MOTION
    CLERK TO RECLOSE CASE IF POST
```

Infolink Panama Corp., et al. v. Corespace, Inc., et al.
Case No.:  14-10104 CA 04

---

## JUDGMENT

---

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

# EXHIBIT "G"

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INFOLINK PANAMA CORPORATION,                    CIRCUIT/CIVIL DIVISION
a Panama corporation, FORTATRUST
USA CORPORATION, a Delaware                     CASE NO.:  14-10104 CA 04
corporation,

      Plaintiffs,
v.

CORESPACE, INC, a Texas corporation,
MARK WULFF, an individual, and
LIANA DUNLAP, an individual,

      Defendants.
_____/

## NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF SAID COURT:

      Defendant, CoreSpace, Inc., by and through its undersigned counsel, gives notice to this Court that Defendant has filed a Notice of Removal to the Federal District Court for the Southern District of Florida, Miami Division.  A copy of the Notice of Removal, including its exhibits is attached hereto.  Pursuant to 28 U.S.C. 1447(d), the filing of this Notice effects the removal and this Court shall proceed no further unless or until this matter is remanded.

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing was served on Jason H. Weber, Esquire, Xander Law Group, P.A., One N.E. 2nd Avenue, Suite 200, Miami, Florida 33132 jason@xanderlaw.com on June 6, 2014.

[Signature on Following Page]

{1896/000/00233423}

**SHRAIBERG, FERRARA & LANDAU, P.A.**
Attorneys for Defendants
2385 N.W. Executive Center Dr., Suite 300
Boca Raton, Florida 33431
Tel:  (561) 443-0800
Fax:  (561) 998-0047
Primary email: jferrara@sfl-pa.com
Secondary email:  scusack@sfl-pa.com


By: /s/ James T. Ferrara
       James T. Ferrara
       Florida Bar No. 764825